| | | |
|---|---|---|
| LAURIE TARDIFF, on behalf of herself, | ) | |
| And on behalf of others similarly situated, | ) | |
| | ) | |
| Plaintiff(s) | ) | |
| | ) | |
| V | ) | CIVIL ACTION NO. 02-251-P-C |
| | ) | |
| KNOX COUNTY, DANIEL DAVEY in | ) | |
| His individual capacity, JANE DOE, in her | ) | |
| Individual capacity, and JOHN DOE, in | ) | |
| His individual capacity | ) | |
| Defendants | ) | |

## PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT WITH INCORPORATED MEMORANDUM OF LAW

# TABLE OF CONTENTS

Table of Contents ................................................................. -i-

Table of Authorities ............................................................. -ii-

1.  PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT............. 1

    1.  INTRODUCTION AND FACTUAL BACKGROUND ..................... 3

    2.  LEGAL ARGUMENT .......................................................... 8

        1.  Standard for Summary Judgment ..................................... 8

        2.  Standard of Review ..................................................... 9

        3.  The elements of a claim under 42 U.S.C. §1983 ................... 10

        4.  The nature of the constitutional violation .............................. 10

        5.  The requirements of the law on strip searches .........................13

        6.  Strip searches never disclose contraband ...............................18

        7.  Knox County's strip search policy is unconstitutional .............. 19

        8.  Knox County's custom and practice of strip searching all arrestees
            is unconstitutional ........................................................24

        9.  Knox County is liable under §1983 ................................... 25

        10. Defendant, Daniel Davey, is liable to Plaintiffs ..................... 28

3.  CONCLUSION ............................................................................... 30

# TABLE OF AUTHORITIES

## FEDERAL CASES

Bell v. Wolfish, 441 U.S. 520 (1979) ..........................................5,11,20,21,22,23

Cook v. Lisbon School Committee, 682 A.2d 672 (Me. 1996)...............................8

Tisei v. Town of Ogunqui, 491 A. 2d 564 (Me. 1985) ......................................8

Kolmosky v. Kolmosky, 631 A.2d 419 (Me. 1993) ...........................................8

Magno v. Town of Freeport, 486 A.2d 137 (Me. 1985) ......................................8

Merchants Insurance Company v. United States Fid. And Gar. Company
143 F.3d 5 (1st Circuit 1998) ....................................................................8

Anderson v. Liberty Lobby Inc., 477 U.S. 242 (1986) .......................................8

Nereida-Gonzalez v. Tiardo-Delgado, 990 F.2d 701 (1st Circuit 1993) .....................8

United States v. Lanier, 520 U.S. 259 (1997) ...................................................9

Graham v. Connor, 490 U.S. 386 (1989) ...................................................9,10

Floyd v. Farrell, 765 F.2d 1 (1st Circuit 1985) ...................................................9

Harlow v. Fitzgerald, 457 U.S. 800 (1982) ......................................................10

Cruz-Erazo v. Rivera-Montanez, 212 F.3d 617 (1st Circuit 2000) .............................10

Swain v. Spiney, 117 F.3d 1 (1st Circuit 1997) ................. .11,12,13,17,19,20,21,22,26

Mary Beth G. v. City of Chicago, 723 F.2d 1263 (7th Circuit 1983) ......10,11,12,13,21,25

Doe v. Calumet City, Ill., 754 F.Supp. 1211 ...................................................11,12

Weber v. Dell, 804 F.2d 796 (2nd Circuit 1986) ...........................................11,13,25

United States v. Montoya D. Hernadez, 473 U.S. 531 (1985) ...............................12

United States v. Cortez, 449 U.S. 411 (1981) ...................................................12

Doe v. Renfrow, 631 F.2d 91 ......................................................................12

1

Roberts v. Rhode Island, 239 F.3d 107 .........................................13,21,22,24,25

Stewart v. County of Lubbock, 767 F.2d 153 (5th Circuit 1985) ........................13,25

Giles v. Ackerman, 746 F.2d 614 (C.A. Idaho 1984)....................................13,25

Hill v. Bogans, 735 F.2d 391 (10th Circuit 1984) .................................13,25

Logan v. Shealy, 660 F.2d 1007 (4th Circuit 1981) .................................13,25

Kelly v. Foti, 77 F.3d 819 (5th Circuit 1996) ...................................................18

Dufrin v. Spreen, 712 F.2d 1084 (6th Circuit 1983) .........................................18

Mack v. Suffolk County, 191 F.R.D. 16 (D.Mass 2000) ...................................20

Arruda v. Fair, 710 F.2d 886 (1st Circuit 1983) ...........................................21,22

Wood v. Clemons, 89 F.3d 922 (1st Circuit 1996) ..............................................21

Chapman v. Nichols, 989 F.2d 393 (10th Circuit 1993) .....................................24

Smith v. Montgomery County, 547 F.Supp. 592 (D.Md.82)................................24

Masters v. Crouch, 872 F.2d 1248 (6th Circuit 1989) .........................................25

Monnell v. New York City Department of Social Services, 436 U.S. 658 (1978) .......25

City of Canton, Ohio v. Harris, 489 U.S. 378 (1989) .........................................25

Santiago v. Fenton, 891 F.2d 373 (1st Circuit 1989) .....................................25,26

Miller v. Kennebec and Knox Counties, 219 F.3d 8 (1st Circuit 2000) .................26,28

Bordinaro v. McCloud, 871 F.2d 1151 (1st Circuit 1989) ...................................27

Gutierrez-Rodriguez v. Cartagena, 882 F.2d 553 (1st Circuit 1989) .........................28

## FEDERAL RULES & STATUTES

42 U.S.C. §1983 ...............................................................................2,9,10

Fed.R.Civ.P. 56(c)..............................................................................1,8,9

Local Fed.R.Civ.P. 56 (a) and (b) ..................................................................1

## STATE STATUTES AND REGULATIONS

5 M.R.S.A. §200-G...................................................................................14

Maine Department of Attorney General Regulations Sec. 26-239 ..........................14

## OTHER AUTHORITIES

Joun, "Challenging Unlawful Strip Searches", ATLA Civil Rights Section,
Vol. 11, No. 2 (Winter 2005)...................................................................17,18

2005 JUN 15 P 3: 50

DEPUTY CLERK

| | |
|---|---|
| LAURIE TARDIFF, on behalf of herself, ) And on behalf of others similarly situated, ) ) Plaintiff(s) ) ) V ) ) KNOX COUNTY, ) ) And ) ) DANIEL DAVEY, in ) His individual capacity and ) in his official capacity as Knox ) County Sheriff ) ) And ) ) JANE DOE, in her individual ) Capacity, ) ) And ) ) JOHN DOE, in his individual ) Capacity ) Defendant(s) ) ) | CIVIL ACTION NO. 02-251-P-C |

## PLAINTIFF LAURIE TARDIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT WITH INCORPORATED MEMORANDUM OF LAW

Pursuant to Rule 56(c) of the Federal Rules of Civil Procedure and Local Rule 56(a) and

(b) of the Maine Rules of Civil Procedure, Plaintiff Laurie Tardiff moves for Summary Judgment

on the issue of liability against all Defendants.

