


UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MAINE

LAURIE TARDIFF,

     Plaintiff,

vs.

KNOX COUNTY, et al.,

     Defendants

Civil No. 02-251-P-C

## DEFENDANTS' OPPOSITION TO PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT, WITH INCORPORATED MEMORANDUM OF LAW

Plaintiff Laurie Tardiff has moved for partial summary judgment on the issue of liability with regard to her claim and the claim of the class she represents. While the same legal standards apply to all claims, the evidence necessary to justify summary judgment on liability is different when considering the Plaintiff's circumstances and the circumstances of all other persons who meet the criteria set forth in the Court's order of certification. Under the prevailing law, the Plaintiff cannot establish liability for herself based on the current record. Moreover, she has not demonstrated that the class as a whole is entitled to summary judgment. For these reasons, her Motion for Partial Summary Judgment must be denied.

### I.    Factual Background

The factual background to this opposition is set forth in the Defendants' Response to Plaintiff's Statement of Uncontroverted Material Facts ("RSMF") and Defendants' Statement of Additional Material Facts ("SAMF"). Those facts are incorporated by reference. In addition, facts pertinent to the particular claims are set forth in the body of the argument.

## II.    Summary Judgment Standard

Curiously, the Plaintiff relies extensively on Maine law in her explication of the summary judgment standard. (Pl's Mot. Sum. Jug't at 8). The standard developed by the United States Supreme Court and the United States Court of Appeals for the First Circuit is, of course, the benchmark for summary judgment motions filed in the United States District Court for the District of Maine. The Supreme Court and the First Circuit have consistently held that in considering a request for summary judgment, a court "must draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000) (citations omitted); *Merchants Ins. Co. v. United States Fid. & Guar. Co.*, 143 F.3d 5, 7 (1st Cir. 1998). Moreover, the District Court is not permitted to weigh evidence, make credibility determinations, or favor one legitimate inference over another. *Reeves*, 530 U.S. at 150-51 (citation omitted). Put another way, the District Court must "disregard all evidence favorable to the moving party that the jury is not required to believe." *Id.* at 151 (citation omitted). If "the evidence . . . reveals a genuine dispute over a material fact – that is, if a reasonable factfinder, examining the evidence and drawing all reasonable inferences in the required manner, could resolve a factual controversy which is critical to the outcome of the case in favor of the nonmoving party – then summary judgment will not lie." *Serapion v. Martinez*, 119 F.3d 982, 987 (1st Cir. 1997).

## III.    Argument

### A.    Fourth Amendment Law

Since at least 1979, the federal courts have applied a test to strip-search claims that balances the rights of the arrestee with the penological interests of the government. *Bell v. Wolfish*, 441 U.S. 520, 559 (1979). *Bell* involved searches of prisoners who were awaiting trial

2

after those prisoners had been permitted contact with persons outside the jail. The Supreme Court held that in those circumstances, the jail's interest in preventing the introduction of contraband justified the use of strip searches.

Since *Bell*, the federal courts have grappled with the balancing test in the context of particular search scenarios. For example, in *Arruda v. Fair*, 710 F.2d 886, 888 (1st Cir. 1983), the First Circuit held that jail security justified a blanket strip-search policy of searching detainees entering and leaving an area where maximum security prisoners were housed. Several years later, in *Swain v. Spinney*, 117 F.3d 1, 8-9 (1st Cir. 1997), the First Circuit held that the strip search of a person being held for a misdemeanor in a cell separate from the general jail population violated the Fourth Amendment. Finally, in *Roberts v. Rhode Island*, 239 A.3d 107, 113 (1st Cir. 2001), the Court upheld judgment in favor of a former arrestee who was admitted to the Rhode Island penitentiary on a misdemeanor charge and strip-searched pursuant to a jail policy. The Court found that the search, conducted without reasonable suspicion that the arrestee was concealing weapons or contraband, violated the Fourth Amendment. Since *Roberts*, the First Circuit has reiterated that "an individual detained on a misdemeanor charge may be strip searched as part of the booking process only if officers have reasonable suspicion that he is either armed or carrying contraband." *Wood v. Hancock Cty. Sheriff's Dep't*, 354 F.3d 57, 62 (1st Cir. 2003) (citation omitted).

The Plaintiff's references to Maine statutory law and the Maine Attorney General's regulations are irrelevant. Violation of Maine law or of administrative regulations are not actionable under 42 U.S.C. § 1983. *See Beltran v. City of El Paso*, 367 F.3d 299, 302 (5th Cir. 2004) (a claim based on an alleged violation of state law "is not cognizable under § 1983 because § 1983 was designed to protect against the violation of federal constitutional and

3

statutory rights, not those created by state statute") (citation omitted); *Medina v. Cram*, 252 F.3d 1124, 1133 (10th Cir. 2001) ("claims based on violations of state law and police procedure are not actionable under § 1983") (citations omitted); *Collins v. Bellinghausen*, 153 F.3d 591, 596 (8th Cir. 1998) (violation of state law, without more, does not state § 1983 or federal constitutional claim); *White v. Olig*, 56 F.3d 817, 820 (7th Cir. 1995) ("It is therefore a truism, reiterated many times by this court, that mere allegations of state law infraction are insufficient to support a Section 1983 claim."); *Patterson v. Coughlin*, 761 F.2d 886, 891 (2d Cir. 1985) ("[A] state employee's failure to conform to state law does not in itself violate the Constitution and is not alone actionable under § 1983.").

