# UNITED STATES DISTRICT COURT

# DISTRICT OF MAINE

|  |  |
|---|---|
| LAURIE TARDIFF, individually and on behalf of others similarly situated, <br><br> Plaintiffs <br><br> v. <br><br> KNOX COUNTY, DANIEL DAVEY, in his individual capacity and in his official capacity as Knox County Sheriff, and JANE DOE and JOHN DOE, in their individual capacities, <br><br> Defendants | Civil No. 02-251-P-C |

Gene Carter, Senior District Judge

### ORDER GRANTING IN PART AND DENYING IN PART
### PLAINTIFFS' MOTION PARTIAL FOR SUMMARY JUDGMENT

Plaintiffs bring this action against Defendants Knox County, Knox County Sheriff Daniel Davey, and individual corrections officers Jane Doe and John Doe for violations of their civil rights pursuant to 42 U.S.C. § 1983. *See* Amended Complaint (Docket Item No. 2). Specifically, Plaintiffs' Amended Complaint alleges that as a result of being strip searched without reasonable suspicion their constitutional rights were violated by Knox County (Count I), Sheriff Daniel Davey (Count II), Corrections Officer Jane Doe (Count IV) and Corrections Officer John Doe (Count VI).[1] The class previously certified in this case is as follows:

---

[1] Counts III, V, and VII request punitive damages based on the alleged constitutional violations.

All people who after November 19, 1996, were subjected to a strip search and/or visual body cavity search without evaluation for individualized reasonable suspicion while being held at the Knox County Jail:

(1) after having been arrested on charges that did not involve a weapon, drugs, or a violent felony; or

(2) while waiting for bail to be set on charges that did not involve a weapon, drugs, or a violent felony; or

(3) while waiting for an initial court appearance on charges that did not involve a weapon, drugs, or a violent felony; or

(4) after having been arrested on a warrant that did not involve a weapon, drugs, or a violent felony.

Plaintiffs now move for Summary Judgment with respect to all liability claims.

## I. FACTS

### A. State Standards Applicable to the Knox County Jail

In Maine, the specific standards pursuant to which strip searches may be undertaken in correctional facilities come from the Attorney General.  *See* 5 M.R.S.A. §200-G(1)(2002) (directs the Attorney General to develop rules governing strip searches and body cavity searches).  The Attorney General's Rules for Strip Searches define a strip search as "a search during which the arrestee's body surface, including an arrestee's anal cavity and a female arrestee's vaginal cavity and breasts, is visually inspected." Plaintiffs' Ex. 10; Defendants' Ex. 58.[2]  The Attorney General's "Rules for Strip Searches, Mouth Searches and Body Cavity Searches of Arrestees" provides, in relevant part:

---

[2] There have been no substantive changes to the Attorney General's Rules since they were created in 1986. Hinckley Depo. at 42.

2

1. Strip searches and mouth search.  An arrestee may be subjected to a strip search and mouth search if any one of the following preconditions for such searches exists:

    A. Probable cause and warrant. ….

    B. Contact with inmates of a detention facility-arrestee for murder or a Class A, B, or C crime.  An arrestee for murder or a Class A, B, or C crime, or a corresponding juvenile offense, may be subjected to a strip search and mouth search if such arrestee is about to come into contact with any inmate of a detention facility.

    C. Contact with inmates of a detention facility – all other arrestees. An arrestee for other than murder or a Class A, B, or C crime, or corresponding juvenile offense, may be subjected to a strip search and mouth search if

        1) the law enforcement officer authorizing such search has reasonable suspicion to believe that the arrestee is concealing on or inside his body a weapon, contraband, or evidence of a crime, and

        2) the arrestee is about to come into contact with any inmates of a detention facility.  Reasonable suspicion may be based on such factors as the nature of the offense for which the arrestee is arrested, the nature of offenses for which the arrestee has previously been arrested, the arrestee's appearance, and the arrestee's conduct.

Defendants' Ex. 58.  The Standard, which the Department of Corrections applies for strip searches, provides:

    D.22.  Strip searches shall be conducted in compliance with the rules promulgated by the Maine Attorney General under 5 MRSA, Section 200G.  At a minimum, strip searches shall:

        a. Be conducted only by, and in the presence of, staff of the same sex as the inmate;

        b. Be conducted in private and in a manner that preserves the dignity of the inmate;

        c. At the time of arrest or admission to the facility, may conduct a strip search when a pre-trial inmate charged or held for murder, or a Class A, B, or C offense;

      d. At the time of arrest or admission to a facility, <u>not</u> conduct a strip search of a pre-trial inmate charged with a Class D, E or other misdemeanor offense unless the officer has reasonable suspicion to believe that an inmate is concealing contraband and is about to come into contact with inmates of the facility;

      e. In the case of an inmate taken into custody for execution of a sentence or already an inmate of a detention facility, be subject to strip search at any time, to include when the inmate enters or leaves a security perimeter;

      f. All strip searches conducted at the time of arrest or admission shall be recorded and include at a minimum:

            1. Name of the inmate and the staff person conducting the strip search and other persons present;

            2. In the case where required under 5 MRSA, Section 200G, justification for the strip search.

Defendants' Ex. 57.

      Maine law requires that "Each strip search or body cavity search shall be recorded in a log kept by the Department of Public Safety, sheriff's department or police department indicating the person who ordered the search, the name of the arrestee and the parts of the body searched." 5 M.R.S.A. § 200-G(2)(D). With respect to record keeping the Attorney General's Rules provide:

      Each strip search, mouth search, and body cavity search of an arrestee shall be recorded in a log kept by the law enforcement agency whose officers were involved in the search.

      The log shall indicate the name of the officer who ordered the search, the name of the officer or medically trained personnel who conducted the search, the names of the officers present at the search, the name of the arrestee, the parts of the body searched, and the justification or justifications for the search, e.g., (1) search warrant, (2) exigent circumstances and probable cause, (3) consent, (4) contact of arrestee for murder, a Class A, B, or C crime, or corresponding juvenile offense, with inmates of a detention facility, or (5) reasonable suspicion combined with contact of arrestee for other than murder, a Class A, B, or C crime, or corresponding juvenile offense, with inmates of a detention facility.

> Where the justification for a warrantless search is based on the existence
> of probable cause or reasonable suspicion, such probable cause or
> reasonable suspicion shall be summarized in the log.

Defendants' Ex. 58.

### B. Knox County Jail and Sheriff Davey's Policies on Strip Searches

Daniel Davey is the elected Sheriff of Knox County in 1985 and has served as Sheriff continually since then.  Davey Aff. ¶ 1.  As Sheriff of Knox County, Mr. Davey has final decision-making authority with respect to all policy and operational matters at the Knox County Jail.  Davey Aff. ¶ 2.  Officially established jail policies and procedures are generally drafted by the Jail Administrator, and then provided to Sheriff Davey for approval.  Davey Aff. ¶ 2.  All jail policies are also provided to the Department of Corrections for approval.  *Id*.  Sheriff Davey is the only individual at the Knox County Jail with the ability to make final decisions regarding the implementation of a jail policy or procedure.  *Id*.

Knox County Jail Policy D-220 entitled "Search Procedures" was revised in January 1994, and provided in relevant part:

Procedure A Search Procedures – General

> Body searches will be performed on inmates in the least degrading
> manner by corrections officers prior to beginning the admission
> process.  The officer performing the search will:

>> Strip search all incoming inmates prior to placement in the
>> general population;

>> ….

….

Procedure C Inmate Strip Search

Definition: A strip search is any unclothed search during which the inmate's body surface and cavities are visually inspected, with lifting or moving of body parts done by the individual being searched.

The intake Officer will conduct a strip search and mouth search on any inmate admitted to the facility who is:

Unable to bail on charges.

Charged with murder, or Class A, B or C crimes whether the individual is an adult or juvenile.

Allowed contact with any other inmate in the jail.

Exceptions: If an officer has reasonable suspicion to believe an inmate is concealing on or inside his/her body a weapon, contraband or evidence of a crime.

Defendants' Ex. 52.

### 1. 1994 Department of Corrections Policy Review and Jail Inspection

In May of 1994, the Department of Corrections conducted a review of Section D of the Knox County Jail Policy and Procedure Manual.  The review was conducted by Maine Jail Inspector John Hinckley.  Davey Aff. ¶ 7; Affidavit of Raymond Voyer ¶ 2. The policy review informed Sheriff Davey that Policy D-220, pertaining to body searches, needed to be revised to comply with the Attorney General's Rules for searches. Davey Aff. ¶ 7; Voyer Aff. ¶¶ 3, 4; Defendants' Ex. 55.  In September, October, and November of 1994, the Department of Corrections undertook an inspection of the Knox County Jail.  Mr. Hinckley, conducted that inspection and, during that inspection, Lt. Cathy Wyman indicated to Mr. Hinckley that Knox County strip searched all the detainees.  Hinckley Depo. at 80, 124; Defendants' Ex. 59 ("While it appears that this facility is in partial compliance, based on policy and staff statements, all inmates are being strip searched if they are to be housed.  This is in violation of D.22.d.").

A revised Knox County Policy D-220 was approved by the Department of Corrections and went into effect in October of 1994.  Defendants' Ex. 53.  In relevant part, the new search procedure provided:

Procedure A Search Procedures – General

Body searches will be performed in the least degrading manner by corrections officers prior to the admission process.  The officer performing the search will ensure that:
….

Strip searches will be conducted only on inmates brought in on a felony charge (A, B or C crime) or if the officer(s) have reasonable suspicion that contraband, i.e., a weapon, drugs or evidence of a crime may be concealed under their clothing.
….

….

Procedure C Inmate Strip Search

Definition: A strip search is any unclothed search during which the inmate's body surfaces and cavities are visually inspected, with the lifting or moving of body parts done by the individual being searched; all clothing items of said individual will also be searched thoroughly in the process.  Strip searches will be performed inside the Booking area in the shower stall after a pat search has first been done before admitting the detainee beyond the 110E door.

1. The intake (Booking) Officer will conduct a strip search of any inmate admitted to the facility who is:

a. Charged with murder, or a Class A, B or C crime and,

b. unable to bail on charges, and,

c. before coming in contact with any other inmate.

7

Defendants' Ex. 53.  Jail Administrator Raymond Voyer[3] was instructed that the new policy be included in the Policy and Procedure Manual, and that all corrections staff be trained in the policy and requirement to implement it. Davey Aff. ¶ 10; Voyer Aff. ¶ 13.