The grounds for this Motion are:

First, there are no genuine issues as to any material fact.

Second, the Defendants are liable to Plaintiff and the class she represents for willfully violating her and their constitutional rights under 42 U.S.C. §1983 and the Fourth Amendment of the United States and Maine Constitutions pursuant to a custom and practice of Knox County.

Third, the Plaintiff is entitled to judgment as a matter of law for the reasons set forth in the accompanying memorandum in support of Plaintiff's Motion, as well as Plaintiff's Statement of Uncontroverted Facts, and the Exhibits filed in support of this motion.

On November 5, 2003, Senior United States District Judge, Gene Carter, certified a class action challenging the constitutionality of strip searches at the Knox County Jail. The class certified, with Ms. Tardiff serving as representative, includes:

All people who after November 19, 1996, were subjected to a strip search and/or visual body cavity search without evaluation for individualized reasonable suspicion while being held at the Knox County Jail;

1. After having been arrested on charges that did not involve a weapon, drugs, or a violent felony; or

2. While waiting for bail to be set on charges that did not involve a weapon, drugs, or a violent felony; or

3. While waiting for an initial court appearance on charges that did not involve a weapon, drugs, or a violent felony; or

4. After having been arrested on a warrant that did not involve a weapon, drugs, or a violent felony.

Laurie Tardiff, representing herself and a class of similarly situated people, moves for partial summary judgment establishing liability of Defendant Knox County ("County"), Daniel Davey, Knox County Sheriff, in his individual and his official capacity, and Jane Doe and John Doe, both in their individual capacities as Defendants for the period November 19, 1996 to the present.

## 1.    INTRODUCTION AND FACTUAL BACKGROUND

This case arises out of the arrest of Plaintiff, Laurie Tardiff, on February 7, 2001. Plaintiff Tardiff was arrested at her residence, 53 Granite Street, Rockland, Maine, by Rockland Police, Officer Patrick Allen. Statement of Uncontroverted Material Facts, ¶1. (Hereinafter "SMF") According to Officer Allen, Ms. Tardiff was arrested pursuant to an arrest warrant. SMF ¶4. Prior to leaving her home, she was required to empty her pockets in front of Officer Patrick Allen. SMF ¶4. She was taken to the Knox County Jail. SMF¶5.

After arriving at the jail, Ms. Tardiff was booked in the intake area. SMF ¶5. An unidentified officer of the Knox County Department of Corrections told her to remove her overcoat. SMF ¶6. At the time, Ms. Tardiff was only wearing a lingerie type see-through shirt under her overcoat and she had on no brassiere. SMF ¶7. She asked Corrections Officer, Edward Colson, if she could have a men's sweatshirt to put on to cover up her chest. SMF ¶8. This request was denied. SMF ¶9.

Also present at the time were other Officers known to Ms. Tardiff, Officers Kenneth Hooper and Jay Costigan. SMF ¶10. Ms. Tardiff asked them for something to wear to cover up with and both of them refused. SMF ¶¶11 and 12.

After standing there in a partially clad state for several minutes, Ms. Tardiff was taken to a shower stall in the Booking Area. SMF¶¶13 and 14. In front of the shower stall is a wall three to

four feet tall. SMF ¶19. She was ordered by a female correction officer to remove her clothes and submit to a strip search. SMF ¶14. After that, she entered the shower stall and was required to squat and cough violently, exposing her vagina and anal cavity to the corrections officer. SMF¶15. This requirement to squat and cough was repeated three times. SMF¶16. The curtain to the shower stall does not completely close off the stall from visual inspection by other corrections officers in the Booking Room. SMF ¶74 and ¶101.

The strip search of Plaintiff, Laurie Tardiff, conformed to the custom and practice of the Knox County Sheriff's Department SMF¶23, SMF ¶76-79, SMF ¶80-89 SMF ¶90-94 and SMF ¶95-101.

Ms. Tardiff was held for approximately 23 ½ hours without bail. SMF ¶20. The charges against Ms. Tardiff were much later dismissed. SMF ¶22.

The strip search of Plaintiff, Laurie Tardiff, was but one example of thousands of such strip searches which have taken place on an annual basis throughout the period encompassed by this suit. SMF ¶18,67. The estimated number of members of the Plaintiff Class is approximately 4,350 people. SMF ¶75.

The strip search which Plaintiff Tardiff endured did not conform to the written strip search policy of the Defendant Knox County, specifically, Sheriff Department Policy Number D-220. SMF ¶19.[1] Further, the custom and practice of the Knox County Sheriff's Department violates the Knox County Sheriff's Department's own written policy regarding strip searches and visual body cavity searches. SMF ¶¶ 32,34,38,39,43,44,47,49,51,52,63,66, and 67. Both the written strip search policy of the Defendant Knox County, and the custom and practice of the Knox County Sheriff's Department regarding strip searches are unconstitutional.

---

[1] By policies, we mean both the original strip search policy and the amended strip search policy of Jail Administrator Richard Robbins.

The Intake Release Logs were identified by Jail Administrator, Richard Robbins as the only place where one would find strip search information. SMF ¶57.

The Intake Release Logs never reflect a documented articulable suspicion (justification) for the strip search of a person charged with a Class "D" or "E" crime, or crimes that did not involve a weapon, drugs, or a violent felony. SMF ¶65. This necessity of an articulable suspicion to justify a strip search of a person charged with a Class "D" or "E" crime, or crimes that did not involve a weapon, drugs, or a violent felony is required by the United States and Maine Constitutions, Federal caselaw, Bell v. Wolfish, 441 U.S. 520 (1979), Maine Statute, the Maine Attorney General Regulations, the Maine Department of Corrections Standard and Knox County's own Policies and Procedures (D.220).

The Intake Release Logs reflect that individuals charged with Class "E" misdemeanors were routinely strip searched. [2] SMF ¶66.