While Maine statutes and Attorney General's regulations may be consistent in certain respects with constitutional requirements, they are not an independent basis for assertion of a constitutional wrong. This is particularly true in the instant case since the statute and regulation are more strict than the constitutional standard. For example, Maine Department of Corrections ("DOC") Standard D.22, which is based upon the Attorney General regulations, prohibits searches of inmates charged with misdemeanors unless there is individualized reasonable suspicion to believe that they are concealing contraband *and* about to come into contact with the general inmate population. SAMF ¶¶ 160-62. In this respect, DOC Standard D.22 is more stringent than the constitutional standard for strip searches. *See, e.g., Wood v. Hancock Cty. Sheriff's Dep't*, 354 F.3d 57, 62 (1st Cir. 2003) (citation omitted). To the extent the Defendants failed to comply with 5 M.R.S.A. § 200-G or Attorney General Regulation Section 26-239 in some respect other than that embodied by the constitutional standard (such as maintenance of certain documentation, etc.), that alleged failure does not support the imposition of liability against the Defendants in this case.

4

**B.     Standard under Section 1983 for County Liability**

The Plaintiff's First Amended Complaint appears to allege civil rights liability on the part of the County for failing to supervise its corrections officers with regard to strip-searches of arrestees. In order to succeed under 42 U.S.C. § 1983 on a theory of governmental entity liability, the Plaintiff must demonstrate the following facts: one, a municipal custom or policy, and two, that the custom or policy was "the cause of and the moving force behind the deprivation of constitutional rights." *Bordanaro v. McLeod*, 871 F.2d 1151, 1156 (1st Cir.), *cert. denied, City of Everett, Mass. v. Bordanaro*, 493 U.S. 820 (1989) (citing *Oklahoma City v. Tuttle*, 471 U.S. 808, 819 (1985)). To make out the required causal connection under a failure to supervise theory, the Plaintiff must show that the inadequate supervision amounts to deliberate indifference to the rights of the person with whom jail personnel come in contact. *See City of Canton v. Harris*, 489 U.S. 378, 388 (1989). The First Circuit has observed that "a municipality can be held liable, for example, 'if its police chief is a policymaker and acquiesces in a police custom or policy as to which he has actual or constructive knowledge.'" *McDermott v. Town of Windham*, 204 F. Supp. 2d 54, 68 (1st Cir. 2002) (citation omitted). However, a governmental entity cannot be held liable simply because it employs persons who have committed an unconstitutional act. *Monell v. Department of Social Servs.*, 436 U.S. 658, 690-91 (1978).

**C.     The Plaintiff's own circumstances do not justify entry of summary judgment in her favor on the issue of liability.**

In analyzing whether Ms. Tardiff is entitled to summary judgment with regard to her civil rights claim, the Court must first consider whether she has established as a matter of law that a constitutional violation occurred. Under the law as it has developed in this Circuit, Ms. Tardiff cannot meet this burden.

5

The record demonstrates that it was at least arguable whether the Jail personnel were justified in strip-searching Ms. Tardiff. First, she was arrested for allegedly tampering with a witness, in violation of 17-A M.R.S.A. § 454. The elements of the crime under Section 454, a Class C felony, include inducement or force or threat of force. *Id.*; SAMF ¶ 104. Moreover, statements made by Ms. Tardiff's victim indicate that Ms. Tardiff threatened violence in connection with her attempt to get the victim to change her testimony. RSMF ¶ 3; SAMF ¶ 105. Therefore, the nature of the charge against Ms. Tardiff, and the statements by the victim, provided the Jail officers with sufficient constitutional justification for conducting a strip-search. *See, e.g., Dobrowolskyj v. Jefferson County*, 823 F.2d 955, 957-58 (6th Cir. 1987) (citing *Dufrin v. Spreen*, 712 F.2d 1084, 1089 (6th Cir. 1984)) (holding that nature of charged offenses justify strip search).

Second, the justification for conducting the search was further supported by the fact that Ms. Tardiff was being processed for admission into the general Jail population. RSMF ¶¶ 19, 21. The Jail's general population includes a mix of inmates, including persons being held for felonies involving weapons or drugs. In addition, Ms. Tardiff's admission was necessary because she was not eligible for bail before a bail commissioner – insofar as one of the charges against her was violation of a condition of release, the Jail was required to bring her before a judge. RSMF ¶ 21.

Third, the manner in which the search was conducted was consistent with constitutional standards. The Jail personnel deny that Ms. Tardiff was effectively "naked" without her overcoat. RSMF ¶¶ 7 & 13. Moreover, she never indicated that she wanted a sweatshirt to cover her chest or torso, only that she wanted a sweatshirt because she was cold. RSMF ¶¶ 8 & 11. Ms. Tardiff was taken to a private area of the Jail and was strip searched by a female officer.

RSMF ¶ 14. The officer who conducted the search denies that Ms. Tardiff's body cavities were exposed to her during the search. RSMF ¶ 15.