In December of 1994, the Department of Corrections issued a report which Sheriff Davey and Mr. Voyer received.  Defendants' Ex. 59; Davey Aff. ¶ 11; Voyer Aff. ¶ 6.  The report identified certain areas of non-compliance with the Department of Corrections Standards.[4]  Relevant to the issues raised in this case, the report found that Department of Corrections Standards and Attorney General's Rules for strip searches were being violated because "based on policy and staff statements, all inmates are being strip searched if they are housed."  Defendants' Ex. 59 at 31; Davey Aff. ¶ 11; Voyer Aff. ¶ 6; Hinckley Depo. at 77, 79; Plaintiffs' Ex.10, Attorney General's Rules and Regulations.  As a result of the 1994 policy review and the jail inspection, Sheriff Davey instructed Mr. Voyer to revise Policy D-220 to comply with Department of Corrections Standards and the Attorney General's Rules.  Davey Aff. ¶ 9; Voyer Aff. ¶ 5.  Mr. Voyer made revisions and Sheriff Davey approved them.  *Id.*

A few months later, Mr. Voyer made further revisions to both Policy C-120 and D-220, and in January 1995 Sheriff Davey approved them.  Defendants' Exs. 48, 54; Voyer Aff. ¶ 12; Davey Aff. ¶ 15.  Policy C-120 –"Admission Procedures - Inmates Not Bailed" provides in relevant part:

> The following admissions procedures are not required to be completed on inmates being admitted and immediately released.  Procedures, as outlined

---

[3] Mr. Voyer held the position of Knox County Jail Administrator from sometime in 1989 until May of 1996.  Voyer Aff. ¶ 1.

[4] Since inspection of the jail began in September 1994, some of the information included in the 1994 Jail Inspection Report may have occurred before Knox County Policy D-220 was revised in October 1994.

below, are necessary to safely admit inmates who are not going to make bail, while protecting their rights.

PROCEDURE A        Strip Search/Decontamination

1. Strip searches will be conducted on pre-trial inmates at the time of arrest or admission to the facility if they are charged or held for murder or a class A, B or C crime[]; they will be conducted only under the following conditions:

    a. They shall be conducted only by, and in the presence of, staff of the same sex as the inmate.

    b. They shall be recorded and include at a minimum:

        (1)    Name of inmate.
        (2)    Name of staff person doing the search.
        (3)    Name of any other persons present.
        (4)    Justification for search if required under 5 MRSA, Section 200G.

2. Strip searches will also be conducted on inmates taken into custody for execution of a sentence or already an inmate of a detention facility, to include when the inmate(s) enter or leave a security perimeter.

3. Strip searches will <u>NOT</u> be conducted at the time of arrest or admission on pre-trial inmates charged with a class D, E, or other misdemeanor offense unless the officer has <u>REASONABLE SUSPICION</u> to believe that an inmate is concealing contraband and is about to come in contact with other inmates of the facility.

Defendants' Ex. 48.  Policy D-220 –"Search Procedures" became effective January 1995

and provides, in relevant part:

Contraband in a correctional facility creates a danger to staff, visitors and residents.  In an effort to stem the flow of contraband, facility shakedowns, searches of common and living areas will be performed, in addition to body searches of inmates in accordance with the Maine State Attorney General's Rules for Searches and the Maine Jail Standards.

Officers must act in a professional manner while performing pat and strip searches and do them in the least degrading manner possible.

PROCEDURE A        Search Procedures, General

1. Body searches will be performed in the least degrading manner by corrections officers prior to the admission process.  The officer performing the search will ensure that:

      a. Pat search all detainees brought into the jail between the 105E and 110E doors <u>before</u> the 110E door is opened and they are brought in to Booking.

      b. Strip searches will be conducted only on inmates brought in on felony charge (A, B, or C crime) or if the officer(s) have reasonable suspicion that contraband, i.e., a weapon, drugs, or evidence of a crime may be concealed under their clothing.

      c. All inmates being transported will be pat searched; they may be strip searched if probable cause exists to believe that the safety of the officers, the inmates and/or the public could be in jeopardy.

      d. The following information is recorded in the Daily Log (Shift Activity Log).

            (1)     Date, time and location of search.
            (2)     Name of the inmate(s).
            (3)     Any items seized.
            (4)     Name(s) of Officer(s) performing the search.

      e. Incident reports are prepared and submitted if any contraband is found.

      f. Searches are performed by persons of the same gender as the person(s) being searched.

….

PROCEDURE C       Inmate Strip Search

DEFINITION:       A strip search is any unclothed search during which the inmate's body surfaces and cavities are visually inspected, with the lifting or moving of body parts done by the individual being searched; all clothing items of said individual will also be searched thoroughly in the process.  Strip searches will be performed inside the Booking area in the shower stall after a pat search has first been done before admitting the detainee beyond the 110E door.

1. The Intake (Booking) Officer will conduct a strip search of any inmate admitted to the facility who is:

a. Charged with murder, or a Class A, B, or C crime and,

b. Unable to bail on charges, and,

c. Before coming in contact with any other inmate.

d. A strip search may also be performed for the safety of the staff and inmate population and security of the facility when probable cause exists to believe that the Inmate in question may be concealing contraband and/or weapons on his/her person and a pat search has not turned up anything.

2. The strip search must be conducted by an officer of the same sex as the inmate, with the following rules observed:

a. Allowing only those officer personnel of the same gender who are necessary to be present during the search for the following reasons:

(1)     Protection.
(2)     Witnessing removal of contraband or evidence of a crime.
(3)     Other legitimate law enforcement purpose.

Defendants' Ex. 54.  When Policy C-120 and D-220 were made effective in January of 1995 they were placed in the Policy and Procedure Manual.[5]  Davey Aff. ¶ 16.  These policies clearly prohibit strip searches of misdemeanor detainees without reasonable suspicion.  Jail Administrator Voyer was instructed to ensure that correctional officers were provided with the revised policy and were given training in the implementation of the policies.  *Id.*  In describing the corrective action planned or taken, Sheriff Davey, together with Mr. Voyer, responded to the Department of Corrections Statement of Deficiencies for Standard D-22 stating: "The search policy has been clarified for all

---

[5] Both the January 1995 revisions of Policy C-120 and Policy D-220 were again reviewed in January of 1996.  Davey Aff. ¶ 16.  It does not appear that any further changes were made to the policies in 1996.

correctional staffers: strip searches are no longer conducted except as specified in the standards." Defendants' Ex. 60; Hinckley Depo. at 94; Davey Aff. ¶12; Voyer Aff. ¶ 7.

### 2. 2000 Department of Corrections Jail Inspection

In August and September of 2000, the Department of Corrections conducted another inspection of the Knox County Jail. Davey Aff. ¶ 17. When he inspected the Knox County Jail again in 2000, Mr. Hinckley found that the jail was not in compliance with Department of Correction Standard on strip searches. Plaintiffs' Ex. 14, 2000 Biennial Inspection Report of Knox County Jail; Hinckley Depo. at 95, 119-120. During the 2000 Jail Inspection, two different Knox County Jail employees interviewed by Mr. Hinckley verified that Knox County was strip searching every detainee.[6] Hinckley Depo. at 97. Moreover, although in some instances Knox County may have relied on the charge itself as the basis for the strip search, the report finds that the specific justification for strip searches required by the Attorney General's Rules, was not being documented by Knox County. Plaintiffs' Ex. 14, 2000, Biennial Inspection Report of Knox County Jail; Hinckley Depo. at 99, 100.

In October of 2000, the Department of Corrections issued a report identifying areas of non-compliance regarding its inspection of the Knox County Jail. Defendants' Ex. 61; Davey Aff. ¶ 17. According to the report and relevant to this case, the jail was not in compliance with the Department of Corrections Standard on strip searches

---

[6] In argument, and without any evidentiary support, Defendants suggest that when interviewed by Inspector Hinckley, the corrections officers may have understood the term "strip search" to be a detainee disrobing but not viewed by the corrections officer. Under Maine law, the Attorney General's Rules, and Knox County policies and procedures, the definition of the term "strip search" is clear and includes viewing the detainee's unclothed body and inspecting body cavities. The record indicates that corrections officers at the Knox County Jail are trained in the definition as well as the procedure for conducting a strip search when initially hired. Defendants' Ex. 47. In the absence of any evidentiary indication by a corrections officer that they understood the term "strip search" to be other than as it is defined in Maine law, the Court will disregard this suggestion.

because, "based on statements from staff, all inmates were being strip searched regardless of the crime if they are to be housed."  Defendants' Ex. 61; Davey Aff. ¶ 17.  In February 2001, Sheriff Davey prepared a response to the finding of non-compliance with Standard D.22.d and stated that "strip searches of Class D and E will NOT take place except in those instances described in the standard."  Defendants' Ex. 62 (emphasis in original); Davey Aff. ¶ 18.

After the 2000 Jail inspection, Jail Administrator Richard Robbins[7] developed a procedure for implementing Policy C-120 with respect to detainees charged with Class D and E crimes.  The procedure for implementing Policy C-120 was approved by Sheriff Davey and became effective in May 2001, providing that detainees charged with misdemeanors "will be *pat searched*."  Defendants' Ex. 49 (emphasis in original); Davey Aff. ¶ 20.  The only mention of strip search is in a section dealing with metal detector alerts where the procedure states "[a]rticulable suspicion is justification for strip search."  Defendants' Ex. 49.  At the same time, Jail Administrator Robbins also developed a specific and detailed "Daily Activity Schedule for Designated Housing for Pre-Arraignment Detainees Class D and E Section 128/cells 130, 131, and 132."  Defendants' Ex. 50.  This procedural memorandum indicated that "[a]ll detainees held in this section HAVE NOT been strip searched; they will not have contact with each other for security reasons."  Defendants' Ex. 50 (emphasis in original); Davey Aff. ¶ 22.

---

[7] Mr. Robbins' affidavit states that he began his tenure as Jail Administrator on December 11, 2001, and was the Jail Administrator of the Knox County Jail until at least March 2003.  Affidavit of Richard Robbins (March 28, 2003) ¶ 1.  However, it appears that Mr. Robbins was serving as Jail Administrator when he approved the memorandum entitled "Procedure for Policy D-120 Pre-Arraignment D & E Detainees" in May 2001.