In the six months reviewed for inclusion herein, thirty-four (34) individuals, male and female, were routinely strip searched for Class "E" misdemeanors. As recently as August 2002, there were six such strip searches. SMF ¶66. No articulable suspicion was noted. SMF ¶66. Examples from those months include:

| DATE/TIME | NAME | CHARGE | STRIPSEARCHED/ OFFICER | JUSTIFICATION |
|-----------|------|--------|-----------------------|---------------|
| 1/14/97 at 1802 | J.A. | FTA/Sea Urchin w/o License | at 1925/C.O Allen | None |

---

[2] There are over 96 months in the Class period (November 1996 to the present) Attorney Dale Thistle and his paralegal, Michelle Ward, reviewed the following six months of that period: January 1997, February 1998, November 1999, October 2000, July 2001, and August 2002. These months were randomly chosen. All of the remaining months – November 1996 through December 2004 - have likewise been reviewed by Plaintiffs' attorneys and staff. (For reasons of confidentiality and to avoid reoffending and further degrading potential class members, their names will be referenced by initials without dates of birth, and address. That information is available and was obtained from the Intake Release Logs supplied through discovery by Defendant, Knox County. References to Date and Time will suffice to identify the record source from the Intake Release Logs. The original Intake Release Logs remain in the possession of Defendants.)

| | | | | |
|---|---|---|---|---|
| 2/21/98 at 1900 | C.M. (female, 25) | Obstructing Govern. Way | at 2120/C.O. Waterman | None |
| 11/26/99 at 922 | R.B. | Failure to Stop for Officer | at 1032/C.O. Daniello | None |
| 10/7/00 at 0148 | J.G. (female, 18) | Oper. W/o License | at 0418/C.O. Simmons | None |
| 7/13/01 at 1715 | L.R. | Driving to Endanger | at 1810/C.O. Springer | None |
| 8/16/02 at 1713 | S.T. (female, 32) | End. Welfare of Child Permitting Unlawful Use of M/V Attach. False M/V Plates | at 1759/C.O. Mylen | None |

SMF ¶66.

In the six months reviewed, for inclusion herein, twenty-five (25) individuals, male and female, were routinely strip searched for Class "D" OUI, all misdemeanors. As recently as August 2002, there were three such strip searches. SMF ¶63. No articulable suspicion was noted. SMF ¶63. Examples from those months include:

| DATE/TIME | NAME | CHARGE | STRIPSEARCHED/ OFFICER | JUSTIFICATION |
|---|---|---|---|---|
| 1/25/97 at 0050 | M.B. (female 21) | OUI | at 0202/Not Noted | None |
| 2/20/98 at 0145 | J.D. | OUI | at 0329/C.O. Jones | None |
| 11/8/99 at 0921 | A.T. (female 32) | OUI | at 1017/C.O. Gracie | None |
| 10/18/00 at 0240 | W.B. | OUI | at 0443/C.O. Sweatland | None |

| 7/6/01 at 1836 | S.G. (female 39) | OUI | at 2013/C.O. Waterman | None |
| 8/6/02 at 2115 | T.W. | OUI | at 2115/C.O. Merrifield | None |

SMF ¶63.

In the six months reviewed, for inclusion herein, twenty-one (21) individuals, male and female, were routinely strip searched for other various misdemeanors. As recently as August 2002, there were two such strip searches. SMF ¶67. No articulable suspicion was noted. SMF ¶67. Examples from those months include:

| DATE/TIME | NAME | CHARGE | STRIPSEARCHED/ OFFICER | JUSTIFICATION |
| --- | --- | --- | --- | --- |
| 1/21/97 at ? | F.H. (female, 20) | Assault "D" Terrorizing Cr.Threat. Harassment | at 1230/C.O. Haj | None |

| DATE/TIME | NAME | CHARGE | STRIPSEARCHED/ OFFICER | JUSTIFICATION |
| --- | --- | --- | --- | --- |
| 2/16/98 at 0955 | L.R. | Refusing to Submit to Arrest | at 1040/C.O. Stewart | None |
| 11/8/99 at 1120 | B.H. (female,30) | Rec.Stolen Property | at 1145/C.O. Hills | None |
| 10/3/00 at 2145 | M.C. | Unpaid Fines | at 2312/C.O. Hooper | None |
| 7/6/01 at 1835 | T.H. | OAR | at 2025/C.O. Daniello | None |
| 8/6/02 at 1935 | N.R. | Viol. Protection Order | at 2059/C.O. Brown | None |

SMF ¶67.

The only conclusion one can reach is that routine, unjustified strip searches and visual body cavity searches of persons charged with minor offenses are the custom and practice of Knox County Jail. SMF ¶¶23,34,38,70,71,72. (Oddly and inexplicably, the Intake Release Logs of the Knox County Jail fail to provide strip search documentation of any sort for felony arrestees.) SMF ¶68.

## 2. LEGAL ARGUMENT

### 1. Standard for Summary Judgment

Summary Judgment is warranted when "[T]he pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Federal Rules Civil Procedure 56(c). Cook v. Lisbon School Committee, 682 A.2d 672, 675 (Me. 1996). Summary judgment is intended "to permit the prompt disposition of cases in which the dispute is solely dependent on the resolution of an issue of law." Tisei v. Town of Ogunquit, 491 A.2d 564, 568 (Me. 1985) (emphasis in original); see also Kolmosky v. Kolmosky, 631 A. 2d 419, 421 (Me. 1993). Thus, summary judgment "may be used to isolate a question of law which will be dispositive of the case." Magno v. Town of Freeport, 486 A.2d 137, 141 (Me. 1985). The Court must view the summary judgment facts in the light most favorable to the non-moving party, and credit all favorable inferences that might reasonably be drawn from the facts without resort to speculation. Merchants Insurance Company v. United States Fid. And Gar. Company., 143 F.3d 5, 7 (1st Circuit 1998). An issue is genuine for these purposes if the evidence is such that a "reasonable jury could return a verdict for the non-moving party." Anderson v. Liberty Lobby Inc., 477 U.S. 242, 248 (1986). A material fact is one that,

"has the potential to affect the outcome of the suit under the applicable law." <u>Nereida-Gonzalez</u> <u>v. Tirado-Delgado</u>, 990 F.2d 701, 703 (1st Circuit 1993).

When there remains a genuine issue on damages only, Fed.R.Civ.P. 56(c) permits summary judgment on liability alone. As seen from Plaintiff's Statement of Uncontroverted Material Facts, this memorandum, and the exhibits provided, summary judgment for the Plaintiff is appropriate.

## 2. Standard of Review

The facts outlined in Plaintiff's Statement of Uncontroverted Material Facts and summarized earlier in this Memorandum demonstrate that this case is not about mere negligence, but rather concerns an abuse of governmental power for which 42 U.S.C. §1983 and Maine Common Law provide remedies.

For purpose of liability under §1983, this case should be analyzed under Fourth Amendment standards governing unreasonable searches (and seizures) as applied to the States through the Fourteenth Amendment to the United States Constitution. The Plaintiffs' claims arise out of the arrest and subsequent strip search of Laurie Tardiff and other similarly situated persons by Correction Officers of Knox County in violation of those individuals' constitutional rights as guaranteed under the Fourth Amendment. Plaintiffs' claims are all covered by the Fourth Amendment protection against unreasonable searches (and seizures) and hence there is no need to resort to the more amorphous standards of substantive due process. See <u>United States v.</u> <u>Lanier</u>, 520 U.S. 259, 272, N.7 (1997); <u>Graham v. Connor</u>, 490 U.S. 386, 395 (1989).