While Ms. Tardiff may dispute some or all of these facts, her protestations do not advance her cause with regard to the Motion for Partial Summary Judgment. The record evidence supports the conclusion that the search of Ms. Tardiff complied with the requirements of the Fourth Amendment. The Court cannot find as a matter of law to the contrary.

### D. The evidence submitted by the Plaintiff of other specific arrestees does not support entry of summary judgment, either for the Plaintiff or the class.

Based on the way the Plaintiff has structured her summary judgment argument, it is unclear whether her discussion of other specific arrestees (Lynette Dean, Judy Carter, Susan Winchenbach, Robert Pedreira and Andrew Pratt) is intended to buttress her claim or the claim of the class in general, or both. Clearly, the Plaintiff's Motion for Partial Summary Judgment does not ask the Court to address their claims separately, in contradistinction to her own claim. In any event, the record is not undisputed with regard to the circumstances of these other arrestees.

For example, the record reflects that Susan Winchenbach was not strip searched at the Jail until after she was a sentenced inmate. While she first came to the Jail on March 13, 2000 as an arrestee, she was released from the Jail after a short stay and was not strip-searched.[1] SAMF ¶ 106. She was arrested again on March 14, 2000 and held at the Jail until she went to court on March 16. SAMF ¶ 107. She returned from court on March 16 as a sentenced inmate. SAMF ¶ 107. At that time, she was strip-searched, consistent with First Circuit precedent. *See Arruda v.*

---

[1] The Defendants also deny that Judy Carter and Andrew Pratt, other affiants, were strip-searched upon admission to the Jail during the arrests they attempt to describe. RSMF ¶¶ 77 & 95-100.

*Fair*, 710 F.2d 886, 888 (1st Cir. 1983).[2] She was not strip-searched before that occasion. SAMF ¶¶ 107-08.

Similarly, Lynette Dean was strip searched on constitutionally permissible grounds. Upon Ms. Dean's admission on December 22, 2000, she was hostile and assaultive. SAMF ¶ 110. This violent behavior justified the officers in strip searching her. SAMF ¶ 110.

These observations serve to undermine any utility that the affidavits have on summary judgment. The affidavits, which are formulaic in their consistency and were admittedly prepared by Ms. Tardiff's counsel, do not present the Court with an unimpeached body of corroborating testimony.

### E. The Class as a whole is not entitled to summary judgment on the issue of liability as there are, at a minimum, factual disputes that undermine the issue of liability.

The Plaintiff attempts to demonstrate class-wide liability despite numerous issues of disputed fact. Her effort is based upon an amalgam of: DOC inspections and an alleged lack of documentary evidence in Jail records. Taking both set of facts separately or together, the Plaintiff does not present a liability issue that can be resolved on summary judgment.

To understand the County's efforts to promulgate and implement policies that meet constitutional standards, a review of pertinent County policies and their evolution is appropriate. The pertinent officially promulgated policies of the Jail since 1994 have included:

    a. Policy A-130 – Staff Training (effective January 1995);

    b. Policy A-131 – Entry Level Training (effective January 1995);

    c. Policy C-120 – Admission Procedures – Inmates Not Bailed – (effective

---

[2] Of equal significance, she her circumstances place her outside of the class defined by the Court, a class which does not include sentenced inmates.

January 1995);

   d. Procedure for Implementing Policy C-120;

   e. Policy C-120 – Procedure for Policy C-120 Pre-Arraignment D & E Detainees (effective May 4, 2001);

   f. Policy C-120 – Daily Activity Schedule for Designated Housing for Pre-Arraignment Detainees Class D & E – (effective May 4, 2001);

   g. Policy C-120 – Intradepartmental Memorandum re: Management of Non-Searched Inmates – (March 19, 2002);

   h. Policy D-220 – "Search Procedures" – (revised January 1994);

   i. Policy D-220 – "Search Procedures" – (revised October 1994);

   j. Policy D-220 – "Search Procedures" – (effective January 1995).

SAMF ¶ 113.

Officially established jail policies and procedures are generally drafted by the Jail Administrator, and then provided to Sheriff Davey for approval. SAMF ¶ 114. All jail policies are also provided to the Department of Corrections for approval. SAMF ¶ 115. Sheriff Davey is the only individual at the Knox County Jail with the ability to make final decisions regarding the implementation of a jail policy or procedure. SAMF ¶ 116.

Policy A-130, entitled "Staff Training", requires that the Jail Administrator, among other things, implement the "A" level training phase of the Maine Criminal Justice Academy corrections curriculum for all new corrections personnel, and ensure that full implementation of post-academic training for all full time corrections officers to include "D" level training. SAMF ¶ 117. Policy A-131, entitled "Entry Level Training", requires that the Jail Administrator provide each correctional officer with a copy of the Knox County Jail Policy and Procedure

Manual and maintain a reference copy of the manual in the booking area. SAMF ¶ 118. The "A" level training referred to in Policy A-130 is described in more detail in Policy A-131 under "Procedure B". SAMF ¶ 119. This training includes training in Knox County Jail Policies and Procedures, control of contraband, principles of body searches, and constitutional law. SAMF ¶ 119.

All of the topics outlined in the preceding paragraph deal with, and provide training in, the area of strip searches. SAMF ¶ 120. Specifically, they include training in Knox County Jail polices regarding searches at the time of intake (Policy C-120) and strip searches (Policy D-220). SAMF ¶ 120.