In May 2001, after Knox County settled a law suit alleging unconstitutional strip searches, Mr. Robbins wrote a memorandum to the chiefs of the local police departments stating:

> 1. As you, no doubt, know, the County recently settled a law suit, which charged that Jail staff conducting [sic] an inappropriate strip search in 1994.
>
> 2. As a consequence of the suit, an extensive and in-depth review of policy and procedure regarding strip searches was conducted by the administration of the Knox County Jail. You may, also, recall that in the past staff at the Jail were occasionally requested to conduct a strip search of an arrestee at the request of the arresting agency. On such occasions a written authorization/request was executed by the arresting officer.
>
> 3. Please be advised that given the resolution of the law suit (Miller v. Knox County et al), *the Jail will no longer conduct a strip search of those arrested and charged with Class D and/or Class E offenses at the request of the arresting officers (for the purpose of discovering evidence)*. If an arresting officer desires to have an arrestee strip searched for the purpose of discovering evidence, the search must take place prior to admission to the Jail.

Plaintiffs' Ex. 23 (emphasis added). In March of 2002, Jail Administrator Robbins issued a memorandum to all staff entitled "Management of Non-Searched Inmates," which states:

> [t]he purpose of the P&P re: non-search inmates is to minimize, as much as possible, the opportunities for such inmates to mix among themselves or the general population. The goal is intended to reduce liability for the County since we cannot be assured that contraband is not in possession of such inmates absent a strip search, which the First Circuit Court has prohibited without articulable suspicion.

Defendants' Ex. 51; Davey Aff. ¶ 23.

Later, in connection with the investigation of this law suit, Mr. Robbins wrote an intradepartmental memorandum which provides:

1. Based on the notation in the Lynette ROBINSON inmate file [12/22/00 @ 0702] that C/O M. Kenney had strip searched inmate ROBINSON, I interviewed C/O Kenney this date.

2. In response to my inquiry C/O Kenney explained her understanding of the current strip search policy, identifying felony PT inmates, sentenced inmates (regardless of class) and misdemeanor PT inmates based upon articulable suspicion were subject to strip search.

3. *C/O Kenney advised that she had been employed at the facility for approximately 5 years and that prior to the procedural changes adopted in February 2001, it was her understanding that anyone, regardless of crime class was to be stripped searched if they were admitted to the general population. She further advised that it was her recollection that she was trained to conduct strip searches of any inmate admitted to general population during her classroom training and job shadowing, albeit she did not recall who presented that segment of her training.* She stated that she had no recollection of the strip search policy developed and written by (then) jail administrator Raymond Voyer.

4. I spoke with Sgt. Jay Costigan and R/O Cheryl Daniello this date regarding the strip search policy and practice. *Both indicated that they recalled a discussion several years ago in which the Voyer and D.O.C. policies were mentioned and that the decision was made by someone (unidentified) to disregard the applicable policy and standard and continue to search all inmates, regardless of crime class, if they were to be admitted to the general population.* The justification, as they recalled, was safety and security of the facility. Sgt. Costigan stated that he doesn't recall ever seeing or receiving a copy of the Voyer strip search policy.

5. Since the policy was written by Mr. Voyer in his capacity as jail administrator, and both Sgt. Costigan and R/O Daniello suggested that a conscious decision was made to disregard the policy, it is reasonable to believe that the ONLY person that could have issued such an advisory to disregard the policy that would have had a compulsory effect on staff would have been Lt. Wyman. As program officer, Lt. Gardner would have lacked such authority.

Plaintiffs' Ex. 20 (emphasis added). A few days later, Mr. Robbins penned another memorandum stating:

1. Based on the notation in the Lynette ROBINSON inmate file [12/22/00 @0702] that C/O M. Kenney had strip searched Inmate ROBINSON, I interviewed C/O Kenney on 2/14/03.

2. *During the course of the interview C/O Kenney mentioned that she was trained to strip search everyone that was not going to be admitted to bail.* She mentioned that C/O Dane Winslow was in her training class and would, therefore, advise that he was trained in the same way.

3. I interviewed C/O Winslow in my office on 2/14/03 at approximately 1615 hours.  I asked C/O Winslow what his understanding of the current strip search policy was.  He explained his understanding, which appeared to be correct except that he did not believe that any misdemeanor PT inmate could be strip searched.

4. *I asked C/O Winslow what his training had been when he first joined the agency.  He confirmed the representation of C/O Kenney, viz., that he had been trained to strip search any inmate that was not admitted to bail regardless of crime class.*  He could not recall who taught the unit, nor was he aware that Maj. Raymond Voyer, former jail administrator, had written an agency policy that prohibited strip searches of misdemeanor PT arrestees.  In response to my request C/O Winslow indicated that he would attempt to locate his training materials in order to identify who taught the strip search unit.

Plaintiffs' Ex. 20 (emphasis added).

### C. Evidence of Strip Searches Conducted at the Knox County Jail

On February 7, 2001, at approximately 5:05 p.m., Plaintiff Laurie Tardiff was arrested at her residence in Rockland, Maine, by a Rockland Police Officer.  Ms. Tardiff was arrested pursuant to a warrant for tampering with a witness – a Class C felony charge.  *See* 17-A § 454(1)(A)(2); Simmons Aff. ¶ 6; Middaugh Aff. ¶¶ 2, 3; Defendants' Exs. 63-65; Affidavit of Laurie Tardiff at ¶ 3.  Prior to leaving home, she was required to empty her pockets in front of the arresting officer.  Tardiff Aff. ¶ 5.  Ms. Tardiff was taken to the Knox County Jail, and on her arrival, was booked in the intake area.  Tardiff Aff. ¶ 6.  After being booked, Ms. Tardiff was taken to a shower area and Correction Officer Linda Simmons ordered her to remove her clothing for inspection.[8]  Tardiff Aff. ¶

---

[8] The shower room in the booking area of the Knox County jail is used exclusively for conducting strip searches.  Robbins Depo. at 57.  The shower room where the strip searches take place is L-shaped and

15.  After her clothing was removed, Ms. Tardiff was strip searched.[9]  Tardiff Aff. ¶ 22-

23.  Once this process was completed, Ms. Tardiff was given jail clothing and allowed to

dress.  Simmons Aff. ¶¶ 6-12; Defendants' Ex. 28.  Ms. Tardiff was then placed in a cell.

The Intake/Release Log for February 7, 2001, omits reference to Ms. Tardiff's strip

search.  Plaintiff's Exhibit 2.

Over the relevant class period, six separate months of the Knox County Jail's

Intake/Release Logs and Inmate Daily Logs,[10] were randomly selected to create a sample

of potential class members: January 1997, February 1998, November 1999, October

2000, July 2001, and August 2002.  Ward Aff. ¶¶ 1-8.  During these six sample months at

least seventeen persons charged with various Class E crimes were strip searched without

reasonable suspicion.[11]  Ex. A of Ward Aff.; Defendants' Ex. 67.  During these six

sample months at least nine persons charged with Class D OUI were strip searched

without reasonable suspicion.[12]  Ward Aff. ¶¶ 21, 22; Ex. B of Ward Aff.; Defendants'

---

adjacent to the small property room in the booking area.  Robbins Depo. at 57.  It is not clear from the record whether there is a curtain over the shower stall or over the entry into the shower room or both.  In any case, the record presents an issue of fact as to whether other persons passing the shower room can view the individual being strip searched.  Colson Affidavit ¶ 12; Tardiff Aff. ¶¶ 19-20; Pratt Aff. ¶ 13.

[9] Although Officer Simmons states that she performed the strip search of Ms. Tardiff as she had been trained, Simmons Aff. ¶ 7, and the Knox County Jail standard procedures require a visual body cavity inspection be performed by the corrections officer when conducting a strip search, Defendants' Ex. 54, Officer Simmons disputes Ms. Tardiff's claim that she completed a visual body cavity inspection of Ms. Tardiff, Simmons Aff. ¶ 11; Tardiff Aff. ¶ 22.  Officer Simmons does admit that she had Ms. Tardiff squat and cough.  Simmons Aff. ¶ 11; Robbins Depo. at 150;

[10] If a notation that a detainee was strip searched was made, it was made in the Intake/Release Log or the Daily Log.

[11] During these six sample months Plaintiffs contend that thirty-four persons charged with various Class E crimes were strip searched without reasonable suspicion.  Exhibit A of Ward Aff.  Defendants respond that thirteen of the Class E misdemeanants were "searched" but not "strip searched" and four were sentenced inmates not part of the class.  Affidavit of Donna Campbell ¶¶ 7-9.  For purposes of summary judgment, the Court will consider only the seventeen arrestees that the parties agree upon as having been strip searched.

Ex. 68.  In addition, during these six sample months at least six persons charged with miscellaneous Class D misdemeanors were strip searched without reasonable suspicion.[13] Ward Aff. ¶ 16; Ex. C of Ward Aff.; Defendants' Ex. 69.

## II. DISCUSSION

Summary judgment is appropriate only if the record shows "that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed.R.Civ.P. 56(c); *United States Steel v. M. DeMatteo Constr. Co*., 315 F.3d 43, 48 (1st Cir.2002).  "In this regard, 'material' means that a contested fact has the potential to change the outcome of the suit under the governing law if the dispute over it is resolved favorably to the nonmovant.  By like token, 'genuine' means that 'the evidence about the fact is such that a reasonable jury could resolve the point in favor of the nonmoving party.'"  *Navarro v. Pfizer Corp*., 261 F.3d 90, 93-94 (1st Cir.2001) (quoting *McCarthy v. Northwest Airlines, Inc*., 56 F.3d 313, 315 (1st Cir.1995)).  The party moving for summary judgment must demonstrate an absence of evidence to support the nonmoving party's case.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).  In determining whether this burden is met, the court must view the record in the light most favorable to the nonmoving party and give that party the benefit of all reasonable inferences in its favor.  *Nicolo v. Philip Morris, Inc*., 201 F.3d

---

[12] During the six sample months Plaintiffs contend that twenty-four Class "D" OUI's were strip searched without articulable suspicion.  Ward Aff. ¶¶ 21, 22 and Exhibit B of Ward Aff.  Defendants respond that six of the Class D OUI misdemeanants were "searched" but not "strip searched" and ten were sentenced inmates not part of the class.  Campbell Aff. ¶¶ 3-6.  For purposes of summary judgment, the Court will consider only the nine arrestees that the parties agree upon as having been strip searched.

[13] During the six sample months Plaintiffs contend that twenty-one Class "D" misdemeanants were strip searched without reasonable suspicion.  Ward Aff. ¶ 16 and Exhibit C of Ward Aff.  Defendants respond that six of the Class D misdemeanants from this list were "searched" but not "strip searched," seven were sentenced inmates not part of the class, and two were not searched.  Campbell Aff. ¶¶ 10-13.  For purposes of summary judgment, the Court will consider only the six arrestees that the parties agree upon as having been strip searched.