The Fourth Amendment standard is an objective one: those law enforcement officials who participate in a search (or seizure) must do so reasonably. <u>Floyd v. Farrell</u>, 765 F.2d 1 (1st

Circuit 1985). If government officials fail to exercise reasonable professional judgment in the course of the search (or seizure), they face civil liability regardless of their subjective good faith.

> "(T)he reasonableness of the official conduct is not measured against the officials actual knowledge of constitutional standards and the probable constitutionality of his or her action, but rather against the relatively uniform level of presumptive knowledge of constitutional standards." Floyd v. Farrell, 765 F.2d 1,4-5(1st Circuit 1985), quoting from Harlow v. Fitzgerald, 457 U.S. 800, 815 (1982).

### 3. The elements of a claim under 42 U.S.C. §1983

"(T)o state a claim under §1983, a Plaintiff must allege (1) the violation of a right protected by the Constitution or laws of the United States and (2) that the perpetrator of the violation was acting under color of law." Cruz-Erazo v. Rivera-Montanez, 212 F.3d 617, 621 (1st Circuit 2000). There is no question that the individual Defendants, as Officers of Knox County, were acting under color of State Law. It is equally undisputed that Knox County Correctional Officers conducted routine strip searches of the Plaintiffs without articulable suspicion in violation of their clearly established constitutional rights. SMF ¶64 and 65.

### 4. The nature of the constitutional violation.

Knox County has an unconstitutional custom and practice of routinely strip searching persons charged with minor offenses without articulable suspicion they harbor contraband or weapons. "(S)trip searches involving the visual inspection of the anal and genital areas (are) demeaning, dehumanizing, undignified, humiliating, terrifying, unpleasant, embarrassing,

repulsive, signifying degradation and submission." <u>Swain v. Spiney</u>, 117 F.3d 1, 6-7 (1st Circuit 1997), quoting <u>Mary Beth G. v. City of Chicago</u>, 723 F.2d 1263, 1272 (7th Circuit 1983).

The law regarding strip searches has been well settled for over two decades. Every circuit faced with this issue has conformed to <u>Bell v. Wolfish</u>, 441 U.S. 520 (1979) holding that the only justification for subjecting people who have been arrested on minor offenses to the indignity of a stripsearch is an articulable suspicion that such arrestees might smuggle weapons or contraband into the facility. "(A)mple precedent antedating the class period had made it crystal clear that the Constitution prohibits blanket strip search policies [practices or customs]." <u>Doe v. Calumet City, Ill</u>, 754 F.Supp. 1211, 1218 (N.D. Ill. 1990).

In <u>Bell v. Wolfish</u>, a landmark United States Supreme Court decision, the Court analyzed the policy of strip searching federal pretrial prisoners after contact visits. <u>Bell v. Wolfish</u>, 441 U.S. 520 (1979). <u>Bell</u> held that the "test of reasonableness under the Fourth Amendment ... requires a balancing of the need for the particular search against the invasion of personal rights that the search entails." <u>Bell</u> at 559. The <u>Bell</u> Court permitted strip searches of inmates awaiting trial after contact visits. After <u>Bell</u>, Courts of Appeals considering this issue have held that strip searches of pre-arraignment detainees require at least a reasonable suspicion that the person has concealed contraband. See <u>Weber v. Dell</u>, 804 F.2d 796, 800 (2nd Circuit 1986); <u>Mary Beth G. v. City of Chicago</u>, 723 F.2d 1263, 1271 (7th Circuit 1983).

In <u>Swain</u>, the First Circuit addressed a stripsearch which occurred following an arrest in 1993. In reversing summary judgment for the individual defendants who were involved with the search, the Court stated that "Courts have recognized that strip and visual body cavity searches impinge seriously upon the values that the Fourth Amendment was meant to protect." <u>Swain</u>, 117 F.3d at 6. Accordingly, "(t)he Fourth Amendment right to be free from unreasonable strip

searches has long been clearly established in this Circuit, as elsewhere." Swain, 117 F.3d at 9. The First Circuit cited numerous cases holding that strip searches are constitutional only where there is at least a reasonable, or articulable, suspicion that the arrestee is concealing contraband or weapons.

Reasonable suspicion suggests that there must be a "particularized and objective basis for suspecting the particular person" of secreting weapons or contraband. United States v. Montoya D. Hernadez, 473 U.S. 531, 541-42 (1985), quoting United States v. Cortez, 449 U.S. 411, 417 (1981). Routine suspicionless strip search policies or practices are unconstitutional. The First Circuit has "repeatedly recognized that strip and/or visual body cavity searches are not routine, and must be carefully evaluated." Swain, 117 F.3d at 7. A woman such as Ms. Tardiff, who is arrested, has a reasonable expectation of privacy in not being unclothed involuntarily. She has a reasonable expectation not to be observed partially clad or nude. She has, likewise, a reasonable expectation of not having her private parts exposed to observation by male and female Correction Officers in the central booking area of the Knox County Jail. Courts have uniformly held that there are "few exercises of authority by the State that intrude on the citizen's privacy and dignity as severely as the visual anal and genital searches practiced here." Mary Beth G. v. City of Chicago, 723 F.2d 1263, 1272 (7th Circuit 1983). The individual's reasonable expectation of privacy can only be overcome on an individualized basis when a law enforcement officer has at least an articulable suspicion (a reasonable suspicion) that she is concealing weapons or contraband. Doe v. Calumet City, 754 F.Supp. 1211, 1220 (E.D. Ill. 1990).

Frankly, strip searches without reasonable cause "exceed the bounds of reason by two and a half country miles." Doe v. Renfrow, 631 F.2d 91, 92 (7th Circuit 1980) (per curiam), cert. denied 451 U.S. 1022 (1981).

The expectation of privacy is so strong that although one may have possessed marijuana, that fact alone, doesn't overcome the individual's privacy interest to be free from an unreasonable strip search. Swain, at 8. Likewise, that one was charged with a crime, alone, is not enough to overcome the individual's privacy interest to be free from an unreasonable strip search. Id. [See Roberts v. Rhode Island, 239 F.3d 107, referencing Weber v. Dell, 804 F.2d 796, 802 (2d Cir. 1986) (This case found strip searches in misdemeanor cases unconstitutional); Stewart v. County of Lubbock, 767 F.2d 153, 156-57 (5th Cir. 1985)(This case found strip searches in misdemeanor cases unconstitutional); Giles v. Ackerman, 746 F.2d at 614, 617 (C.A. Idaho, 1984) (This case held that strip searches for traffic violations and other minor offenses was unconstitutional); Hill v. Bogans, 735 F.2d 391, 394 (10th Cir. 1984) (This case held that strip searches for traffic violations was unconstitutional); Mary Beth G. , 723 F.2d at 1272-73 (This case held that strip searches for misdemeanor crimes was unconstitutional); Logan v. Shealy, 660 F.2d 1007, 1013 (4th Cir. 1981) (This case held that strip searches for driving while intoxicated was unconstitutional).]