In May of 1994, the Department of Corrections conducted a review of Section D of the Knox County Jail Policy and Procedure Manual. The review was conducted by John W. Hinkley, the State jail inspector. SAMF ¶ 121. The policy review informed Sheriff Davey that Policy D-220, pertaining to body searches, needed to be revised to coincide with Attorney General rules for searches. SAMF ¶ 122.

As a result of receiving the policy review, Davey instructed Raymond Voyer, Jail Administrator, to revise Policy D-220 to comply with the DOC requirements and the Attorney General regulations. SAMF ¶ 124. Voyer made the revisions and Davey approved them. SAMF ¶ 125. The revised Policy D-220 was approved by the Department of Corrections and went into effect in October of 1994. SAMF ¶ 126. Jail Administrator Voyer was instructed to require that the new policy be included in the Policy and Procedure Manual, and that all correctional staffers be trained in the policy and be required to implement it. SAMF ¶ 127.

In September, October and November of 1994, the Department of Corrections conducted an inspection of the Knox County Jail. SAMF ¶ 128. In December of 1994, the Department of

Corrections issued a report which Sheriff Davey and Voyer received. SAMF ¶ 128. The 1994 report identified certain areas of alleged non-compliance with the Department of Corrections Standards. SAMF ¶ 129. The report alleged that DOC Standard D.2.d was being violated because, "based on policy and staff statements, all inmates [were] being strip searched if they [were] to be housed". SAMF ¶ 129.

Davey, together with Jail Administrator Raymond Voyer, were required by DOC to provide a description of corrective action taken or planned. SAMF ¶ 130. The description of the corrective action taken/planned did not admit nor deny the allegation. SAMF ¶ 131. However, even though the area of non-compliance alleged that based upon "policy" all inmates were being strip searched when they were to be housed, the policy in effect specifically prohibited such searches unless supported by reasonable suspicion and unless the inmate was about to come into contact with the general population of inmates. SAMF ¶ 132. This policy had been approved by the Department of Corrections. SAMF ¶ 133. In the County's response to the 1994 DOC report, the County stated that "the search policy has been clarified for all correctional staffers; strip searches are no longer conducted except as specified in the standards". SAMF ¶ 134.

To the knowledge of Sheriff Davey, as the sole final decision maker at the Knox County Jail, strip searches of misdemeanor detainees were not routinely conducted at any time after the implementation of the revised Policy D-220 in October of 1994. SAMF ¶ 135. However, because the jail inspection began in September of 1994, it is possible that the information referred to in the DOC report predated the revision of the policy and the further training of correctional staffers. SAMF ¶ 136.

Even though Davey had no reason to believe that individuals charged with misdemeanors were being strip searched in the fall of 1994, particularly in light of the policy revisions made in

11

October of 1994, Davey asked Jail Administrator Voyer to review Policy D-220, along with Policy C-120. SAMF ¶ 137. Voyer made further revisions to both Policy C-120 and D-220, and presented those to Davey in January of 1995 when he approved them. SAMF ¶ 138.

Both the January 1995 revision of Policy C-120 and the January 1995 revision of Policy D-220 were again reviewed in January of 1996. SAMF ¶ 139. When Policy C-120 and D-220 were made effective in January of 1995 they were placed in the Policy and Procedure Manual. SAMF ¶ 140. Jail Administrator Raymond Voyer was instructed to ensure that correctional officers were provided with the revised policy and were given training in the implementation of the policies. SAMF ¶ 141. Voyer instructed his training staff to disseminate the October 1994 version of Policy D-220, and the January 1995 versions of Policies C-120 and D-220 to correctional staffers, and to train them in the polices and ensure that the policies were followed. SAMF ¶ 142.

In August and September of 2000, the Department of Corrections conducted another inspection of the Knox County Jail. SAMF ¶ 143. In October of 2000, the Department of Corrections issued a report identifying areas of non-compliance regarding its inspection of the Knox County Jail. SAMF ¶ 144. According to the report, the jail was not in compliance with the DOC Standard D-22.d because, "based on statements from staff, all inmates were being strip searched regardless of the crime if they are to be housed". SAMF ¶ 145. Davey, along with Jail Administrator Richard Robbins, prepared a response to the finding of non-compliance with Standard D.22.d and stated that "strip searches of Class D and E will not take place except in those instances described in the Standard". SAMF ¶ 146. The Knox County Jail did not admit or deny that, in fact, such searches had been taking place because the required response did not call upon them to do so. SAMF ¶ 147.

In connection with Knox County's response to the Department of Corrections regarding the October 2000 inspection, Davey instructed Jail Administrator Robbins to further review the procedure for handling detainees charged with Class D or E crimes. SAMF ¶ 148. In response to Davey's instruction, Jail Administrator Robbins developed a procedure for implementing Policy C-120 with respect to detainees charged with Class D and E crimes. SAMF ¶ 149. The procedure was presented to Davey and he approved it. SAMF ¶ 149. The procedure for implementing Policy C-120 became effective on May 4, 2001, and made explicitly clear and reinforced that detainees charged with misdemeanors were not to be strip searched in the absence of reasonable suspicion. SAMF ¶ 150. The purpose of this procedure was to reinforce the existing Policy C-120 and Policy D-220, and to spell out, in detail, how these detainees were to be handled. SAMF ¶ 150.