29, 33 (1st Cir. 2000).  Once the moving party has made a preliminary showing that no

genuine issue of material fact exists, the nonmovant must "produce specific facts, in

suitable evidentiary form, to establish the presence of a trialworthy issue." *Triangle*

*Trading Co. v. Robroy Indus., Inc.*, 200 F.3d 1, 2 (1st Cir. 1999) (citation and internal

punctuation omitted); Fed.R.Civ.P. 56(e).  "As to any essential factual element of its

claim on which the nonmovant would bear the burden of proof at trial, its failure to come

forward with sufficient evidence to generate a trialworthy issue warrants summary

judgment to the moving party."  *In re Spigel*, 260 F.3d 27, 31 (1st Cir. 2001) (citation and

internal punctuation omitted).

## A. MUNICIPAL LIABILITY

A claim under section 1983 requires the plaintiff to show the deprivation of a

federally secured right by a person acting under color of state law.  *See* 42 U.S.C. § 1983;

*see also Camilo-Robles v. Hoyos*, 151 F.3d 1, 5 (1st Cir.1998).  A municipality cannot be

held liable under 42 U.S.C. § 1983 for constitutional deprivations unless the

unconstitutional conduct occurred as a result of the implementation or execution of a

municipal policy or custom.  *Monell v. New York City Dept. of Social Services*, 436 U.S.

658, 690-91, 694, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978).  As with any other tort claim,

there must be a showing in a section 1983 action of "a direct causal link" between the

municipal policy or custom and the alleged constitutional deprivation.  *Canton v. Harris*,

489 U.S. 378, 385, 109 S. Ct. 1197, 103 L. Ed. 2d 412 (1989).

In applying *Monell*, courts have struggled to determine just which sorts of

municipal wrongdoing may properly be said to have caused constitutional violations.  *See*

*id.* (noting that this inquiry has left the Supreme Court "deeply divided").  A clear basis

for municipal liability is, however, the municipality's enforcement of an unconstitutional regulation, ordinance, or written policy. *See Pembaur v. City of Cincinnati*, 475 U.S. 469, 480, 106 S. Ct. 1292, 89 L. Ed. 2d 452 (1986). A "policy" may be established by either a policy or decision adopted by the municipality or a single act of a municipal official with final policymaking authority. *See St. Louis v. Praprotnik*, 485 U.S. 112, 124, 108 S. Ct. 915, 99 L. Ed. 2d 107 (1988). Another basis for municipal liability arises out of an unconstitutional "custom or practice" if it is "so well settled and widespread that the policymaking officials of the municipality can be said to have either actual or constructive knowledge of it yet did nothing to end the practice." *Bordanaro v. McLeod*, 871 F.2d 1151, 1156 (1st Cir. 1989). Unlike a "policy," which comes into existence because of the top down affirmative decision of a policymaker, a "custom or practice" develops from the bottom up. Thus, the liability of the municipality for custom-based constitutional violations derives not from its creation of the custom, but from its tolerance of or acquiescence in it. *Id.*

### 1. The Constitutionality of the Policy of Strip Searching All Detainees Charged with a Non-Violent, Non-Weapon, or Non-Drug Felony

Plaintiffs contend that Knox County's written policy of strip searching all felony detainees without reasonable suspicion is unconstitutional. Defendants respond that the felony charge itself provides the justification to perform a strip search. Because the class of Plaintiffs certified in this case include only those detainees charged with a non-violent, non-weapon, non-drug felony, it is not necessary for the Court to decide the issue of whether any felony charge alone provides a constitutional basis upon which to strip search a detainee. Rather the Court will consider the narrower question of whether a

detainee charged with a non-violent, non-weapon, non-drug felony can be constitutionally strip searched based on the charge alone.

Almost twenty-five years ago the Supreme Court laid out a balancing test under the Fourth Amendment to determine the reasonableness of a search which requires the weighing of the "need for the particular search against the invasion of personal rights that the search entails." *Bell v. Wolfish*, 441 U.S. 520, 559, 99 S. Ct. 1861, 60 L. Ed. 2d 447 (1979). Specifically, this balancing test requires courts to "consider the scope of the particular intrusion, the manner in which it is conducted, the justification for initiating it, and the place in which it is conducted." *Id.* In applying the *Bell* test in the context of misdemeanor detainees, the First Circuit concluded that strip and visual body cavity searches "must be justified by at least a reasonable suspicion that the arrestee is concealing contraband or weapons." *Swain v. Spinney*, 117 F.3d 1, 7 (1st Cir. 1997). *See also Wood v. Clemons*, 89 F.3d 922, 929 (1st Cir. 1996)(reasonable suspicion standard is the appropriate one for justifying strip searches of prison visitors); *United States v. Uricoechea-Casallas*, 946 F.2d 162, 166 (1st Cir. 1991)(reasonable suspicion standard is the appropriate one for justifying strip searches non-routine border searches). In the years following *Swain*, the First Circuit has reaffirmed that strip searches of persons arrested on a misdemeanor charge and brought to a local jail for booking must be justified by individualized reasonable suspicion of concealed weapons or contraband. *See Wood v. Hancock County*, 354 F.3d 57, 62 (1st Cir. 2003); *Roberts v. Rhode Island*, 239 F.3d 107, 113 (1st Cir. 2001); *Miller v. Kennebec County*, 219 F.3d 8, 12-13 (1st Cir. 2000); *see also Savard v. Rhode Island*, 338 F.3d 23, 37 (1st Cir. 2003)(en banc)(equally divided court affirmed district court's grant of qualified immunity to defendants based on

conclusion that unlawfulness of strip search of misdemeanants housed at a state's maximum security prison without particularized suspicion was not clearly established).

The record in this case establishes that pursuant to Knox County's written policy corrections officers at the Knox County Jail routinely strip search newly-arrived felony arrestees regardless of the charge. The jail policies do not differentiate between violent felonies and other non-violent, non-weapon, or non-drug Class "C" crimes. Robbins Depo. at 12. Under Maine law, there are some felony crimes that do not involve violence, weapons, or drugs. For example, Maine's "Operating Under the Influence" statute provides a Class C felony. *See* 29-A M.R.S.A. § 2411. It cannot be understood that being accused of operating under the influence would automatically provide reasonable suspicion to believe that the detainee was concealing contraband on or in their body.

While the goal of preventing the entry of contraband into a local jail is justifiable from the standpoint of safety and security, such justification alone can not sustain a policy or practice of strip searching individuals without reasonable suspicion. *See Wood*, 89 F.3d at 928 ("[A] strip search can hardly be characterized as a routine procedure or as a minimally intrusive means of maintaining prison security. Indeed, 'a strip search, by its very nature, constitutes an extreme intrusion upon personal privacy, as well as an offense to the dignity of the individual.'")(internal quotations omitted). Defendants offer no evidence or precedent that would justify a policy for searching all detainees charged with non-violent, non-weapon, or non-drug felonies. Although Defendants assert that the reason for the policy is to prevent the entry of contraband into the facility, they do not argue that the Knox County Jail is frequently confronted with contraband smuggled into

the Knox County Jail.  There is no evidence that detainees have typically concealed contraband or weapons in their bodies in the past, let alone that the felony detainees are responsible for a greater amount of contraband than misdemeanor detainees.  Defendants' rely on three incident reports from the Knox County Jail all arising out of the August 2002 two-day detainment of a single felony arrestee named Jodi Young.  Defendants' Exs. 71, 72, 73.  Each report indicates that contraband was discovered either in her cell or on her person.  *Id.*  However, it is not determinable from the record whether she was charged with a felony involving violence, a weapon or drugs.  Since it is not known on what type of felony charge she was detained, evidence of her possession of contraband while at the Knox County Jail is not necessarily probative of the justification for strip searching all felony detainees.  The evidentiary record, contrary to Defendants' assertion, does not support a conclusion that a non-violent, non-weapon, non-drug felony charge automatically provides reasonable suspicion to conduct a strip search.

Defendants assert that in developing their policy they relied on the Attorney General's Rules and Department of Corrections Standards, which permit the strip search of all felony arrestees without reasonable suspicion.  This argument, however, goes only to the question of Knox County's good faith in adopting those non-mandatory rules and standards.[14]  Since the County is not entitled to the benefit of a qualified immunity defense, Knox County's reliance on them does not excuse the application of an otherwise unlawful policy.  *See Owen v. City of Independence*, 445 U.S. 622, 639, 100 S. Ct. 1398,

---

[14] Defendants assert that the Department of Corrections Standards are mandatory for all county jails.  While Department of Corrections Standards may be mandatory, the relevant provisions governing strip search policy and procedure in those standards, like the Attorney General's Regulations, merely authorize, but do not require, felony detainees to be strip searched.  Defendants' Exs. 57 and 58.

63 L. Ed. 2d 673 (1980) (municipality may not assert the good faith of its officers as a

defense to section 1983 liability).

    While the First Circuit has not directly addressed the appropriate test for the

validity of a strip search during the booking process at a local jail and incident to a felony

arrest, this Court concludes that, with respect to detainees charged with a non-violent,

non-weapon, non-drug felony, the particularized reasonable suspicion test is applicable,

rather than strip searches of all felony arrestees being authorized based solely on the fact

that they had been arrested on a charge categorized under state law as a felony. *Swain*,

117 F.3d at 7 ("[I]t is clear that at least the reasonable suspicion standard governs strip

and visual body cavity searches in the arrestee context…."). This conclusion is based in

part on the First Circuit's clear statements about constitutional protections applicable to

individuals who are the subject of a governmentally initiated strip search. The law in this

Circuit does not countenance a policy permitting strip searches of all non-violent, non-

weapon, non-drug felony detainees upon arrival at a local correctional facility simply

because they stand accused of a felony. The distinction between felony and misdemeanor

detainees alone fails to address the likelihood that a detainee would be concealing drugs,

weapons, or other contraband. *See Tennessee v. Garner*, 471 U.S. 1, 14, 105 S. Ct. 1694,

85 L. Ed. 2d 1, (1985) ("[T]he assumption that a 'felon' is more dangerous than a

misdemeanant [is] untenable."). Moreover, a non-violent, non-weapon, non-drug felony

charge fails to create a presumption of reasonable suspicion required to perform a strip

search.