## 5. The requirements of the law on strip searches.

Throughout the class period, the law required articulable suspicion to justify a strip search and, also, thorough documentation of strip searches. First, the Maine Statute required:

"(D) Each strip search or body cavity search shall be recorded in a log kept by the Department of Public Safety, sheriff's department, or police department indicating the person who ordered the search, the name of the arrestee, and the parts of the body searched." 5 M.R.S.A. §200-G(2)(D) (hereinafter the "Statute").

Second, the Attorney General's regulations required:

"(IV) Records. Each strip search, mouth search, and body cavity search of an arrestee shall be recorded in a log kept by the law enforcement agency whose offices were involved in the search.

The log shall indicate the name of the officer who ordered the search, the name of the officer or medically trained personnel who conducted the search, the names of the officers present at the search, the name of the arrestee, the parts of the body searched, and the justification or justifications for the search... where the justification for a warrantless search is based on the existence of probable cause or reasonable suspicion, such probable cause or reasonable suspicion shall be summarized in the log." Maine Department of Attorney General Regulations, Sections 26-239 (hereinafter "AG Regs").

Third, the Jail's policies and procedures:

"They (the strip searches) shall be recorded and include at a minimum –
(1) name of inmate. (2) name of staff person doing the search. (3) name of any other person present. (4) justification for search if required under 5 M.R.S.A., Section 200-G." Knox County Jail's Policies and Procedures, C-120 at Procedure A, Paragraph 1.b (hereinafter "The Jail Regs").

To recap: the Jail was required to keep the following information "in a log" (Statute, AG Regs):

(1) the name of the detainee searched (Statute, AG Regs, Jail Regs);

14

(2) the person who ordered the search (Statute, AG Regs);

(3) the person or officer who conducted the search (AG Regs, Jail Regs);

(4) the parts of the body searched (Statute, AG Regs);

(5) the names of others present at the search (AG Regs, Jail Regs);

(6) the justification for the search (AG Regs, Jail Regs);

(7) if based on probable cause or reasonable suspicion, a summary of such (AG Regs, Jail Regs).

Jail Administrator Richard Robbins stated there is not a single log within the jail records keeping system that was used exclusively to record strip search information. SMF ¶52. He stated that the only place where one would find such strip search information would be the Intake Release Logs. SMF ¶57. The Intake Release Log should contain the reason a misdemeanor arrestee was strip searched. SMF ¶64. But none of the Intake Release Logs contain any articulable suspicion or justification for a strip search. SMF ¶64. . In fact, Knox County failed to keep the necessary information including: (2) the person who ordered the search; (4) the parts of the body searched; (5) the names of others present at the search; (6) the justification for the search; (7) if based on probable cause or reasonable suspicion, a summary of such; and frequently (3) the person or officer who conducted the search. SMF ¶49 and SMF¶21.

Pursuant to case law, Statute, Attorney General Regulations, and Jail Regulations, a misdemeanor arrestee should not be strip searched without articulable suspicion of contraband or weapons. Thousands of misdemeanants were strip searched – not one was justified in the record.

Jail Administrator Robbins asserted in Deposition that a person arrested for Class "D" OUI would not be strip searched under the Jail's current policy. SMF ¶62. Plaintiffs' review of

the Intake Release Logs provided through discovery contradicts that assertion dramatically as shown earlier. SMF ¶63,66 & 67.

A thorough analysis of the Intake Release Logs is beyond the scope of the present Motion, however, to provide helpful insight, Plaintiff has summarized several months of Intake Release Logs reviewed. The review was conducted as part of Plaintiffs' attempt to determine the number of Class members. As part of that, Plaintiff reviewed over eight years of records from November 1996 through December 2004. A summation of data retrieved from a review of the following six months (January 1997, February 1998, November 1999, October 2000, July 2001 and August 2002) indicates that Class "D" OUI's were routinely strip searched. (Documentation is found in the Intake Release Logs and summarized in Exhibit B of the Ward Affidavit. SMF ¶63.) In fact, there were 25 Class "D" OUI arrestees strip searched during the six-month period. Each of those is documented in the Intake Release Logs. A separate strip search log is not maintained by the Knox County Jail. SMF ¶52. Worse, the Intake Release Logs and all other Logs fails to provide the Officers articulable suspicion, the information required by case law, the Maine Statute, the Attorney General Regulations, and Jail Policies and Procedures to justify the strip search. SMF ¶51.

Frequently the name of the officer conducting the strip search is omitted. The Maine Statute and the Attorney General's Regulations require the parts of the body searched to be noted in the log. That information is never included. (Presumably because a strip search is a strip search, etc. every one was done exactly the same.) SMF ¶33, 38. The name of the officer who ordered the search is required to be kept in the log by the Attorney General's Regulations. That information is never included in the Intake Release Log. SMF ¶33, 38. Most egregiously, nowhere in the Intake Release Logs of over eight years is a single justification for a strip search

16

of an arrestee ever found. <u>Not one</u> single example can be found. Plaintiffs have reviewed 97 months of Intake Release Logs and have found <u>not one</u> notation of an articulable suspicion, justification, for a strip search. SMF ¶64. Thousands were strip searched, not one justified.

Class "E" misdemeanants were routinely strip searched without articulable suspicion. SMF ¶66. In the six months sample provided with this Memorandum, there are 34 Class "E" misdemeanants who were strip searched as identified in the Intake Release Log maintained by the Jail without one justification to support a strip search. SMF ¶66.

Jail Administrator Robbins admitted in deposition that if no articulation was to be found in those records and an Officer had strip searched a non-felony detainee, he violated both Knox County Jail Policy and Procedures and the State's procedures. SMF ¶69.

A timely and relevant article on strip searches in ATLA's Civil Rights Section, Winter 2005 Newsletter addressed, in part, this issue. <u>Joun, "Challenging Unlawful Strip Searches",</u> ATLA Civil Rights Section, Vol. 11, No.2 (Winter 2005). The author states it "does not necessarily follow that a criminal charge involving drugs, weapons, or one that is considered a violent felony, provides automatic cause to justify a strip search." Id. "The fact that (the plaintiff) may have possessed some unspecified amount of marijuana is not enough to overcome" factors which could lead to a finding that the search was unreasonable. <u>Swain v. Spiney</u>, 117 F.3d 1, 9 (1st Circuit 1997). The article suggests that the crime charged is just one of many factors to be weighed by the officers in deciding whether to conduct a strip search, but that it should not be the only factor. Id. Other factors would include prior arrest record of the arrestee, the nature of the offense, the arrestee's appearance and conduct during the arrest, other reasonable alternatives in lieu of a strip search, and of course, the effect on institutional security.