Robbins also developed a specific and detailed daily schedule for misdemeanor detainees who had not been strip searched. SAMF ¶ 151. In March of 2002, Jail Administrator Robbins issued an intradepartmental memorandum with respect to the management of non-searched inmates, wherein it was once again emphasized that detainees charged with misdemeanors were not to be strip searched. SAMF ¶ 152.

At no time between receiving the December 1994 Department of Corrections report and receiving the October 2000 Department of Corrections report was Davey ever aware of any allegation that would lead him to believe that detainees charged with misdemeanors were being routinely strip searched in the absence of reasonable suspicion. SAMF ¶ 153. At no time during his tenure as Jail Administrator, except when receiving the December 1994 DOC report, was Jail Administrator Voyer ever aware of any allegation that misdemeanor detainees were routinely being strip searched. SAMF ¶ 154. At no time while serving as Jail Administrator did David

Lovejoy ever receive any information indicating that misdemeanor detainees were being routinely strip searched. SAMF ¶ 155. At no time before receiving the October 2000 DOC report was Jail Administrator Robbins ever aware that misdemeanor detainees were being routinely strip searched. SAMF ¶ 156.

All versions of Policy C-120 and D-220, including the procedures for implementing Policy C-120, were promulgated by the respective Jail Administrators at the time, submitted to Davey for approval, approved by Davey, and placed in the Knox County Jail Policy and Procedure Manual. SAMF ¶ 157. Robbins instructed his training staff to provide training to correctional staffers in the procedure for implementing Policy C-120, and in the daily schedule for inmates affected by that policy. SAMF ¶ 158. Robbins personally conducted training, tested jail employees, and conducted random quality control exercises to verify that all jail staffers were knowledgeable of applicable policies and procedures in order to avoid strip searches of inmates charged with misdemeanors in the absence of individualized reasonable suspicion. SAMF ¶ 159.

As this detailed history reveals, the County at all pertinent times has maintained *written* Jail policies that do not violate the rights of the class as a whole. Sheriff Davey and the administrators took steps to promulgate policies that were more exacting than the Fourth Amendment requirements, based as they were on DOC and Attorney General standards. For example, the policy that was effective since January 1995, and reviewed in January 1996, states in pertinent part:

- That body searches of inmates should be performed in accordance with Attorney General rules of DOC jail standards;

- That searches should be performed in the least degrading manner, including a provision that body searches be performed by officers of the same gender as the inmate; and

- That "[s]trip searches will be conducted only on inmates brought in on a felony charge (A, B or C crime) or if the officer(s) have reasonable suspicion that contraband, i.e., a weapon, drugs, or evidence of a crime may be concealed under the clothing."

(Pl's Exh. 8).

This history also shows that Sheriff Davey and his jail administrators have at all times taken action to ensure that the corrections officers conduct searches that meet constitutional requirements. Newly hired officers were trained on Jail policies and provided copies of those policies. As alterations to policies specific to strip-searches were made, these changes were conveyed to the corrections officers through additional training. When DOC reviews indicated non-compliance with DOC standards – and not, it should be noted, non-compliance with constitutional standards – the Jail responded promptly to address the DOC's concerns. To the extent Sheriff Davey had notice of any possible irregularities, those irregularities pertained to DOC regulations and were quickly dealt with.

There is also record evidence that the policy has been followed by corrections officers at the Jail. For example, Richard Robbins testified that since he took the position of Jail Administrator in December of 2000, he emphasized with his staff the need to conduct searches consistent with the policy. (Pl's Exh. 12 (137/15 to 138/5)). Jail Administrator Robbins also checked with staff, supervisors and line officers on a random basis to ensure that misdemeanor

arrestees were not being strip searched without articulable suspicion.[3] (Pl's Exh. 12 (138/6-19)). Based on the written policy, as applied by the Jail officers, there is at least a genuine issue of material fact as to the circumstances of any searches that may have occurred with regard to misdemeanor arrestees.

The evidence the Plaintiff relies upon in requesting summary judgment is insufficient, both legally and factually. Legally, it is irrelevant whether the Jail personnel complied with State law or Jail policies in failing to fully document strip searches. Violations of State law or police procedure are not actionable under 42 U.S.C. § 1983. *Medina v. Cram*, 252 F.3d 1124, 1133 (10th Cir. 2001) (citing *Romero v. Board of Cty. Comm'rs*, 60 F.3d 702, 705 (10th Cir. 1995); *Wilson v. Meeks*, 52 F.3d 1247, 1554 (10th Cir. 1995); and *Davis v. Scherer*, 468 U.S. 183, 194-96 (1984)). Therefore, despite what the Plaintiff argues, the absence of any particular information recounting details about certain searches is not probative of the issue at the core of the class's case: whether a practice of routine searches existed without any consideration of reasonable suspicion. Put another way, the evidence may tend to show that the Jail officers were poor record-keepers, but it does not show, as a matter of law, that they violated the constitutional rights of the class members.