    Though the crime for which a detainee is charged is an important factor for

consideration, it does not independently establish reasonable suspicion necessary under

the Fourth Amendment.  Officers should evaluate whether the crime charged involves violence, drugs, or some other feature from which an officer could reasonably suspect that an arrestee was hiding weapons or contraband as well as other factors like the circumstances of the arrest and the particular characteristics of the arrestee.  When these factors are considered, it is possible that the strip search of many accused felons may be legitimate.  Nevertheless, strip searching all individuals charged with felony crimes that do not involve violence, weapons, or drugs as part of the booking process at a local jail is unconstitutional.  Plaintiffs have established that corrections officers were following the unconstitutional policy of strip searching all felony detainees when their rights were violated.  Because Knox County's written policy of strip searching all felony detainees charged with non-violent, non-weapon, or non-drug offenses is unconstitutional and that policy caused the violation of the constitutional rights of Plaintiffs arrested on felony charges, the Court will grant Plaintiffs' Motion for Partial Summary Judgment against Knox County on that part of Count I as to the existence of liability.

### 2. The Constitutionality of Knox County's Alleged Custom and Practice of Strip Searching Detainees Charged with Misdemeanors

Plaintiff must meet two requirements to maintain this type of section 1983 claim.  First, the custom or practice must be attributable to the municipality; *i.e.*, it must be "so well settled and widespread that the policymaking officials of the municipality can be said to have either actual or constructive knowledge of it yet did nothing to end the practice."  *Bordanaro*, 871 F.2d at 1156.  Second, the custom must have been the cause of and "the moving force" behind the deprivation of constitutional rights.  *Id.* at 1157.  Under the law regarding strip searches of persons arrested on a misdemeanor charge it is well established that the Fourth Amendment requires that strip and visual body cavity

searches "must be justified by at least a reasonable suspicion that the arrestee is

concealing contraband or weapons." *Swain*, 117 F.3d at 7.  Plaintiffs contend that Knox

County has a custom and practice of routinely strip searching persons charged with minor

offenses without articulable suspicion that they harbor contraband or weapons.  While

Defendants deny unlawfully strip searching four proposed Plaintiffs charged with

misdemeanors,[15] Defendants admit to strip searching a significant number of

misdemeanor detainees without reasonable suspicion during the relevant class period.

### a. Existence of Widespread Practice

Prior to October 1994, Knox County Jail policy required corrections officers to

strip search all detainees brought to the facility.  Defendants' Ex. 52.  With respect to

misdemeanor detainees, the revisions made to Policy D-220 in October 1994 and Policy

C-120 in January 1995 brought those written policies in line with constitutional

standards.  Defendants' Exs. 53, 48.  While Knox County Policies C-120 and D-220 have

clearly stated, since October 1994, that misdemeanor detainees are not to be strip

searched without reasonable suspicion, the record presents undisputed evidence that

substantial numbers of persons arrested for misdemeanor offenses were routinely strip

searched without reasonable suspicion at the Knox County Jail.

The reports generated by the Department of Corrections following the 1994 Jail

Inspection and the 2000 Jail Inspection find, based on staff statements made at those

times, that corrections officers at the jail were strip searching all detainees charged with

misdemeanors.  Defendants' Exs. 59, 61.  Even before the 2000 Jail Inspection was

conducted, Jail Administrator Robbins admits that as a result of the lawsuit *Miller v.*

---

[15] The four proposed Plaintiffs – Susan Winchenbach, Andrew Pratt, Lynette Dean, and Judy Carter – are
discussed in section B(1)(b) of this opinion.

*Kennebec County*, 219 F.3d 8 (1st Cir. 2000), which was filed in this Court in April 1998,

he "became aware that the jail staff were not always following the policy and were, at

least on some occasions, conducting strip searches in violation of policy [C-120]."[16]

Robbins Aff. ¶ 6.  In 2001, Jail Administrator Robbins wrote to local police chiefs

notifying them that the Knox County Jail would no longer provide the service of strip

searching misdemeanor arrestees on "the request of arresting officers (for the purpose of

discovering evidence)."  Plaintiffs' Ex. 23.

Further confirmation of the existence of a widespread practice is gleaned from

Knox County Jail's own intradepartmental memoranda.  Two intradepartmental

memoranda, the subjects of each described as "Strip Search Practice Interview" written

after this case was filed in 2003, indicate that at least some corrections officers at the

Knox County Jail believed that strip searching all detainees was the jail's practice.

Plaintiffs' Ex. 20.  Perhaps the most strongly corroborative evidence of the existence of

this practice are the statements contained in the memoranda that were made by two

corrections officers that they were told that, for security reasons, the policy that there

must be reasonable suspicion to search misdemeanor detainees should be ignored.

Plaintiffs' Ex. 20.  Those intradepartmental memoranda establish that in 2003

Corrections Officers Costigan and Daniello believed that they were to search all

misdemeanor detainees.  Plaintiffs' Ex. 20.  The record shows that from sometime in

1998 when she was hired, until the procedural changes adopted in February 2001,

Corrections Officer Kenney understood that anyone, regardless of crime class was to be

stripped searched if they were admitted to the general population.  Plaintiffs' Ex. 20.

---

[16] The Court notes that Knox County was one of the named defendants in the *Miller* lawsuit.

Finally, evidence of this unconstitutional practice can be easily verified from a review of the daily Intake/Release Log entries.  That log establishes that based on a six-month sample during the relevant class period, Defendants strip searched at least seventeen persons charged with various Class E crimes without reasonable suspicion. Exhibit A of Ward Affidavit; Defendants' Ex. 67.  With respect to detainees charged with Class D OUI, Defendants admit that during these six sample months at least nine persons were strip searched without reasonable suspicion.  Affidavit of Michelle Ward ¶¶ 21, 22; Exhibit B of Ward Affidavit; Defendants' Ex. 68.  With respect to miscellaneous Class D misdemeanor detainees, Defendants admit that during these six sample months at least six persons were strip searched without reasonable suspicion.[17]  Ward Aff. ¶ 16; Ex. C of Ward Aff.; Defendants' Ex. 69.  Based on the undisputed evidence presented in the summary judgment record, the record shows, without cavil, that the practice by corrections officers of strip searching misdemeanor detainees was so widespread that the policymaking officials of the municipality had constructive knowledge of it.  Moreover, the Court concludes that Knox County personnel with policy-making authority had actual notice that the corrections officers were unlawfully strip searching misdemeanor detainees without reasonable suspicion.

### b. Defendants' Failure to Take Corrective Action

The Court is struck by the fact that even after the 2000 Jail Inspection Report clearly found that misdemeanor detainees were being routinely strip searched, there is no

---

[17] Although it is not known from the record exactly how many individuals charged with misdemeanors were brought into the Knox County Jail over the six month sample in order to determine the percent of misdemeanor detainees Defendants admit were strip searched, the record is convincing that, based on the sample, that misdemeanants were routinely strip searched without reasonable suspicion. Ward Aff. ¶¶ 18,19 and Exhibit A of Ward Affidavit.

evidence that any official at Knox County made a clear or plain statement that this practice was to stop. Defendants assert that new procedures, created after the 2000 Jail Inspection Report was released, were intended to address the noted area of non-compliance regarding misdemeanor detainees.[18] Those new procedures, however, are directed at misdemeanor detainees who had not been strip searched. The foundational information that apparently spawned the new procedures – no misdemeanor detainees shall be strip searched without reasonable suspicion – was omitted from the procedures. For example, the procedure for implementing Policy C-120 that became effective in May 2001, provided that detainees charged with misdemeanors "will be *pat searched*." Defendants' Ex. 49 (emphasis in original).[19] The only mention of strip search is in a section dealing with metal detector alerts where the procedure states "[a]rticulable suspicion is justification for strip search." Defendants' Ex. 49. That overall procedure, however, does not make it clear to the corrections officers who had been strip searching all detainees, that the prior practice of strip searching misdemeanor detainees without reasonable suspicion must be stopped.[20]

---

[18] Sheriff Davey's February 2001 response to the Department of Corrections with respect to the finding of non-compliance with Standard D.22.d on strip searches states that "strip searches of Class D and E will NOT take place except in those instances described in the standard." Defendants' Ex. 62. Defendants make the point that they have never admitted or denied the findings in the Jail Inspection Reports that all misdemeanor detainees were being strip searched.

[19] The 2000 Jail Inspection Report finding that all detainees were still being strip searched was issued in October of 2000. The Court notes that the new procedure apparently aimed at addressing this issue did not become effective until six months after issuance of the Jail Inspection Report finding non-compliance with Department of Corrections Standards.

[20] While that is the most significant information missing, it is not the only information that was omitted in the new procedure for implementing Policy C-120. Sheriff Davey states that "although not specifically stated in the procedure for implementing Policy C-120, misdemeanor detainees who were not strip searched were given yellow-colored jail uniforms to specifically distinguish them as non-searched inmates." Davey Aff. ¶ 21A.

Likewise, the Court finds that the "Daily Activity Schedule for Designated Housing for Pre-Arraignment Detainees Class D and E Section 128/cells 130, 131, and 132" and the "Management of Non-Search Inmates" provided direction to corrections officers regarding the treatment of detainees who had not been strip searched.  The "Daily Activity Schedule for Designated Housing for Pre-Arraignment Detainees Class D and E Section 128/cells 130, 131, and 132," like the procedure for implementing Policy C-120, specifically identifies cell assignments to be used for unsearched misdemeanor detainees.  It states "Procedure for daily activities for all pre-arraignment detainees held in section 128, cells 130, 131 an 132.  All detainees held in this section HAVE NOT been strip-searched; they will NOT have contact with each other for security reasons." Defendants' Ex. 50.  From this statement it can be understood that if a detainee is housed in section 128 the detainee has not been searched.  But it does not provide that, except if an officer has reasonable suspicion that the detainee is in possession of contraband and conducts a strip search of that detainee, all misdemeanor detainees shall be housed in section 128.  The memorandum on "Management of Non-Search Inmates," issued one year later, bears the same defect.  Defendants' Ex. 51.  Neither memorandum provides a clear statement directing corrections officers not to strip search misdemeanor detainees without reasonable suspicion.  Defendants' Exs. 50, 51.