Kelly v. Foti, 77 F.3d 819, 821 (5th Circuit 1996). In Kelly the Court said that speculation that some percentage of women arrested will have contraband concealed on their bodies does not provide reasonable suspicion. Kelly, 77 F.3d at 822.

The Sixth Circuit decided to not "make any rules of broad application or to lay down any bright line based upon the type of crime charged." Dufrin v. Spreen, 712 F.2d 1084, 1089 (6th Circuit 1983). In upholding the felony assault charge the Court also considered the fact that Dufrin "would ultimately come into contact with the inmate population." Id. "The central difficulty with a bright line rule is that it requires law enforcement officials to determine whether a felony crime involved 'violence' without making a fact specific determination by looking to the particular facts and circumstances of the arrest in the police reports … it is unclear how law enforcement officials can make this determination without looking to the facts and circumstances of each individual case." ATLA, Supra. The real difficulty with the bright line rule is that simply based on the category of the offense, ones constitutional right to be free from unreasonable strip searches is outweighed by institutional concerns for security when such concerns may be unwarranted. The classic hypothetical example of this would be a case similar to that involving Martha Stewart. Charged with a felony white collar crime, is it reasonable to infer that, on booking, Martha Stewart should be strip searched by her jailors? Under Knox County's policies and procedure she would be.

6.      **Strip searches never disclose contraband.**

Of the thousands of people taken into custody during this Class period, November 1996 to the present, Knox County Jail found not one item of contraband in its search of those people. SMF ¶102. Callously, the County argues that the strip search policy exists to protect the integrity

of the institution. To protect its safety and security. To protect against the influx of contraband. Plaintiff takes no issues with these laudable objectives. Yet the record is full of examples, hundreds of examples, of men and women strip searched for crimes such as Class "D" OUI and then immediately released from the Jail. They never come in contact with the Jail population, they may be held for a brief period of time, but in almost every instance they are held in a "holding cell" not in a maximum, medium, or minimum security cell. The First Circuit got it right in Swain v. Spiney, when it said "Strip searches involving the visual inspection of the anal and genital areas (are) demeaning, dehumanizing, undignified, humiliating, terrifying, unpleasant, embarrassing, repulsive, signifying degradation and submission." Swain, 117 F.3d 1, 6-7 (1st Circuit 1997).

The strip searches at the Knox County Jail served no penalogical purpose. If they did, the record would reflect that purpose, in writing, as required. The record is devoid of information necessary to determine any purpose at all other than "degradation and submission".

People do not anticipate being arrested. From a practical stand point if there ever were a justification for a strip search, certainly after eight years and approximately 13,050 strip searches, involving approximately 4,350 different individuals, one would reasonably expect to find one instance of contraband or weapon secreted on a persons body. Knox County has not found contraband once. SMF ¶102.

7.    **Knox County's strip search policy is unconstitutional.**

Knox County admits that it strip searches all inmates brought in on felony charges. Its policy, D-220, requires that all persons charged with a Class A, B, or C crimes are to be strip

searched. (Procedure A.1.b.) The Policy makes no distinction between violent crimes, serious drug offenses, and minor felonies.

In Bell v. Wolfish, 441 U.S. 520 (1979) the United States Supreme Court addressed a strip and visual body cavity search of all inmates who had had a contact visit with a visitor from outside the institution. The Court noted at the time that body cavity searches "instinctively (gave it) the most pause". The Supreme Court held that the strip search and visual body cavity search of inmates in those situations, incarcerated in a prison and after a contact visit, that the search was reasonable. The Court balanced "the need for the particular search against the invasion of personal rights that the search entails." Id at 559.

The Supreme Court instructed other Courts to "consider the following factors when considering similar strip search and visual body cavity search issues:

1)      The scope of the particular intrusion;

2)      The manner in which the search is conducted;

3)      The justification for initiating the search; and,

4)      The place in which it is conducted.

Id. Bell v. Wolfish at 559.

The First Circuit in Swain v. Spiney looked at the case of prisoners held in local jails for minor offenses. The holding in Swain, though, sweeps broadly. "[A]ll strip searches not just those performed on persons held for misdemeanors, must be justified by at least a finding of reasonable suspicion." Mack v. Suffolk County 191 F.R.D. 16, 22 (D. Mass 2000), (citing

20

Swain v. Spiney, 117 F.3d 1 (1st Circuit 1997). (Consequently, an argument can be made that the class ought to consist of all persons strip searched without articulable suspicion and the definition of the class amended.). Under Bell, the Court required officers to have a reasonable suspicion that a particular detainee held contraband prior to conducting a strip or visual body cavity search. Swain v. Spiney, 117 F.3d at 7.

In Roberts v. Rhode Island, 239F.3d 107, the First Circuit, again, reconsidered the Bell factors in light of the facts presented by that case. The Court noted that, as to, the "scope of the particular intrusion" that visual body cavity searches "impinged seriously upon" Fourth Amendment values. Swain 117 F.3d at 7. Such searches are a "severe if not gross interference with a person's privacy." Arruda v. Fair, 710 F.2d 886, 887 (1st Circuit 1983). See also, Mary Beth G. v. City of Chicago, 723 F.2d 1263, 1272 (7th Circuit 1983) (describing such searches as, among other things, "demeaning, dehumanizing, undignified, embarrassing and repulsive"). They are as expressed in Wood v. Clemons, 89 F.3d 922, 928 (1st Circuit 1996) "an offense to the dignity of the individual". As in Roberts, the Plaintiff, here, was forced to display her genitals, spread her legs so that officials could observe her body cavity, squat on several different occasions, and cough vehemently in the presence of an unknown, unfamiliar, female corrections officer. SMF ¶¶ 15 and 16.

The Bell Court next advised that Courts look at the manner in which the search is conducted. In Ms. Tardiff's case, she was required to disrobe in front of a stranger. She was required to display her genitals, spread her legs, squat and cough violently and repeat that procedure three times. SMF ¶¶ 15 and 16. All this was required to be done in a "public area", the Booking Room of the Knox County Jail, with opposite sex corrections officers and inmates milling about and passing through. SMF ¶74, 101.

21

Third, the Supreme Court advised that Courts review the "justification for initiating" the search. Bell, 441 U.S. at 559. As amply demonstrated, Knox County fails to justify any search of any individual and has throughout this class period failed to note even one justification for the strip search of a misdemeanant or a minor felon. Not only that, the Intake Release Logs for the Correctional Facility show not one example of contraband or weapons being discovered through a strip search, not only of a misdemeanant but also of a person arrested for a more serious or violent felony. In Arruda, previously cited, a strip search was upheld of inmates returning from the law library or infirmary, as well as those who had a contact visit. The facts in that case are vastly different from those here. The prison in Arruda was a maximum security facility. The inmate in question had been confined to a "special security area for particularly dangerous inmates." And "the record [contained] a lengthy history of prison contraband problems." Arruda 710 F.2d at 888. Institutional security concerns failed to carry the day in Swain, however. There, the arrestees were held in a local jail and posed "no risk of contact with other prisoners." Swain 117 F.3d at 8.