A similar observation can be made about the Plaintiff's reference to lack of documentation of contraband. Assuming, for the purposes of argument, that discovery of contraband during searches was not documented, it does not follow that no contraband was found. To the contrary, the Plaintiff's argument (that several types of information were not properly documented, including the name of the officer who conducted a search) militates

---

[3] That the Plaintiff disputes the accuracy of Jail Administrator Robbins' testimony is simply one more reason for the Court to deny the Plaintiff's Motion for Partial Summary Judgment with regard to liability to the class. (Pl's Mot. Sum. Jud't at 15-16). A conflict in the evidence precludes the entry of summary judgment as a matter of established summary judgment practice in the federal courts.

against any inference that the absence of a record means that no contraband was found. Under the Plaintiff's theory, it is just as likely that contraband was found, but that it was not properly logged. The inference in this regard must favor the non-movants and must go against the Plaintiff. Moreover, based on the testimony of Jail personnel, contraband has been discovered as the result of strip-searches. RSMF ¶ 102.[4]

The Plaintiff's reliance on inspection reports from the Maine Department of Corrections is also misplaced. The 1994 inspection is largely irrelevant because it precedes the class period. In any event, the inspection report reflected alleged violations of DOC regulations, not constitutional standards. Of equal significance, the 2000 report suggests that a violation of policy has been occurring based upon "statements of officers" without any additional information. Contrary to the Plaintiff's suggestion, this comment was not admitted "by omission" by the Jail. The Jail's response to this comment was simply that searches of arrestees accused on Class D and E crimes would not be conducted absent reasonable suspicion. (Pl's Exh. 15, at 4). With regard to both reports, moreover, the record reflects that the County took action to ensure both that the Jail's policies were in compliance with DOC standards (which were more rigorous than constitutional standards) and that the corrections officers were trained to carry out those policies.

Finally, the survey of Jail records by the Plaintiff's attorneys' office does not support the entry of summary judgment as a matter of law. The assertions contained in paragraphs 21 and 22 and Exhibit B of the Affidavit of Michelle Ward are only partially accurate. SAMF ¶ 167. With respect to Exhibit B of the Ward affidavit, Ms. Ward asserts that 25 inmates charged with Class

---

[4] In is important to note that even if no contraband was actually discovered, this fact alone would not militate against the Jail's interest in preserving safety. As the Supreme Court noted in *Bell*, the deterrent effect posed by a strip-search, in itself, served legitimate jail security interests. *See Bell*, 441 U.S. at 559.

D OUI were strip searched. SAMF ¶ 167. Of the 25 inmates selected by Ms. Ward, only nine were strip searched. SAMF ¶ 167. Six were "searched," and ten were sentenced inmates and therefore not within the class definition. SAMF ¶ 167. In addition, the table attached to Ms. Ward's affidavit identified as "Class E Misdemeanor Strip Search" is only partially accurate. SAMF ¶ 168. Of the 34 individuals identified by Ms. Ward, only 16 were strip searched. SAMF ¶ 168. Thirteen were "searched"; four were sentenced inmates and therefore not within the class definition; one was not strip searched; and in the case of one inmate, it was impossible to tell. SAMF ¶ 168. With respect to the exhibit annexed to Ms. Ward's affidavit entitled "Miscellaneous Misdemeanants Strip Searched," the information is only partially accurate. SAMF ¶ 169. Of the 21 inmates identified by Ms. Ward, only six were strip searched – six others were "searched," seven were sentenced inmates and therefore not within the class definition, and two were not searched. SAMF ¶ 169. In fact, using the exact dates selected by Ms. Ward in her tables, the Intake/Release Logs reveal that more inmates were not strip searched than were strip searched. SAMF ¶ 170.

Moving from the specific to the more general, Ms. Ward's affidavit does not justify summary judgment. Ms. Ward makes numerous conclusory statements about "routine" Jail practices over the class period involving Class D and Class E misdemeanants. However, Ms. Ward did not establish an appropriate foundation for making these generalizations. Her statements are based on a review of only 11 months of records, a fraction of the class period. Moreover, her characterizations about what was "routine" are entirely subjective.

The inaccuracies and other deficiencies in Ms. Ward's affidavit generate issues of fact that cannot be resolved on summary judgment. The point the Plaintiff apparently attempts to make through Ms. Ward's affidavit – that virtually all arrestees held on misdemeanor charges

were being strip-searched – is undermined when a closer examination of the records is conducted. Ms. Ward's affidavit does not establish the factual predicate for the Plaintiff's liability theory.

For all of these reasons, the Plaintiff cannot demonstrate, on behalf of the class, that summary judgment is appropriate. With written policies that are more stringent than the Fourth Amendment requires, she must rely upon evidence of an unconstitutional practice to which Sheriff Davey was deliberately indifferent. The conflicts in the evidence undermine the existence of the practice that the Plaintiff seeks to prove. Moreover, she fails to demonstrate, as a matter of law, that Sheriff Davey knew or should have known about an unconstitutional practice. To the contrary, the record reflects that whenever the possibility of more than an isolated variance from the Jail policy was brought to his attention, Sheriff Davey acted promptly to ensure that a standard more exacting than the Fourth Amendment requirements was reinforced. The Court should deny the Plaintiff's request for summary judgment.