While Defendants provided corrections officers copies of revisions to policies and all newly promulgated procedures, the most basic statement, which Defendants assert motivated the creation of the new procedures for misdemeanor detainees, is curiously absent from all the documents establishing new procedures.  As previously discussed, those procedures are directed at misdemeanor detainees who have not been searched and

never clarify that, except if an officer has reasonable suspicion, no misdemeanor detainees shall be strip searched. Although there is evidence that after the new procedural changes regarding misdemeanor detainees were implemented one corrections officer may then have understood that they were not to strip search all misdemeanor detainees, Plaintiffs' Ex. 20 (statement by Corrections Officer Kenney), this evidence alone is insufficient to refute the overwhelming evidence that the procedural changes were not effectively tailored and that the practice continued on a widespread basis. Plaintiffs' Ex. 20 (Corrections Officers Costigan and Daniello "both indicated that they recalled a discussion several years ago in which the Voyer and D.O.C. policies were mentioned and that the decision was made by someone (unidentified) to disregard the applicable policy and standard and continue to search all inmates, regardless of crime class, if they were to be admitted to the general population.").[21] The record is not persuasive that the procedural memoranda, issued after the 2000 Jail Inspection and settlement of the *Miller* lawsuit, were directed at stopping the unconstitutional practice.

Even though it failed to promulgate new written procedures to eliminate the unconstitutional practice, Knox County could have employed a training regime directed at correcting the unconstitutional practice. The record indicates that a "Entry Level Training" procedure, which was in place since 1995, requires that all new full-time corrections officers receive a copy of the Knox County Jail Policy and Procedure Manual and that a reference copy of the same be maintained in the booking area for all part-time employees. Defendants' Ex. 47 (Policy A-131). Pursuant to that policy pre-assignment

---

[21] Although in 2003, Corrections Officers Costigan and Daniello had been employed for a few years, the evidence in the record does not show when their employment with the Knox County Jail began.

training shall be conducted for all new corrections officers.[22]  There is no separate

category of training in Policy A-131 that specifically addresses strip searches.  Sheriff

Davey asserts, however, that the training conducted in the areas of "Knox County Jail

Policies and Procedures, control of contraband, principles of body searches, and

constitutional law" all "deal with, and provide training in, the area of strip searches."

Davey Aff. ¶ 6.  There is evidence that around 1998 at least two corrections officers'

entry level training included, contrary to Knox County written policy, the direction to

strip search all misdemeanor detainees admitted to the jail.  Plaintiffs' Ex. 20

(Corrections Officer Kenney and Corrections Officer Winslow).  However, even if new

officers' initial training on strip searches was conducted in accord with the written policy,

such training was not aimed at stopping the corrections officers who were engaged in

institutionally entrenched unconstitutional *practice* of strip searching all misdemeanor

detainees brought to the Knox County Jail.  The result was an ongoing practice that was

far removed from the written policy.

Other than the entry level training, there is meager evidence in the record that

Knox County employed training to bring an end to this practice.  A training session was

conducted on May 1, 2, and 3, 2001, by Lieutenant Cathy Wyman the subject of which

was "Procedures for Pre-Arraignment Class D and E Detainees."  Plaintiffs' Ex. 22.  The

"Training Roster" provides the names of the corrections officers who attended the

training sessions and their quiz scores, but does not indicate what subjects were covered

or how long the training session lasted.  The record also includes a memorandum from

Lt. Wyman to the staff of the Knox County Jail dated the day after the final training

---

[22] The entry level training policy also requires that the jail administrator schedule training for all new full-time corrections officers at the Maine Criminal Justice Academy within the first year of the individual's employment.  Defendants' Ex. 47.

session was completed, the subject of which is "Helpful hints on D and E detainee procedures" and detailing "some of the issues that were brought forth during the training of the procedures."  Plaintiffs' Ex. 22.  Although the "hints" never explicitly state that misdemeanor detainees shall not be strip searched, the memorandum states that "[r]equest by other law enforcement agencies for us to do a strip search because they feel they have probable cause is a simple NO."  Plaintiffs' Ex. 22.  Lt. Wyman's training sessions were conducted just days before Jail Administrator Robbins new "Procedure for Policy C-120 Pre-Arraignment D & E Detainees" became effective and there is no evidence to suggest that it included any more information than the new written procedure.  Defendants' Ex. 49 (effective May 4, 2001).  The memorandum by Lt. Wyman, like the new procedure for Policy C-120 Pre-Arraignment D & E Detainees, fails to clarify for the corrections staff that no misdemeanor detainee shall be strip searched without reasonable suspicion.

There is also evidence in the record that a two-hour training session was conducted for corrections officers at the Knox County Jail in February and March of 2002 on "Liability Issues in Corrections."  Plaintiffs' Ex. 21.  In addition to the names of the corrections officers who attended the training, the record contains a document which appears to be authored by the attorney who conducted the training.  Plaintiffs' Ex. 21.  It is not known whether all the topics addressed in the document were actually discussed at the training sessions or if the document was distributed to corrections officers during the training sessions.  For purposes of Plaintiffs' Motion for Partial Summary Judgment, however, the Court will assume all topics in the document were discussed.   One of those topics is "strip searches" and, the strongest guidance the document provides is "[a]lthough the use of the balancing test creates some uncertainty as to defining what the

law is, it does appear that the general trend is that courts are identifying that it is unreasonable to conduct a strip search of a person arrested for traffic offenses or other minor offenses unless authorities have a reasonable suspicion that the arrestee is concealing weapons or contraband on their person." Plaintiffs' Ex. 21. This qualified statement leaves room to conclude that the practice of strip searching misdemeanor detainees may be lawful. It cannot, therefore, be understood as guidance directed at putting an end to a long-standing unconstitutional practice by Knox County.

The record before the Court contains no evidence that any official from Knox County directed, by way of written policy or procedure, training, or other means, that the unconstitutional practice stop. It could be argued that the direction to stop strip searching all misdemeanor detainees was implicit in the new procedures and training. Given the strong evidence of the persistence of the unconstitutional practice even after the 2001 procedural changes, no reasonable person could conclude that the actions of Knox County were directed at stopping the practice. At some point, it must have been evident to Knox County officials that the corrections staff had not gotten the message. Yet, there is no evidence that, even after the 2000 Jail Inspection Report indicated that the practice of strip searching all misdemeanor detainees who were housed continued, Sheriff Davey or any other official from Knox County promulgated any procedures, conducted any training, or engaged in any closer oversight, directed at eliminating the unconstitutional misdemeanor search practices of the corrections officers at the Knox County Jail.

### c. Cause of the Constitutional Deprivations

Plaintiffs have established that the practice of strip searching misdemeanor detainees without reasonable suspicion that they were concealing contraband was the

moving force behind constitutional deprivation of class members.  This practice was widespread and not the result of the actions of a few uninformed corrections officers. Defendants have failed to put forth any evidence to the contrary that may have created a genuine issue of material fact.  Plaintiffs' have established that corrections officers were following the unconstitutional practice of strip searching misdemeanor detainees when their rights were violated.  An affirmative link between Knox County's failure to take action to stop the unconstitutional practice of its corrections officers' and the violation of the constitutional rights of Plaintiffs arrested on misdemeanor charges has been established.  The Court will, therefore, grant Plaintiffs' Motion for Partial Summary Judgment against Knox County on that part of Count I as to liability alleging that Plaintiffs' constitutional rights were violated as a result of the custom and practice of strip searching all misdemeanor detainees without reasonable suspicion.

### 3. Failure to Train Corrections' Officers

Another category of section 1983 cases which results in municipal liability arises in the so-called "failure to train" context.  Plaintiffs' Amended Complaint alleges that Knox County is liable for its officers' unlawful actions because it had failed to properly train and supervise them.  The indefinite nature of judgments about the proper level of training for municipal employees has led the Supreme Court to express concern that failure-to-train actions "would open municipalities to unprecedented liability under § 1983," *Harris*, 489 U.S. at 391, and has limited failure-to-train liability to the most egregious cases.  Accordingly, "inadequacy of [correction officer] training may serve as the basis for § 1983 liability only where the failure to train amounts to deliberate indifference to the rights of persons with whom the police come into contact."  *Id.* at 388.

Although some facts are presented in the summary judgment record regarding the training given to Knox County corrections officers, Plaintiffs present no specific argumentation on their failure to train claim. Accordingly, the Court will deny Plaintiffs' Motion for Partial Summary Judgment against Knox County on that part of Count I alleging a failure to train corrections officers.

## B. INDIVIDUAL LIABILITY

The Court will start by determining whether Ms. Tardiff's federal constitutional right to be free from unreasonable searches has been violated. The Court will next determine Sheriff Davey's responsibility for the Knox County Jail policy of strip searching all non-violent, non-weapon, non-drug felony detainees without reasonable suspicion. Finally, the Court will address Sheriff Davey's liability for the Knox County Jail's custom and practice of strip searching all misdemeanor detainees without reasonable suspicion.

### 1. Liability of Corrections Officers

#### a. Laurie Tardiff

It is undisputed in the record that on February 7, 2001, Ms. Tardiff was strip searched at the Knox County Jail after being arrested on a warrant. Defendants contend that Ms. Tardiff was arrested on a violent felony charge and, therefore, her strip search was reasonable. Plaintiffs respond that despite being charged with a Class C crime, the charge was of a non-violent nature. While the parties agree that she was charged with tampering with a witness – a Class C felony, the summary judgment record presents issues of material fact as to the specific fact-based nature of the charge under which Ms. Tardiff was arrested.

36

Maine criminal code section 454 – tampering with a witness – has both a non-threatening and a threatening provision.  *See* 17-A § 454(1)(A) and 17-A § 454(1)(B). While Defendants suggest that the Court should consider statements in the affidavits from the victim that support the police officer's affidavit to obtain an arrest warrant and conclude that the charge was of a threatening nature pursuant to 17-A § 454(1)(B)(1), Defendants' Exs. 64, 65, Plaintiffs contend that the Court should simply rely on the affidavit submitted by the police officer in the application for the arrest warrant charging 17-A § 454(1)(A)(2) – non-threatening witness tampering.  Defendants' Exs. 63; Middaugh Aff. ¶¶ 2, 3.  Although the police officer's affidavit submitted to obtain the arrest warrant for Ms. Tardiff clearly charges the non-threatening type of the offense, the actual arrest warrant for Ms. Tardiff is not provided in the record.  For that reason, the Court is unable to determine the exact nature of the charge for which Ms. Tardiff was arrested.

While the Court has already determined that it is unconstitutional to, as part of the booking process, strip search a felony detainee not charged with a crime involving violence, weapons or drugs without reasonable suspicion, there are issues of material fact regarding the charge upon which Ms. Tardiff was arrested that prevent the Court from determining if she qualifies as a member of the certified class.  Therefore, the Court will deny Plaintiffs' Motion for Partial Summary Judgment with respect to Ms. Tardiff on the claims against the individual corrections officers raised in Counts IV and VI of the Amended Complaint.[23]

---

[23] The Court notes that Defendants do not raise the qualified immunity defense with respect to the claims brought against the individual corrections officers.