In Roberts v. Rhode Island, the facts fell somewhere between the Bell or Arruda cases and the Swain case. In Roberts, Department of Corrections policies called for all males committed to the State prison to be subjected to a strip search and visual body cavity search upon incarceration. It was a routine procedure. Roberts was a passenger in a car stopped for an expired registration sticker. A records review showed that Roberts was subjected to an "outstanding body attachment". He was transported to the intake service center at the adult correctional institution in Cranston, Rhode Island. Once there, he was subjected to a strip search and visual body cavity search. The search was held by the First Circuit to be objectively unreasonable under Bell v. Wolfish.

22

Here, applying the <u>Bell</u> test regarding justification, institutional security appears to be Knox County's sole concern. Yet, there is no evidence of a contraband problem and, there is no individualized articulable suspicion. SMF ¶102.

Finally, the <u>Bell</u> Court instructed that Courts look at "the place in which it is conducted". <u>Bell</u> at 559. In Tardiff's case, the strip search is conducted in the most public and degrading manner possible. No matter how you attempt to frame it, the strip search of Ms. Tardiff took place in the booking room of the jail. It took place with other officers present in the room, both male and female. SMF ¶13. It took place in a small shower stall with a clear or opaque plastic curtain which in itself did not extend fully across the opening of the stall. SMF ¶14,18,101. Ms. Tardiff and others have consistently mentioned hearing and seeing other guards walk by as they were being strip searched or as they were bent over exposing their vagina and/or anal cavity. SMF ¶18,101.

Applying those factors, it is clear that the rights of the individuals to be free from unreasonable searches under the Fourth Amendment outweighs the institutional objective of jail security.

In Knox County's case, though institutional security appears to be the justification for their custom and practice of strip searching every person taken into the facility, a review of the Intake Release Logs indicates, by and large, that strip searched misdemeanant arrestees are not and have not been mixed with the general jail population. SMF ¶21,87. Most misdemeanants were held briefly at the facility pending the arrival of a bail commissioner. SMF ¶102. By and large they were not held overnight, but were held only until bail could be provided, and, yet, these individuals with no possibility of being mixed with the jail population, were strip searched

without articulable suspicion. Plaintiff would point out that numbers of courts have held that intermingling alone is insufficient to justify a search without reasonable suspicion. Chapman v. Nichols, 989 F.2d 393, 396 (10th Circuit 1993); Roberts v. Rhode Island, 239 F.3d 107 (we agree with these courts that the unified nature of the Rhode Island prison system is not, in itself, dispositive of the reasonableness of the search.); Smith v. Montgomery County, 547 F.Supp. 592, 598-99 (D.Md. 1982); and Masters v. Crouch, 872 F.2d 1248, 1254 (6th Circuit 1989). But the First Circuit concluded in Roberts that "standing alone, the security concerns of the intake facility cannot support the search policy here, as it applies to minor offenses. The policy is unconstitutional under the Fourth Amendment." Roberts v. Rhode Island, citing Logan v. Shealy, 660 F.2d 1007, 1013 (4th Circuit 1981).

### 8. Knox County's custom and practice of strip searching all arrestees is unconstitutional.

It is the custom and practice of the Knox County Sheriff's Department to strip search every person taken into custody regardless of the length of time the person is to be held or the charge against the person. SMF ¶34. It is the custom and practice of Knox County Sheriff's Department to strip search every individual, whether the individual is housed in a holding cell for a short period of time, or mixed with the general population of the Jail. SMF ¶34. The Intake Release Logs reflect that it is the custom and practice of the Knox County Sheriff's Department to strip search individuals charged with misdemeanors. SMF ¶63,66,67. It is the custom and policy of the Knox County Sheriff's Department to strip search individuals charged with Class C OUI's. SMF ¶62.

The Fourth Amendment protects people when they have a reasonable expectation of privacy. Strip searches of misdemeanants or those charged with minor felonies, without articulable suspicion are plainly unreasonable and unconstitutional. [See Roberts v. Rhode Island 239 F.3d 107, referencing Weber v. Dell, 804 F.2d 796, 802 (2d Cir. 1986) (misdemeanors); Stewart v. County of Lubbock, 767 F.2d 153, 156-57 (5th Cir. 1985)(misdemeanors); Giles v. Ackerman, 746 F.2d at 614, 617 (C.A. Idaho 1984) (traffic violations and other minor offenses); Hill v. Bogans, 735 F.2d 391, 394 (10th Cir. 1984) (traffic violations); Mary Beth G. , 723 F.2d at 1272-73 (misdemeanors); Logan v. Shealy, 660 F.2d 1007, 1013 (4th Cir. 1981) (DWI).]

### 9. Knox County is liable under § 1983.

Governmental entities can be held liable under §1983 for constitutional violations committed pursuant to an unconstitutional custom, policy, or practice. Monnell v. New York City Department of Social Services, 436 U.S. 658, 690 (1978). The governmental entity can only be held liable "where it itself causes the constitutional violation at issue." City of Canton, Ohio v. Harris, 489 U.S. 378, 385 (1989). The requirement is that "The Plaintiff demonstrate both the existence of a policy or custom and a causal link between that policy and the constitutional harm." Santiago v. Fenton, 891 F.2d. 373, 381 (1st Circuit 1989).

The undisputed facts of this case support the imposition of liability against the County. First, the policy itself is defective in that it permits the unconstitutional strip search of minor felon arrestees. There is no distinction made in the policy itself between serious violent felons and those arrested on non-violent, non-drug, non-weapons charges. More importantly, the record is replete with evidence of an unconstitutional custom or practice of deliberately violating the

constitutional rights of men and women by strip searching them without any articulable suspicion that they may have a weapon or other contraband.

The causal link required by <u>Santiago</u> is the unconstitutional custom and practice of strip searching, without articulable suspicion, misdemeanor arrestees in violation of their constitutional rights. Plaintiffs have amply demonstrated the existence of the policy, custom or practice and the ensuing constitutional harm, the strip search. In the case of Carmen Miller v. Knox County, a case with identical facts, the First Circuit overturned summary judgment in favor of Knox County finding as fact: "[M]eanwhile, as part of the intake process at the jail, Carmen Miller was required to submit to a strip search and, while naked, to squat and cough. <u>Miller v. Kennebec and Knox Counties</u>, 219 F.3d 10 (1st Circuit 2000).

It is insightful to repeat here the First Circuit's discussion on liability.