**F.  Sheriff Davey cannot be held liable in his supervisory capacity as a matter of law in that the evidence does not support a finding of deliberate indifference.**

To the extent Sheriff Daniel Davey has been sued in his official capacity, the claim is redundant of the claim against County. *See Hafer v. Melo*, 502 U.S. 21, 25 (1991) (citing *Kentucky v. Graham*, 473 U.S. 159, 165-66 (1985)). In addition, there are no facts in the summary judgment record to suggest that Sheriff Davey participated in any alleged improper searches. Therefore, his individual liability is not at issue. Finally, viewing the current record, there is no basis for the Court to enter summary judgment against Sheriff Davey on the theory of supervisory liability.

A supervisory official can be held liable pursuant to 42 U.S.C. § 1983 only if a plaintiff can demonstrate an "affirmative link" between the subordinate officer's conduct and the supervisor. *See Carmona v. Toledo*, 215 F.3d 124, 131 (1st Cir. 2000). A supervisor "may be liable for the foreseeable consequences of [a subordinate's conduct] if he would have known of it but for his deliberate indifference or willful blindness. . . ." *Maldonado-Denis v. Castillo-Rodriguez*, 23 F.3d 576, 582 (1st Cir. 1994). "To demonstrate deliberate indifference a plaintiff must show (1) a grave risk of harm, (2) the defendant's actual or constructive knowledge of that risk, and (3) his failure to take easily available measures to address the risk. . . ." *Camilo-Robles v. Hoyos*, 151 F.3d 1, 7 (1st Cir. 1998), cert. denied, 525 U.S. 1105 (1999) (citations omitted). However, a supervisor's deliberate indifference is only actionable if a plaintiff can also prove causation. *Id.* A supervisor cannot be held liable solely on the basis of *respondeat superior*. *Monell v. Department of Social Servs.*, 436 U.S. 694 n.58 (1978).

The Plaintiff asserts that Sheriff Davey can be held liable based on the results of the DOC inspections and the existence of Carmen Miller's lawsuit. Neither set of facts establishes liability as a matter of law. After the results of the 1994 inspection were issued, Sheriff Davey and the then Jail Administrator, Raymond Voyer, took steps to rectify any inadequacies in the County policy. Specifically, they addressed the DOC's concern that persons charged with misdemeanors were apparently being strip-searched on intake without reasonable suspicion that they were concealing contraband. (Pl's Exh. 9 (Hinkley Dep. Exh. 2A at 1)). The result was the promulgation of a revised D-220, effective January 1995, which expressly required reasonable suspicion before a person arrested for Class D or E crimes could be strip-searched. (Pl's Exh. 9 (Hinkley Dep. Exh. 2A at 2); Pl's Exh. 8).

20

The DOC's report in 2000 does not establish that the alleged strip-searches continued from 1994 to 2000. As DOC inspector John Hinkley admitted during his deposition, the report in 2000 did not reflect whether the Jail had been in compliance from 1994 to 2000 – just that, according to the DOC, it was out of compliance again in 2000. (Pl's Exh. 9 (Hinkley Dep. at 115/6-16)). Moreover, Mr. Hinkley did not actually observe any improper searches while he was inspecting the Jail – he based his determination on comments by certain unidentified corrections officers. (Pl's Exh. 9 (Hinkley Dep. at 119/23 to 120/17)). Mr. Hinkley also conceded that he did not inquire of the Jail personnel he spoke with what they considered a strip search to be. (Pl's Exh. 9 (Hinkley Dep. at 122/2 to 123/9)).

In fact, the Plaintiff attempts to misdirect the Court with some sleight-of-hand concerning the DOC reports. As discussed in more detail above, neither the DOC jail standards nor the Maine Attorney General's standards are co-extensive with constitutional standards. In many respects, the former regulations are more exacting than the constitutional requirements. Therefore, violation of one would not necessarily constitute violation of the other. In addition, Mr. Hinkley confirmed that his inspections were not intended to indicate to the County whether it was transgressing constitutional standards. SAMF ¶ 165. Rather, the inspections were gauging compliance with DOC rules. SAMF ¶ 164. It does not follow – as the Plaintiff suggests without stating as much – that awareness of compliance issues related to DOC standards necessarily connotes notice of constitutional issues.

In any event, after both the 1994 report and the 2000 report, Sheriff Davey took steps to ensure that the Jail's written search policy was being followed. As the Defendants discuss at length above with regard to the claim against the County, Sheriff Davey, in coordination with his administrators, took steps after each inspection to ensure that the officers were trained in the Jail

21

standards. Just as these actions contradict any deliberate indifference on behalf of the County, they also undermine a claim against Sheriff Davey based on supervisory liability.