### b. Evidence of Other Individual Plaintiffs

The Court notes that Plaintiffs also present facts with respect to four individuals who they allege were strip searched after being brought to the Knox County Jail on misdemeanor charges.  Relying on the absence of a log entry noting a strip search, Defendants deny that those individuals were indeed strip searched.  Although additional support for the existence of an unconstitutional practice can certainly be inferred from specific instances of such conduct, the summary judgment record with respect to three of these individuals – Susan Winchenbach, Andrew Pratt, and Lynette Dean – presents genuine issues of material fact that prevent the Court from considering whether their constitutional rights were violated.[24]  Because the Intake/Release Log does not confirm

---

[24] Susan Winchenbach was stopped by a Knox County Deputy on March 13, 2000, for having a light out on her car and taken to the Knox County Jail on the charge of Operating After Suspension at approximately 11:28 p.m.  Plaintiffs' Ex. 5, Affidavit of Susan Winchenbach ¶ 3.  The parties dispute whether she was strip searched at this time.  Winchenbach Aff. ¶ 4; Defendants' Exs. 3-4.  A short time later, she returned to her vehicle by way of taxi cab.  Winchenbach Aff. ¶ 5.  With apparently no other way to get home, she got in her car and began to drive.  She was immediately pulled over, arrested, and returned to the jail.  Winchenbach Aff. ¶ 5.  The parties dispute whether she was strip searched at this time.  Winchenbach Affidavit ¶ 6 and Defendants' Exs. 5-11.  During her sixty-hour stay at the Knox County Jail, she was seen by the jail physician in the company of a Correction Officer.  Winchenbach Affidavit ¶ 6.  After seeing the physician, she asserts that she was strip searched for a third time.  Winchenbach Affidavit ¶ 6.  The parties dispute whether she was strip searched at this time.

Ms. Winchenbach remained at the jail until she was taken to court at 2:05 p.m. on March 16, 2000, when she was brought before a judge and sentenced to time served.  *See* Defendants' Ex. 11.  She was returned from court at 3:08 p.m. as a sentenced inmate and strip searched at 3:23 p.m.  Defendants' Ex. 11.  After being placed in a holding cell, she was released from jail at 3:44 p.m.  Defendants' Ex. 11.  Being a sentenced inmate, this search is outside the class definition.  However, there are issues of fact as to whether Ms. Winchenbach was strip searched on any of the three other occasions as she alleges.

Andrew Pratt was arrested on December 12, 2002, on a violation of a protection from abuse order a Class D crime.  The parties dispute whether he was strip searched.  Plaintiffs' Ex. 7, Affidavit of Andrew Pratt ¶ 6; Defendants' Ex. 32.

With respect to Lynette Dean, there are issues of material fact regarding the justification for her strip search.  Lynette Dean was arrested for operating under the influence on November 10, 2000.  Plaintiffs' Ex. 3, Affidavit of Lynette Dean ¶ 3.  She was taken to the Knox County Jail, bailed, and released.  Dean Aff. ¶ 3.  Intake records indicate that at approximately 11:00 p.m. on December 21, 2000, she was arrested for violating her conditions of release, a class E crime, see 15 M.R.S.A. § 1092, and she was taken again to the Knox County Jail where she was held in a holding cell.  Dean Aff. ¶ 4; Defendants' Ex. 13.  Dean was strip searched at 7:02 a.m. on December 22, 2000.  Dean Affidavit ¶ 5; Defendants' Ex. 14.  Defendants contend that she was strip searched because she exhibited hostile and assaultive behavior.  Defendants' Exs. 13, 14.  Although the Intake/Release Log indicates that Ms. Dean was taken to a "detox"

that those individuals were strip searched, the Court may be required at some later date to undertake a more in depth inquiry into the reliability of Defendants' record keeping.[25] The other proposed individual Plaintiff – Judy Carter – was a sentenced inmate at the time she was strip searched and as such she does not fall within the previously certified class.[26] Therefore, the Court will deny Plaintiffs' Motion for Partial Summary Judgment with respect to Ms. Winchenbach, Mr. Pratt, Ms. Dean, and Ms. Carter on their claims against the individual corrections officers raised in Counts IV and VI of the Amended Complaint.

---

cell "due to abusive language, hostile and assaultive behavior" it does not indicate why approximately 8 hours later she was strip searched. Defendants' Exs. 13, 14.

[25] The Court understands Plaintiffs to assert that these deficiencies in Defendants' record keeping support a separate section 1983 violation. As Defendants point out, the violation of an internal policy or procedure or even rules promulgated by the Attorney General, does not per se amount to a constitutional violation. *See Beltran v. City of El Paso*, 367 F.3d 299, 302 (5th Cir. 2004); *Medina v. Cram*, 252 F.3d 1124, 1133 (10th Cir. 2001); *Collins v. Bellinghausen*, 153 F.3d 591, 596 (8th Cir. 1998); *White v. Olig*, 56 F.3d 817, 820 (7th Cir. 1995); *Patterson v. Coughlin*, 761 F.2d 886, 891 (2d Cir. 1985). However, the ultimate reliability of Defendants' record keeping may be significant in resolving other issues in this case.

     The Attorney General's Rules, the Department of Corrections Standards, and Defendants own policies require the articulation of reasonable suspicion in the record to justify any strip search. Defendants' Exs. 48, 57 and 58. Defendants' record keeping on strip searches performed at the Knox County Jail appears to be deficient. In both the 1994 and 2000 Jail Inspection Reports, State Inspector Hinckley noted that the Jail was not keeping the required strip search log and was not articulating in their record any reasonable suspicion they had to justify a strip search of a detainee. Hinckley Depo. at 140-41. Indeed, except where the charge itself may provide reasonable suspicion upon which to conduct a search, the Intake/Release Log does not contain the reason that any detainee was strip searched. Robbins Depo. at 135; Hinckley Depo. at 142; Affidavit of Michelle Ward ¶ 20 and Exhibits A through D of Ward Aff. There is insufficient evidence in this record for the Court to make a wholesale determination regarding the accuracy of Defendants' record keeping regarding when strip searches were conducted. Specifically, the Court cannot conclude from the noted deficiencies in the record keeping and the log book entries proffered on summary judgment that every misdemeanor detainee was strip searched.

[26] Judy Carter was arrested for OUI on November 19, 1998. Affidavit of Judy Carter, Exhibit 5, ¶ 3. At the time she was arrested she was not strip searched. However, after she was sentenced to 24 hours in jail but before she began to serve her sentence on December 9, 1999, she was strip searched at the Knox County Jail. Carter Affidavit ¶ 5. Thereafter, she was placed in a holding cell. Carter Affidavit ¶ 5. As she was sentenced inmate, Judy Carter's strip search does not fall within the class definition. *See Order Granting Plaintiff's Motion for Class Certification (Docket Item No. 21) at 5.*

## 2. Supervisory Liability of Sheriff Davey

Plaintiffs have also sued Sheriff Davey in both his official and his personal capacity. Official capacity suits "'generally represent only another way of pleading an action against an entity of which an officer is an agent.'" *Kentucky v. Graham*, 473 U.S. 159, 165, 105 S. Ct. 3099, 3105, 87 L. Ed. 2d 114 (1985) (quoting *Monell*, 436 U.S. at 690 n. 55). Accordingly, Plaintiffs' suit against Sheriff Davey in his official capacity shall be treated as an action against Knox County. Discussed *supra*. Personal capacity suits, however, seek to impose personal liability upon a government official and damages are recoverable from the official's personal assets. *Graham*, 105 S.Ct. at 3105.

The undisputed facts establish that Sheriff Davey has final decision making authority with respect to all policy and operational matters at the Knox County Jail. Davey Aff. ¶ 2. Since Sheriff Davey was elected Sheriff of Knox County in 1985 and has remained in that position for the entire class period, he may be responsible for unconstitutional strip search policies and practices during the class period. Davey Aff. ¶ 1. When a plaintiff asserts claims against an individual in his supervisory capacity, liability cannot be established on a basis of respondeat superior. Rather, "[a] supervisor may be found liable only on the basis of his own acts or omissions. Moreover, a supervisor cannot be liable for merely negligent acts. A supervisor's acts or omissions must amount to a reckless or callous indifference to the constitutional rights of others." *Febus-Rodriguez v. Betancourt-Lebron*, 14 F.3d 87, 92 (1st Cir. 1994) (internal citations omitted).

**a. Detainees Charged with Non-Violent, Non-Weapon, and Non-Drug Felony**

Plaintiffs have shown that Sheriff Davey's written policy permitted, as part of the booking process, the strip searching all detainees charged with non-violent, non-weapon, non-drug felonies without reasonable suspicion of concealing contraband or weapons caused the deprivation of their rights under the Fourth Amendment. Defendant Davey has raised the defense of qualified immunity. Whether an official may prevail in a qualified immunity defense depends upon the "objective reasonableness of [his] conduct as measured by reference to clearly established law." *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S. Ct. 2727, 73 L. Ed. 2d 396 (1982). A government official making a policy decision is entitled to qualified immunity if the law was not clearly established at the time the determination was made. If the law is unclear, "an official could not reasonably be expected to anticipate subsequent legal developments, nor could he fairly be said to 'know' that the law forbade conduct not previously identified as unlawful." *Id.*

The Court does not think it a great leap from prior cases for a reasonable law enforcement officer to conclude that invasive strip searches of all detainees who arrive at a local correctional facility, like Knox County Jail, who are charged with non-violent, non-weapon or non-drug felonies, must be supported by reasonable particularized suspicion. Fourth Amendment jurisprudence concerning the standard for determining the reasonableness of a strip search has been rather consistent for many years. *See, e.g., Bell*, 441 U.S. at 559; *Swain*, 117 F.3d at 7; *Justice v. City of Peachtree*, 961 F.2d 188, 192 (11th Cir. 1992); *Masters v. Crouch*, 872 F.2d 1248, 1255 (6th Cir.1989); *Weber v. Dell*, 804 F.2d 796, 802 (2d Cir. 1986); *Stewart v. Lubbock County*, 767 F.2d 153, 156 (5th Cir.1985); *Giles v. Ackerman*, 746 F.2d 614, 615 (9th Cir.1984); *Mary Beth G. v. City of*

*Chicago*, 723 F.2d 1263, 1273 (7th Cir. 1983). Although it has been clearly established in the law for some time that a blanket policy of strip searching all misdemeanor detainees is unlawful, the constitutionality of a policy of strip searching detainees charged with non-violent, non-weapon, and non-drug felonies without reasonable suspicion has not been previously established in this Circuit. The fact that neither the Supreme Court nor the United States Court of Appeals for the First Circuit has specifically ruled on the constitutionality of blanket strip search policies for detainees charged with non-violent, non-weapon or non-drug felonies, inclines the Court to find that Sheriff Davey is entitled to the benefit of the doubt on this point. Although conduct could potentially violate clearly established law even if the allegedly unconstitutional conduct had not been the subject of a prior court case, *see Hope v. Pelzer,* 536 U.S. 730, 739, 122 S. Ct. 2508, 153 L. Ed. 2d 666 (2002), the right allegedly violated must be defined at an appropriate level of specificity before a court can conclude that it was clearly established, *see Wilson v. Layne,* 526 U.S. 603, 615, 119 S. Ct. 1692, 143 L. Ed. 2d 818 (1999)(citing *Anderson v. Creighton,* 483 U.S. 635, 640, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987)).