"The district court found that there was ample evidence from which a jury could find that the repeated strip searches to which Miller was subjected during her three-day detention in the Knox County Jail were not justified by a reasonable suspicion that she was concealing contraband or weapons, particularly because the offense for which she was detained – failure to pay a fine – gave rise to no such suspicion. See <u>Swain v. Spinney</u>, 117 F.3d 1, 6 (1st Cir. 1997). We agree. ... Miller must meet two requirements to maintain a §1983 claim grounded upon an unconstitutional municipal custom or practice. First, the custom or practice must be attributable to the municipality, i.e., it must be "so well settled and widespread that the policymaking officials of the municipality can be said to have either actual or constructive knowledge of it yet did nothing to end the practice."

Bordanaro v. McLeod, 871 F.2d 1151, 1156 (1st Cir. 1989). Second, the custom must have been the cause of and "the moving force" behind the deprivation of constitutional rights. Id. at 1157. There was sufficient evidence for a jury to find the existence of a practice to strip search arrestees without regard to whether there was a reasonable suspicion that they concealed weapons or contraband. Jeffrey Fuller, a corrections officer assigned to the jail, testified without contradiction that contrary to the County's written policy which conformed to constitutional standards, all arrestees unable to make bail are strip searched. Moreover, Miller's own experience being strip searched is undisputed by Knox County on summary judgment. See Id. at 1156 ("Additional support for the existence of such a practice can be inferred from the event itself."). Although there is no direct evidence that Sheriff Davey, as the responsible Knox County official, had actual knowledge of the jail's practice of strip searching all arrestees unable to make bail, his knowledge may be inferred. Miller offered undisputed evidence that the jail held no more that 59 arrestees, that all persons unable to make bail were routinely strip searched regardless of whether they were suspected to have weapons or contraband, and that she herself was strip searched repeatedly during her forty-eight hour detention. The evidence is sufficient to raise a triable issue that the strip search practice was "so widespread or flagrant that in the proper exercise of their official responsibilities, the municipal policy makers should have know of [it]." Id. at 1157 (citations, internal quotation marks, and alterations omitted). Moreover this practice of strip searching all arrestees unable to make bail was the moving force behind the unreasonable searches of Miller. We agree with the

27

district court, and it is not disputed, that there was no reasonable suspicion that Miller was concealing weapons or contraband."

Here, as in <u>Miller</u>, the practice of strip searching all arrestees in Knox County was the moving force behind the unreasonable searches of Ms. Tardiff and all other Class members.

**10.      Defendant, Daniel Davey, is liable to Plaintiffs.**

Daniel Davey is the Sheriff of Knox County. He is the ultimate policy maker for the Jail. Sheriff Davey was Sheriff of Knox County prior to the 1994 Biennial Inspection of John Hinckley. He was the Sheriff at the time of the second Biennial Inspection of the Knox County Jail in the year 2000 and he is still Sheriff of Knox County. State Jail Inspector John Hinckley made Sheriff Davey aware after the Biennial Inspection of the Knox County Jail in 1994 that the Jail was in non-compliance with State Department of Corrections Standards regarding strip searches of its inmates. SMF ¶24. After the 2000 Biennial Inspection Report, Sheriff Davey was put on notice that the Jail was in non-compliance of Standard D.22 again. "Based on statements from staff, all inmates are being strip searched regardless of the crime if they are to be housed. This is a violation of Item D above. (D. At the time of arrest or admission to a facility, <u>not</u> conduct a strip search of a pretrial inmate charged with a Class "D", "E", or other misdemeanor offense unless the officer has reasonable suspicion to believe that an inmate is concealing contraband and is about to come into contact with inmates of the facility;)" SMF ¶38.

To impose supervisory liability on Davey, Plaintiffs must establish that his conduct or inaction amounts to "reckless or callous indifference of Plaintiffs' constitutional rights and that an "affirmative link" existed between the constitutional violation and his acts or omissions." <u>Gutierrez-Rodriquez v. Cartagena</u>, 882 F.2d 553, 562 (1st Circuit 1989). In the <u>Miller</u> case, the

First Circuit found the evidence insufficient to meet that standard and affirmed summary judgment on Sheriff Davey's behalf. Here, several years later, Knox County faces not one Plaintiff but thousands.

"Miller's ordeal began on Saturday afternoon (of the three day Patriots Day Weekend), April 13, 1996…" Miller at 10. Shamefully, years later, the practice has continued. Ms. Tardiff was strip searched by Sheriff Davey's personnel the very week Ms. Miller settled her claim with Knox County for $425,000 (Four hundred twenty-five thousand dollars). SMF ¶103. The evidence can no longer be considered insufficient to impose liability on Sheriff Davey.

That there continue to be misdemeanants strip searched as late as August of 2002 for misdemeanor crimes (for Class "E" and Class "D" crimes) is unconscionable. It demonstrates the "reckless or callous indifference" necessary to impose supervisory liability on the Sheriff. The evidence today is gravely overwhelming. Sheriff Davey implemented and maintained the policy, custom, and practice of conducting strip searches and visual body cavity searches of all people who were admitted to the Knox County Jail, regardless of the nature of charges or the circumstances of the individual. SMF ¶47. He knew or should have known that the strip search policy and practice at the Jail, and as implemented by its personnel, would directly result in Correctional Officers conducting unconstitutional searches of every man and woman who was held in the Jail. SMF ¶ 45,46,47. Sheriff Davey implemented and maintained this strip search policy, custom and practice. SMF ¶ 45,46,47. Sheriff Davey, in fact, had actual notice that the policy and practice followed in the Knox County Jail of strip searching all men and women was unconstitutional, yet he continued to enforce that unconstitutional policy and practice. SMF ¶ 45,46,47. He acted with reckless indifference to the constitutional rights of Plaintiff, Laurie Tardiff, and the men and women detained at the Knox County Jail.

Hence, supervisory liability should be imposed on Sheriff Davey.

3.  CONCLUSION

This Court should enter Summary Judgment establishing liability of Defendants Knox
County, Sheriff Daniel Davey, Jane Doe, and John Doe, to the named Plaintiff and the Class she
represents.

RESPECTFULLY SUBMITTED,
The plaintiff, individually and on
Behalf of all others similarly situated,
By her attorneys,

Dated ___6/15/05___

Dale F. Thistle, Esq.
LAW OFFICE OF DALE F. THISTLE
103 Main Street, P.O. Box 160
Newport, ME 04953
207/368-7755
Email: dthistle@midmaine.com

Sumner H. Lipman, Esq.
LIPMAN, KATZ & MCKEE, P.A.
227 Water Street, P.O. Box 1051
Augusta, ME 04332-1051
207/622-3711
Email: slipman@lipmankatzmckee.com

Dated ___6/15/05___

Robert N. Stolt, Esq.
LIPMAN AND KATZ, PA
227 Water Street, P.O. Box 1051
Augusta, ME 04332-1051
207/622-3711
Email: rstolt@lipmankatzmckee.com

## CERTIFICATE OF SERVICE

I certify that on this day a true copy of the above document was served upon the attorney of record for each party by mail.

Dated: _____6-15-05_____

Dale F. Thistle, Esq.