Finally, the First Circuit's decision in *Miller v. Kennebec Cty.*, 219 F.3d 10 (1st Cir. 2000) has little or no impact on this case because it did not conclusively decide anything. In *Miller*, the First Circuit vacated summary judgment for Knox County, holding that the plaintiff presented sufficient facts to allow the Section 1983 claim against the County to go to the jury. *Id.* at 12-13. However, no final determination of fact was made as to the County or Sheriff Davey. To the contrary, the First Circuit expressly held that despite the plaintiff's disputed evidence that "all persons unable to make bail were routinely strip searched regardless of whether they were suspected to have weapons or contraband" (evidence that the Court credited in her favor under the summary judgment standard), she was unable to show any evidence that Sheriff Davey's conduct amounted to "reckless indifference" or that there was a causal link between his actions (or inactions) and the alleged constitutional deprivation. *Id.* In any event, Ms. Miller's claim represents one incident that occurred approximately seven years before this class-action lawsuit was filed. In itself, her claim (which, as the Plaintiff notes, was settled and not reduced to a judgment) does not negate the efforts Sheriff Davey took to ensure compliance with the Jail's written policy. Therefore, it would be impossible for the Court to conclude as a matter of law that Sheriff Davey was recklessly or deliberately indifferent to the arrestees' rights, nor could the Court conclude that his actions were causally connected to any alleged violations. The Plaintiff has failed to make out her case against Sheriff Davey as an issue for summary judgment.

22

**G.     The issue of Sheriff Davey's liability cannot be resolved on summary judgment to the extent that his entitlement to qualified immunity shields him from liability under Section 1983.**

In *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982), the United States Supreme Court held that qualified immunity protects governmental officials based on an objective standard: "Governmental officials performing discretionary functions, generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs*, 475 U.S. 335, 341 (1986). The First Circuit has encapsulated the qualified immunity analysis as follows:

> The threshold question is whether the plaintiffs have established a constitutional violation. *Hope v. Pelzer*, 536 U.S. 730, 736, 153 L. Ed. 2d 666, 122 S. Ct. 2508 (2002); *Saucier v. Katz*, 533 U.S. 194, 201, 150 L. Ed. 2d 272, 121 S. Ct. 2151 (2001). The second question deals with fair warning; it asks whether the law was clearly established at the time of the constitutional violation. *Hope*, 536 U.S. at 739-41; *Anderson [v. Creighton]*, 483 U.S. [635] at 638-40 [(1987)]. The final question is whether a reasonable official, situated similarly to the defendant(s), would have understood that the conduct at issue contravened the clearly established law. *Saucier*, 533 U.S. at 202.

*Savard v. Rhode Island*, 338 F.3d 23, 27 (1st Cir. 2003).

In *Savard*, the First Circuit, sitting *en banc*, affirmed by an equally-divided court a grant of summary judgment based on qualified immunity. The defendants in *Savard* were corrections officers at the Rhode Island correctional facility who were accused of carrying out unconstitutional strip-searches of newly-admitted arrestees. The plaintiffs, who were all allegedly searched before March 17, 2000 (the date a federal district court ruled the jail's policy to be unconstitutional), asserted that a policy of strip-searching all persons who were admitted to the facility violated their Fourth Amendment rights. The First Circuit, in an opinion authored by

23

Judge Selya and joined by Judges Boudin, Lynch and Howard, found that the status of the law concerning strip-searches of inmates who were being admitted to facilities with mixed inmate populations (i.e., maximum and medium security inmates) was not clearly established in this jurisdiction until March 17, 2000.

Given the state of the law prior to the First Circuit's decision in *Roberts*,[5] Sheriff Davey would be entitled to qualified immunity with regard to any claims of supervisory liability arising out of incidents before 2001. Judge Selya's decision in *Savard* stands for essentially that proposition. In fact, the existence of the dissent in *Savard* only amplifies the point that Judge Selya was making: if eight judges of the First Circuit, with the benefit of briefing from counsel and generous resources to locate and analyze applicable law, cannot reach a consensus on when the constitutional standard was clearly established, if follows that Sheriff Davey should not be saddled with liability for attempting to run the Jail within the "grey area" of the law. As qualified immunity protects Sheriff Davey from liability, the Plaintiff is not entitled to summary judgment.

## IV.    Conclusion

At a minimum, the record reflects disputed facts as to both Ms. Tardiff's and the class's civil rights claims. The Plaintiff cannot demonstrate, as a matter of law, that the Defendants are liable for violations of the Fourth Amendment in carrying out searches that have been described as "valuable law enforcement tools in maintaining security." *Magill v. Lee County*, 990 F. Supp. 1382, 1389 (M.D. Ala. 1998), aff'd 161 F.3d 22, 1998 U.S. App. LEXIS 29922 (11th Cir. Ala.

---

[5] In *Savard*, the Court referred to March of 2000 as a threshold date because the relevant policy was the subject of a district court decision. The parties in *Savard* would therefore have been aware of the ruling, even though it was made at the district court level. In the instant case, notice to jail personnel in Maine of the nature of the right would be more logically tied to *Roberts* – a First Circuit decision that would have application in all district courts within the jurisdiction.

1998) (citing *Justice v. City of Peachtree City*, 961 F.2d 188, 193 (11th Cir. 1992)).  As these legal and factual issues remain to be resolved, the Court should deny the Plaintiff's Motion for Partial Summary Judgment.

Date: July 11, 2005

Respectfully submitted,

Peter T. Marchesi, Esq.
Attorney for Defendants
Wheeler & Arey, P.A.
27 Temple St. / P.O. Box 376
Waterville, Maine  04903-0376

_for and with permission of_

John J. Wall, III, Esq.
Attorney for Defendants
Monaghan Leahy LLP
95 Exchange Street, P.O. Box 7046
Portland, Maine  04112-7046

25