The Department of Corrections Standards and the Attorney General's Rules permit strip searches of all felony detainees. Sheriff Davey's reliance on those standards and rules, led to the development and implementation of Knox County's policy authorizing strip searches of all felony detainees. While the Fourth Amendment rights of those individuals charged with felonies of a non-violent, non-weapon, and non-drug nature who were automatically strip searched were indeed violated, the Court concludes that those rights were not clearly established in the law during the relevant class period.

The Court concludes that Sheriff Davey is, therefore, entitled to qualified immunity for the Knox County Jail Policy permitting the strip search of all persons charged with non-violent, non-weapon, and non-drug felonies without reasonable suspicion.

Because he prevails on his defense of qualified immunity, the Court will deny Plaintiffs' Motion for Partial Summary Judgment with respect that part of Count II alleging that Sheriff Davey is responsible, in his personal capacity, for the Knox County Jail's unlawful policy of strip searching detainees charged with non-violent, non-weapon, and non-drug felonies.  The Court will, therefore, grant Summary Judgment to Sheriff Davey establishing that he is entitled to qualified immunity for Plaintiffs' claim in Count II of an unconstitutional policy with respect to strip searching detainees charged with non-violent, non-weapon, non-drug felonies without reasonable suspicion.

### b. Detainees Charged with Misdemeanors

Although the written policies conformed to constitutional standards applicable to misdemeanants, Plaintiffs have shown that the Knox County Jail, under the leadership of Sheriff Davey, had a widespread custom and practice of strip searching all detainees charged with misdemeanors without reasonable suspicion that they were concealing contraband and that this practice caused the deprivation of their rights under the Fourth Amendment.  "If the right the government allegedly violated was clearly established at the time of the challenged conduct, 'the immunity defense ordinarily should fail, since a reasonably competent public official should know the law governing his conduct.'" *Lynch v. City of Boston*, 180 F.3d 1, 13 (1st Cir. 1999)(quoting *Harlow*, 457 U.S. at 818-19).   During the relevant class period, the Knox County Jail's practice of strip searching all new detainees charged with misdemeanors without reasonable suspicion, was clearly

unconstitutional.  *See Swain*, 117 F.3d at 5 ("[I]t was clearly established at the time of the search [in 1993] that the Fourth Amendment requires *at least* a reasonable suspicion to conduct a [strip search].")(emphasis in original).  Maintenance of the practice after the operative class date – November 19, 1996 – insofar as it applied to misdemeanants, cannot be shielded by qualified immunity.

Unlike individual officer liability, the liability of supervisory officials does not depend on their personal participation in the acts of their subordinates which immediately brought about the violation of the plaintiff's constitutional rights.  *See Voutour v. Vitale*, 761 F.2d 812, 819 (1st Cir. 1985).  Liability can result from Sheriff Davey's acquiescence to Knox County Jail's ongoing practice of strip searching all detainees charged with misdemeanors.  *See Jett v. Dallas Independent School Dist.*, 491 U.S. 701, 737, 109 S. Ct. 2702, 105 L. Ed. 2d 598 (1989) (A municipal policymaker may be found to have caused subordinate officials' conduct by reason of the policymaker's "acquiescence in a long standing practice or custom which constitutes the 'standard operating procedure' of the local governmental entity.").

Some evidence in the record points to Sheriff Davey's actual knowledge of this ongoing practice.  For example, the 1994 and 2000 Jail Inspection Reports and the statements made by two corrections officers that they "recalled a discussion several years ago in which the Voyer and D.O.C. policies were mentioned and that the decision was made by someone (unidentified) to disregard the applicable policy and standard and continue to search all inmates, regardless of crime class, if they were admitted to the general population."  Plaintiffs' Ex. 20.  However, Sheriff Davey disputes that he had actual knowledge of the unlawful custom and practice of strip searching detainees

charged with misdemeanors without reasonable suspicion of concealing contraband or weapons. Davey Aff. ¶ 14. Regardless of his actual knowledge, the Court concludes that based on the undisputed evidence in the record he should have known that the practice was ongoing, and that, despite the change to the written policy in 1994 and the institution of new procedures in 2001, the practice had not been eliminated. The issue then becomes whether Plaintiffs have established that Sheriff Davey's conduct amounts to deliberate indifference or willful blindness to an unconstitutional practice of his subordinates. *See Camilo-Robles*, 151 F.3d at 7. Finally, Plaintiffs must establish a causal connection between Sheriff Davey's conduct and the corrections officers' unconstitutional actions. *See Maldonado-Denis v. Castillo-Rodriguez*, 23 F.3d 576, 582 (1st Cir. 1994).

Both Jail Inspection Reports noted that, based on staff statements made at the time, the practice by corrections officers of strip searching all detainees charged with misdemeanors was ongoing and that it needed to stop. It is telling that even after the 2000 Jail Inspection Report clearly found that misdemeanor detainees were being routinely strip searched, there was no clear and plain statement by Sheriff Davey that this practice was to stop. Sheriff Davey put in place new procedures for misdemeanor detainees after the 2000 Jail Inspection, yet, as discussed in the section on municipal liability, none of those new procedures clearly stated that misdemeanor detainees were not to be strip searched absent reasonable suspicion. Defendants' Exs. 49, 50. As discussed in detail in the prior section on municipal liability, although it appears that Sheriff Davey directed the jail administrator to clarify the procedures for detainees who had not been strip searched, he never plainly directed that the corrections officers *not*

45

search misdemeanor detainees without reasonable suspicion.  Moreover, he failed to provide remedial training aimed at correcting the unlawful practice.

Sheriff Davey's assent to this ongoing unconstitutional practice is evident by reviewing his corrections department's daily log entries.  Examination of the Intake/Release Log, maintained in the booking area of the jail, indicates that corrections officers were strip searching misdemeanor detainees without reasonable suspicion.  For example, as recently as July 13, 2001, Corrections Officer Springer strip searched a detainee charged with driving to endanger – a Class E crime, Defendants' Ex. 67; Ex. A to Ward Aff., and on July 6, 2001, Corrections Officer Waterman strip searched a detainee charged with OUI – a Class D crime, Defendants' Ex. 68; Ex. B to Ward Affidavit.  Indeed, the record indicates that Sheriff Davey was a named defendant in the *Miller* lawsuit, which alleged that after being arrested and brought to the Knox County Jail on a misdemeanor charge plaintiff was strip searched.

Further confirmation of Sheriff Davey's acquiescence to the practice is highlighted in intradepartmental memoranda.  In 2001, Jail Administrator Robbins wrote to local police chiefs notifying them that the Knox County Jail would no longer provide the service of strip searching misdemeanor arrestees on "the request of arresting officers (for the purpose of discovering evidence)."  Plaintiffs' Ex. 23.  Obviously, before the local police departments received these memoranda, corrections officers conducted strip searches of misdemeanor arrestees on the request of the arresting police officer.  In addition, statements by corrections officers in 2003, during an interview with Jail Administrator Robbins, support the conclusion that corrections officers believed that they should ignore the policy directing that misdemeanor detainees shall not be strip searched

46

without reasonable suspicion and continue to strip search all detainees admitted to the jail. Plaintiffs' Ex. 20. The widespread practice was sufficient to alert Sheriff Davey that the unlawful strip search practice persisted. On the evidence presented in the summary judgment record, the Court concludes that Sheriff Davey's failure to take any corrective action directed at eradicating this pervasive practice – even in the face of official Department of Corrections' reports and the incontrovertible record evidence that the practice persisted – amounts to a reckless indifference of the constitutional rights of class members arrested on misdemeanor charges. Sheriff Davey's reckless indifference allowed the practice to persist for years and caused the violation of the constitutional rights of Plaintiffs arrested on misdemeanor charges.

For the foregoing reasons, the Court will grant Plaintiffs' Motion for Partial Summary Judgment with respect to that part of Count II alleging that Sheriff Davey is responsible, in his personal capacity, for the Knox County Jail's unconstitutional custom and practice of strip searching detainees charged with misdemeanors.

### III. CONCLUSION

Accordingly, it is **ORDERED** that Plaintiffs' Motion for Partial Summary Judgment, be and it is hereby, **GRANTED** in respect to:

> Count I against Knox County on Plaintiffs' claim of an unconstitutional policy with respect to strip searching all felony detainees and an unconstitutional custom or practice of strip searching all misdemeanor detainees; and

> Count II against Sheriff Davey on Plaintiffs' claim of an unconstitutional custom or practice of strip searching all misdemeanor detainees.

It is further **ORDERED** that Plaintiffs' Motion for Partial Summary Judgment, be and it is hereby, **DENIED** in respect to:

Count I against Knox County on Plaintiffs' claim of failure to train corrections officers;

Count II against Sheriff Davey on Plaintiffs' claim of an unconstitutional policy with respect to strip searching all felony detainees; and

Count IV and VI against individual corrections officers for the strip searches of Laurie Tardiff, Susan Winchenbach, Andrew Pratt, Lynette Dean, and Judy Carter.

Finally, it is **ORDERED** that summary judgment be, and it is hereby, **GRANTED** to Sheriff Davey establishing that he is entitled to qualified immunity for Plaintiffs' claim in Count II of an unconstitutional policy with respect to strip searching detainees charged with non-violent, non-weapon, non-drug felonies without reasonable suspicion.

/s/ Gene Carter
Gene Carter
Senior United States District Judge

Dated this 2nd day of November, 2005.