UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

|  |  |  |
|---|---|---|
| LAURIE TARDIFF, | ) | |
| Plaintiff | ) | |
| | ) | |
| v. | ) | Civil No. 02-251-PC |
| | ) | |
| KNOX COUNTY, DANIEL DAVEY, | ) | |
| JANE DOE and JOHN DOE, | ) | |
| Defendants | ) | |
| | ) | |

## **DEFENDANTS' MOTION FOR RECONSIDERATION OF ORDER GRANTING IN PART AND DENYING IN PART PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT**

NOW COME Defendants, through counsel, and move this Honorable Court to reconsider so much of its Order as granted Plaintiff's Motion for Partial Summary Judgment. The court should reconsider its Order for four reasons: (1) the Defendants were not afforded the benefit of the summary judgment standard which requires that all facts be viewed and all inferences be drawn in favor of the non-moving party; (2) the court reached conclusions and made findings not supported by the summary judgment record; (3) the legal conclusions are contrary to First Circuit decisional law insofar as the policy permitting strip searches of felony detainees is deemed unconstitutional; and (4) this court misinterpreted and misapplied *Bell v. Wolfish* and First Circuit law interpreting and applying *Bell v. Wolfish*, causing the court to assume that Fourth Amendment privacy requirements applied to the categories of detainees listed in the class certification without applying a necessary expectation of privacy analysis. The errors listed above, both collectively and individually, warrant vacating the court's decision of November 2, 2005, and the issuance of a new decision expressly addressing all of the points raised herein.

**SUMMARY JUDGMENT STANDARD AND
EXTENT OF DISCOVERY**

At issue is a Complaint brought by Plaintiff, Laurie Tardiff, against Knox County and

Sheriff Daniel Davey pursuant to 42 U.S.C. 1983.  Discovery  commenced on January 7, 2003

and closed on April 8, 2005.   Plaintiff conducted limited discovery seeking documentary

evidence from the Defendants and taking the depositions of  former Jail Administrator Richard

Robbins and Department of Corrections employee, John Hinkley.  The limited discovery

conducted by Plaintiff constricted the competent evidence available to the Plaintiff and the Court

for summary judgment purposes.  The implications of this fact will be discussed further below.

In considering a motion for summary judgment, the trial court must "view the entire

record in the light most hospitable to the party opposing summary judgment, indulging all

reasonable inferences in that party's favor."  *McCarthy v. Northwest Airlines,* 56 F.3d 313, 135

(1st Cir. 1995), quoting, *Griggs-Ryan v. Smith,* 904 F.2d 112, 115-116 (1st Cir. 1990).  Put

another way, the trial court is to "tak[e] the facts (including the reasonable inferences therefrom)

in the light most favorable to the [non-moving party]."  *Coyne v. Taber Partners,* 53 F.3d 454,

457 (1st Cir. 1995).

**I.  THE COURT'S ASSAY OF THE EVIDENCE WITH RESPECT TO MUNICIPAL
LIABILITY FAILED TO PROPERLY HEW TO EITHER THE RIGOROUS
SUMMARY JUDGMENT STANDARD OR THE REQUIREMENT FOR
ESTABLISHING MUNICIPAL LIABILITY BY CUSTOM  OR PRACTICE IN A
§ 1983 CASE.**

A municipality or county may be liable for a violation of constitutional rights caused by

an unconstitutional custom or practice.  *Monell v. New York City Department of Social Services,*

436 U.S. 658, 691 (1978).  In order to prevail on this theory, the Plaintiff must prove two

elements:  "First, the custom or practice must be attributable to the municipality.  In other words,

it must be so well settled and widespread that the policymaking officials of the municipality can be said to have either actual or constructive knowledge of it yet did *nothing* to end the practice. [citations omitted]  Second, the custom must have been the cause of *and* moving force behind the deprivation of constitutional rights." *Bordanaro v. McLeod,* 871 F.2d 1151, 1156 (1st Cir. 1989) (emphases supplied).    Under *Bordanaro*, once the municipality is on notice, it is not required to take actions and implement procedures perfect in all respects; rather, it required to do *something* to address the custom or practice and liability will attach only if the it is found to have done *nothing*.

*Moreover*, potential liability is limited to those with actual or constructive knowledge of that custom or practice who also possess *final* policy or decision making authority.

These exacting standards are more demanding still when, as stated above, a Plaintiff seeks summary judgment and the Defendant is entitled as a matter of law to the benefit of all reasonable inferences. The summary judgment record in this case does not support a finding that the evidence compelled but one outcome.

A. Plaintiff has not met her burden with respect to proving the existence of a widespread practice of strip searching all individuals charged  with misdemeanors because, viewed under the proper standard, there are genuine issues of material fact as to whether such a practice existed.

In its decision, the court concluded that "the record presents undisputed evidence that substantial numbers of persons arrested for misdemeanor offenses were routinely strip searched without reasonable suspicion at the Knox County Jail."[1] *Order Granting in Part and Denying in*

---

[1] The Order does not explain what is meant by the term "substantial," nor does it elucidate how this ostensibly quantitative assessment was undertaken.  For example, although the Order refers to the affidavit of Plaintiff's counsel's paralegal, Michelle Ward, *Order* at p.28, the Plaintiff produced no evidence by which the information contained in that affidavit could be compared  with the numbers of persons processed on a periodic basis in the Knox County Jail. That the Plaintiff conducted only limited discovery may explain this omission.  Whatever the reason, the Court was denied an essential basis on

*Part Plaintiff's Motion For Partial Summary Judgment*, p. 26 (11/2/05) (hereafter "Order"). The court identified six discrete pieces of evidence upon which it concluded that "the record shows, without cavil, that the practice by corrections officers of strip searching misdemeanor detainees was so widespread that the policy making officials of the municipality had constructive knowledge . . .[and] actual notice . . .". *Order at 28.* Those six pieces of evidence are: (1) Report by the Department of Corrections, 1994, *Order* at 8; (2) Report by the Department of Corrections, 2000, *Order* at 12-13; (3) Affidavit of Richard Robbins, *Order* at 14; (4) Notice from jail administrator Richard Robbins to local Police Chiefs, Exhibit 23, *Order* at 14, 27, and 46; (5) two intradepartmental memoranda written by jail administrator Robbins, Exhibit 20, *Order* at 15-16, 27, 31, 32, 44, 45 and 47; [2] and (6) Intake and Release Logs as summarized by paralegal Michelle Ward, *Order* at 17, 18, 28, 29, 39 and 25. After its discussion of those six discrete pieces of evidence, the court concludes that there is:

> . . . undisputed evidence presented in the summary judgment record . . . that the practice by corrections officers of strip searching misdemeanor detainees was so widespread that the policy making officials at the municipality had constructive knowledge of it . . .[and] that Knox County personnel with policy-making authority had actual notice that corrections officers were unlawfully strip searching misdemeanor detainees without suspicion.

*Id.*[3]

---

which to draw the very inference the Plaintiff urged. In the absence of such comparative evidence, the Court lacked the necessary definitive basis on which to make that legal finding.

[2] These memoranda, which appear to have been relied upon heavily by the court, were included in the Plaintiff's reply to the Defendants' Objection to summary judgment without proper foundation. The memoranda are themselves hearsay and contain hearsay both twice and thrice removed. For these reasons, the documents are not competent evidence for consideration on the summary judgment record. *See note 10, infra* at pp. 8-9.

[3] The court refers generically to "policy making officials of the municipality" and "Knox County personnel with policy-making authority", but does not identify who those individuals are. Apropos the standard for establishing municipal liability via a custom or practice, the only officials to be considered are those with *final* decision or policy making authority. *See Pembaur v. City of Cincinnati*, 475 U.S.

1. <u>The Department of Corrections jail inspection reports focus on discrete points in time, and do not allow the inference that the findings, even if accurate and relevant, pertain to the intervening six years.</u>

Although the Order contains little discussion of the 1994 and 2000 jail inspection reports, they are identified as evidence supporting the conclusion that there was a widespread practice of strip searching all misdemeanor detainees. *Id. at 26.* Neither report contains sufficient evidence to support such a finding. First, it is apparent that the 1994 DOC Report covered a period of time outside the ambit of Plaintiff's lawsuit.

Second, neither report contains detailed findings regarding strip search practices nor does either identify with any particularity the sources of the information on which the findings are premised. The findings in these reports could have been pursued by the Plaintiff in discovery through depositions but, as noted above, Plaintiff conducted only limited discovery. As the decision recognized, at best the reports contain some evidence suggestive of a strip search practice that did not comply with DOC standards in 1994 and 2000, but say nothing about the practice in the intervening six years. *Id.* ("Based on staff statements *made at those times . . .* corrections officers were strip searching all detainees charged with misdemeanors".) Indeed, the author of those reports, John Hinkley, admits that they are only snapshots in time, and say nothing about the practice between 1994 and 2000. *Hinkley Dep.* at p.115. Given Hinkley's admission, the court's tacit concession of the reports' limited evidentiary value, and substantial other record evidence demonstrating efforts on the part of the jail to conform to constitutional requirements,[4] Plaintiff has not met her burden of demonstrating through these reports that there

---

469, 483 (1986). The Order concedes that Sheriff Davey is the only individual at Knox County with final decision and policy making authority. *Order at 5.*

[4] *See, e.g., Affidavit of Daniel Davey, Affidavit of Raymond Voyer, Affidavit of David Lovejoy, Affidavit of Richard Robbins, Affidavit of Donna Campbell, Defendants' Exhibits 46-54, 70.*

was a widespread and pervasive practice. Stated plainly, the strongest inference supported by the jail inspection reports is that some unidentified correctional officers (those providing the information in the reports) conducted strip searches in 1994 and 2000 in violation of standards imposed by the State of Maine. Considering that the class period covers over eight years, these documents provide little in way of support for the existence of a widespread custom and practice as an undisputed fact.

### 2. The Robbins Affidavit

The decision cites, without discussion, paragraph 6 of the Robbins Affidavit. It is unclear how the affidavit supports the Court's conclusion that a widespread custom or practice existed. First, as stated in the affidavit and acknowledged in the decision, Robbins became aware of nonconformity with jail search policies as a result of a single case, and not a course of conduct.[5] Moreover, the affidavit says only that Robbins "became aware that jail staff were not *always* following the policy and were, *at least on some occasions*, conducting strip searches in violation of policy . . ." *Robbins Aff. ¶ 6* (emphasis added)*; Order* at 26-27. First, it is instructive to say what the affidavit does not. It says nothing about how often or over what period of time the policy may not have been properly implemented, nor how many correctional officers may not have implemented it properly. In addition, as with the DOC reports, Robbins' statement refers to a snapshot in time. The statement does not explain how the alleged practice came into being and how it related to the obligations of Sheriff Davey and Knox County. The affidavit contains nothing to support the ultimate conclusion reached by the court: that there was a widespread

---

[5] The breadth and comprehensive nature of his response is well chronicled and demonstrates that, far from doing nothing, the jail undertook prompt and appropriate corrective action. *See §I(B), infra* at pp. 17-23.

practice of conducting unconstitutional strip searches over the course of the entire class period beginning in 1996 and continuing on an open-ended basis.[6]

Contrariwise, the Robbins Affidavit makes clear that, like the DOC reports, it is limited to a "snapshot in time". Moreover, the excerpt from the Affidavit quoted above by its very terms does not describe an uninterrupted, invariable practice. To the contrary, it strongly suggests that jail personnel were following policy far more often than not. Seen in the context of Plaintiff's burden to demonstrate a County custom or practice and held to the standard that a moving party must meet to prevail on Summary Judgment, the Robbins Affidavit is, quite simply, insufficient.

3. Robbins' letter to police chiefs.

In further support of its findings, the court wrote that "in 2001, Jail Administrator Robbins wrote to local police chiefs notifying them that the Knox County Jail would no longer provide the service of strip searching misdemeanor arrestees on 'the request of arresting officers (for the purpose of discovering evidence)'." *Order* at 27.[7] Without more, this letter is entirely inadequate to support a legal finding of municipal liability. To begin with, it is manifest that the letter lacks detail. It says nothing about the frequency or number of searches conducted at the request of arresting officers or the period of time over which such searches were conducted. Indeed, the full text of the letter states that "staff at the jail were *occasionally* requested to conduct a strip search of an arrestee at the request of the arresting agency." *Order* at 14. This language does not support the inference that such searches were common, widespread or pervasive.

---

[6] The court has established an open ended class, beginning in October 1996, and continuing. *See Order*, Docket No. 85, p.2, Cohen, Maj. J. (Feb. 23, 2005).

[7] As with the DOC report and the Robbins affidavit, there is but brief mention of this document, and no discussion of how it ostensibly supports the ultimate conclusion.

More important, the letter in no way supports the inference that such searches were conducted without reasonable suspicion. To the contrary, the letter states that such searches were conducted 'for the purpose of discovering evidence'. That statement allows the inference that the arresting officer had a reasonable basis, recognized by the Fourth Amendment,[8] to believe that such a search was permissible. It also allows the inference that under the circumstances, the arresting officer might well have preferred that such a search be performed by persons professionally trained in such searches.[9]

For that reason, and because the letter refers only to occasional searches and does not exclude the inference that such searches were based upon reasonable suspicion, it may not serve as a basis on which to conclude that there was a widespread and pervasive practice of strip searching misdemeanor detainees.

    4.  <u>Intradepartmental memoranda entitled "strip search practice interview".</u>

The court appears to have placed great weight on two memoranda penned by Jail Administrator Robbins that purport to reflect portions of conversations he had in 2003 with four jail employees regarding strip searches of misdemeanor arrestees.[10] The court reaches four

---

[8] Applicability of the Fourth Amendment has not been decided by the Supreme Court. *See § III, infra* at pp. 29-33.

[9] It should also be noted that the United States Supreme Court has recognized that police possess considerable latitude to both conduct post-arrest searches See, e.g., *Illinois v. Lafayette*, 462 U.S. 646 (1983). Whether and to what extent that authority extends to jail personnel conducting a strip search at the request of the police has never been decided.

[10] These memoranda, together identified as Plaintiff's Exhibit 20 first submitted in connection with Plaintiff's Reply Memorandum, are not competent evidence and should not have been considered as part of the summary judgment record. In order for evidence to be considered in a motion for summary judgment, it must be admissible. *Vazquez v. Lopez-Rossario*, 134 F.3d 28, 33 (1st Cir. 1998); *Fed.R.Civ.P. 56(e)*. Plaintiff's Exhibit 20 contains out of court statements that were relied upon by the court for the truth of the matters asserted therein. As such, they are inadmissible hearsay. *F.R.Evid. 801(c), 802*. Plaintiff's Exhibit 20 contains a second level of hearsay in the form of statements attributed to correctional staffers Kenney, Winslow, Costigan and Daniello (and it is unclear whether the

conclusions which, by summary judgment definition, it finds are undisputed based upon these memoranda: (1) "that at least *some* corrections officers . . . believed that strip searching all detainees was the jail's practice", (2) ". . . two corrections officers were told that, for security reasons, the policy that there must be reasonable suspicion to search misdemeanor detainees should be ignored", (3) ". . . in 2003 . . . Costigan and Daniello believed that they were to search all misdemeanor detainees", and (4) ". . . Kenney understood that anyone, regardless of crime class was to be strip searched if they were admitted to the jail population". *Order at 27* (internal citations omitted) (emphasis added). The evidence cited by the Court in support of these conclusions either does not support them or is not sufficient to support them for summary judgment purposes. Each will be addressed in turn.

---

memoranda accurately capture the conversations to which they refer), and a third level in the form of statements ostensibly made to those four correctional officers by an unknown declarant.

Furthermore, to the extent that the court may have considered Plaintiff's Exhibit 20 to be and contain admissions under F.R.Evid. 801(d)(2), the limitations in that rule precluded reliance. In order to treat the statement as a vicarious admission under F.R.Evid. 801(d)(2)(D), the proponent must show "(1) that an agency relationship existed; (2) that the statements were made during the course of the relationship; and (3) that the statements relate to matters within the scope of the agency". *Gomez v. Rivera Rodriguez*, 344 F.3d 103, 116 (1st Cir. 2003). The burden is on the proponent of the evidence to establish those foundational elements. *Id.* at 117. The foundational requirements "cannot be proven solely by the unsupported out of court statements of the claimed agent". *Id.* at 116. Because the record is devoid of any showing that the memoranda themselves are admissible, or that the statements attributed to identified and unidentified correctional officers were vicarious admissions, they were not competent evidence and should not have been considered by the court in connection with the summary judgment proceedings. Both because Exhibit 20 and the statements contained therein are hearsay, and because there is an absolute dearth of any foundational evidence to establish that the statements contained in Exhibit 20 are vicarious admissions, the exhibit is insufficient evidentiary quality and is incompetent to support either the matters for which it was purportedly offered (Plaintiff's Reply Brief, pp. 6, 8), or ultimately used by the court.

a. The belief of some corrections officers does not support finding an undisputed fact with respect to a widespread custom or practice.

The Court's conclusion regarding the belief of "at least some corrections officers" does not assist the summary judgment analysis. First, there is no evidence as to how many corrections officers harbored this belief, and what percentage of the entire population of correctional officers they represent.[11]

Additionally, the statements attributed to these four correctional staffers do not lend themselves to application at particular points in time. For example, the references to Kenney appear to suggest that from 1998 to 2001 she believed that all detainees should be strip searched, but that beginning in February of 2001 she understood that misdemeanor detainees could not be strip searched without reasonable suspicion. *Order* at 15. As for Winslow, he confirms that his original training (with Kenney in 1998) was to strip search all detainees, but his current understanding was that *no* misdemeanor pretrial detainees could be strip searched. There is no information as to when or why his understanding changed or what the jail practice was before his initial training. Given the requirement that to be attributable to the municipality the practice be widespread and pervasive, and given the court's obligation to view all inferences in a manner most hospitable to the Defendant, the statements of Kenney and Winslow fall far from establishing the existence of a practice or custom spanning over eight years. And, as discussed above, the statements attributed to Costigan and Daniello say nothing about the current policy or past practice. They refer ambiguously to "a discussion several years ago". While these

---

[11]  Based upon the memoranda themselves, assuming their accuracy, *no* correctional officers believed that as of 2003 the practice was to strip search misdemeanor detainees. Kenney stated "that *prior to* the procedural changes adopted in February 2001, it was her understanding that anyone . . . was to be strip searched if they were admitted to the general population". *Order at 15* (emphasis added). The memoranda say nothing about Costigan and Daniello's current (as of 2003) understanding, but only "a discussion several years ago". *Id.* Winslow's current understanding was that "he did not believe that any misdemeanor inmate could be strip searched". *Id. at 16.*

statements, if otherwise admissible, might be *relevant* to the question of whether or not there was

a widespread custom or practice, they are simply inadequate to support broad legal findings of

longstanding violations practiced by large numbers of jail personnel.  And, while the statements

relied upon by the court may support the proposition that "at least some corrections officers at

the Knox County Jail believed that strip searching detainees was the jail's practice", *id.* at 27,

these statements do not establish, as an undisputed fact, that there was a widespread or pervasive

practice over an eight year period because, again, Plaintiff submitted no evidence on what

percentage of the correctional staff population these officers represent, the nature of their duties

over the entire period of their employment, or  the time frames during which these few officers

may have harbored their beliefs.

> b.  The conclusion that Costigan and Daniello believed that they were to
> strip search all misdemeanor detainees in 2003 is not supported.

The decision states that the memoranda "establish that in 2003 Corrections Officers

Costigan and Daniello believed that they were to search all misdemeanor detainees".  *Id. at 27.*

The conclusion is not supported by the memoranda.  In pertinent part, the memoranda state that:

> [b]oth indicated that they recalled a discussion several years ago in
> which the Voyer and the DOC policies were mentioned and that
> the decision was made by someone (unidentified) to disregard the
> applicable policy and standard and continue to search all inmates,
> regardless of crime or class, if they were to be admitted to the
> general population.

*Plaintiff's Exhibit 20.*   There are no other statements attributable to either Costigan or Daniello.

The only statements attributed to those individuals indicate that "several years ago" (from 2003)

they recalled a discussion where an unnamed person said that applicable polices should be

disregarded. There is no time frame other than the reference to "several years ago", and certainly

nothing that would support the proposition that these individuals believed in 2003 that all

misdemeanor detainees should be searched.[12]  As is the case throughout, despite possessing this information, Plaintiff failed to pursue additional information from these or other officers through discovery.   Consequently, Plaintiff deprived herself and this Court of the bases on which to rest the Court's broad inferences.

      c.   The suggestion that there was a statement made by an unidentified individual to deliberately ignore established polices does not provide support for the finding that, as a matter of undisputed fact, there was a widespread practice of strip searching all misdemeanor detainees during the entire class period.

The reference in the Robbins' memoranda  to an unidentified individual instructing two correctional staffers to disregard an established policy leaves so many open questions as to foreclose reliance in the summary judgment calculus. At best, this evidence would support the inference  that one unidentified person told two people that search polices were to be disregarded.  There is no evidence as to who this person was, when the statement was made (other than "several years ago"), who other than the two identified persons heard the statement, or for what period of the statement, if implemented, had any affect on the actual search practices of the jail. While, with proper foundation, such statements might be relevant with respect to the question of whether such a policy or practice existed, they fall far short of eliminating all other reasonable inferences and thus permitting the conclusion reached by the court.

      5.   The intake/release logs do not establish an unconstitutional practice of the duration and breadth required by Supreme Court and First Circuit decisional law.

The decision states that "evidence of this unconstitutional practice can be easily verified from a review of the daily intake/release log entries." *Id. at 28.*  The court then recites the

---

[12]  As noted previously, in 2003 both Winslow and Kenney understood that, at a minimum, misdemeanor detainees could only be strip searched based upon reasonable suspicion. Kenney's understanding went as far back as February 2001, and the memoranda are silent as to when Winslow learned that there were limitations on strip searching misdemeanants.

following statistics: (1) that over six months seventeen persons charged with various Class E crimes were searched without suspicion, (2) over six months nine persons charged with Class D OUI were strip searched without suspicion, and (3) during those same six months six persons charged with Class D misdemeanors were searched without reasonable suspicion. Those facts do not support the conclusion that there was a widespread practice of unconstitutional strip searches.

### a. A "widespread and pervasive" finding is not compelled by the logs.

As an initial matter, the court concedes that the Plaintiff has failed to adduce any evidence that would allow a determination as to the percent of misdemeanor detainees that were strip searched out of the entire universe of detainees processed at the jail during the relevant time frame. *Id. at 28, n. 17.* The decision does not discuss the concept of "widespread and pervasive" articulated by the Supreme Court and the First Circuit. *See discussion, supra* at p. 3. Without that evidence, and without the ability to determine at least rough percentages, this Court cannot reach a legal conclusion about the frequency, pervasiveness or routineness of the searches. That Plaintiff failed to adduce such evidence on the summary judgment record is neither the Defendants' nor the Court's responsibility. In the absence of such evidence it is impossible to establish as a matter of undisputed fact that there was a widespread, pervasive, and well-settled practice.

It is noteworthy that, faced with the dearth of evidence submitted by the Plaintiff, the Court apparently did not consider, and certainly does not discuss, Defendants' Exhibit 70.[13] Here, the Defendants identify a great number of individuals who were processed but not strip searched, including individuals charged with aggravated assault, theft, stealing drugs, domestic

---

[13]  Defendants' Exhibit 70 is a table identifying inmates who would in some cases meet the class definition and in other cases not, and who were booked during the same time frame of those inmates contemplated by the Ward Affidavit, but who were not strip searched. *Defendants' Exhibit 70; Affidavit of Donna Campbell,* ¶¶ 14-16, July 8, 2005.

assault, terrorizing, escape, and conspiracy to traffic in cocaine.  Given that the record does not

indicate the percentage of misdemeanor detainees who were strip searched, and that the record

does contain substantial evidence of both misdemeanor and felony detainees who were not strip

searched, there is insufficient evidence on which to conclude that a "widespread and pervasive

practice" has been proved. The obviously conflicting evidence precludes summary judgment.

      b.  <u>One reasonable inference that can be drawn from the logs is that jail staff had at least a 90% compliance rate with search policies</u>.

Although Plaintiff's deficient proffer makes it impossible to determine precise

percentages of misdemeanor detainees that may have been strip searched in contravention of

established policy, the evidence submitted does support some inferences which may be drawn in

favor of the Defendants.

First, the court concluded that, "at least on a six-month sample during the relevant class

period, Defendants strip searched at least seventeen persons charged with various Class E crimes

without reasonable suspicion."  *Order at 28.*  That is slightly less than three per month.  The

intake/release logs in the records (*Plaintiff's Exhibit 2 and Defendants' Exhibits 1-45)* reveal

that, on average, at least one person charged with a Class E crime is processed at the jail every

day, for a total of approximately thirty per month.[14]  Using the number of persons searched as

determined by the court, and a conservative determination of the number of Class E

misdemeanants processed during the six month period, slightly less than ten percent of all Class

E misdemeanants are strip searched.[15]

---

[14] These figures are conservative, and do not include multiple charges for the same person at the same booking.

[15]  The court has concluded that these searches are without reasonable suspicion.  As noted previously, the record does not reveal whether or not there was reasonable suspicion for these searches.  Defendants do not concede that the Court's conclusion is correct.

Second, the court has determined that "with respect to detainees charged with Class D OUI, Defendants admit during these six sample months at least nine persons were strip searched without reasonable suspicion."[16] Stated differently, 1.3 persons per month who were charged with OUI were strip searched. Assuming one Class D OUI arrest per day, and therefore thirty per month, slightly more than one per cent of Class D OUI detainees were strip searched. Put otherwise, slightly under ninety-nine per cent of Class D OUI detainees were not strip searched.

Third, the court has concluded that "with respect to miscellaneous Class D misdemeanor detainees, Defendants admit that during these six sample months at least six persons were strip searched without reasonable suspicion."[17] That results in one Class D misdemeanor strip search per month. Again using the figure of one Class D misdemeanor detainee process per day, or thirty per month, slightly more than one per cent of these detainees were strip searched.

These analyses demonstrate that the very statistics on which the Plaintiff premised much of her motion can also be interpreted to the Defendants' benefit. Where the record must be viewed in a light most favorable to the Defendants, these statistics allow for the inference that the Defendants complied with their own search policy between ninety and ninety-nine percent of the time. Such an interpretation, to which the Defendants are entitled as a matter of law, necessarily excludes the Court's conclusion that "misdemeanants were routinely strip searched without reasonable suspicion". *Order* at 28, n.17.

      c.  <u>The intake/release logs do not support the conclusion that strip searches were done without reasonable suspicion.</u>

The decision also concludes, based upon the intake/release log entries, that not only was there an unconstitutional custom or practice of strip searching misdemeanor detainees, but that

---

[16] The Defendants have never admitted that these searches were without reasonable suspicion.

[17] *See supra* note 16

those detainees identified were strip searched "without reasonable suspicion". *Order* at 28, n.17. The Jail logs are silent as to whether or not those detainees identified were searched with or without reasonable suspicion. The fact that the logs do not document reasonable suspicion does not mean that it did not exist. Plaintiff has not demonstrated that the absence of documentation in the logs about reasonable suspicion means a search was conducted without such suspicion. The decision does not discuss how the court is led to the conclusion that these searches were without reasonable suspicion. Because the Jail logs are silent on this issue, it cannot be deemed an undisputed fact.

Viewed against the backdrop of the summary judgment standard which required that inferences drawn from underlying evidence be viewed in the light most favorable to the non-moving party, and against the municipal liability standard which sets a high bar for the Plaintiff, the summary judgment record demonstrates genuine disputes of material fact on the question of whether there was a custom or practice of strip searching misdemeanor detainees that was so widespread and pervasive that Sheriff Davey knew or should have known of it. The role of the court is not to assess credibility or weigh evidence, but rather to determine whether the moving party has met its burden of establishing through competent and admissible evidence that there are no disputed issues of material fact. The record in this case is rife with such disputed facts and summary judgment is inappropriate.

B. <u>The court's conclusion that Knox County failed to take any corrective action in response to evidence that its search policy may not have been uniformly implemented is not supported by the record.</u>

The court's decision criticizes measures undertaken by the Defendants to ensure that its official policy regarding *strip* searches of misdemeanor detainees was implemented. There are two primary flaws in the court's analysis. First, it focuses almost entirely on the time period of

2000 to 2001 and the efforts of the jail to respond to findings of noncompliance with DOC standards in the 2000 DOC jail inspection report. Second, although the court may be dissatisfied with the Defendants' efforts to ensure conformity with official Jail policy and Constitutional requirements, those efforts must be judged against the standard set forth in *Bordanaro v. Mcleod*: that is, whether, once the Defendants had knowledge of an unconstitutional custom or practice, they did *nothing* to end it. *Bordanaro v. McLeod*, *supra* at 1156. *See discussion supra* at p. 3. If, when viewed in the light most favorable to the Defendants, the record reflects evidence that the Defendants did *something* to end an unconstitutional practice, then there is a trial-worthy issue that precludes summary judgment.

1. The record demonstrates that the Defendants undertook at least eight initiatives to ensure compliance with their search procedures.

The court appears to place great emphasis on the fact that new procedures implemented in 2001 do not specifically declare that strip searches of misdemeanor detainees were to stop. The court concedes, however, as it must, that the new procedures were prompted by precisely that declaration. *Order* at 29. Indeed, that declaration was already embodied in official county policy which the new procedures were specifically designed to implement. And, importantly, the court itself acknowledges that "it could be argued that the direction to stop strip searching all misdemeanor detainees was implicit in the new procedures and training". *Id.* at 34. That concession is true not only of the new written procedures for implementing the policy, but also of the broad and comprehensive efforts undertaken by the county to ensure that, regardless of past practice, applicable constitutional norms[18] and official county policy would be recognized henceforth.

---

[18] Applicability of the Fourth Amendment to searches of detainees has not been established by the United States Supreme Court or the First Circuit. *See discussion, §III, infra* at pp.29-33.

The court has previously concluded that the official policies regarding searches are constitutional. *Order* at 26. Following both the 2000 jail inspection report and the *Miller* lawsuit, the Defendants undertook to strike a balance between the need to prevent the introduction of contraband into the general jail population on the one hand, and the enforcement of its search policies on the other hand.

First, the Defendants established written procedures designed to carry out the directives contained in their search policies.[19] As the court has noted, one inference that can be drawn from these procedures is that misdemeanor detainees could not be strip searched without reasonable suspicion.[20]

Second, the new procedures were provided to all correctional officers, *Order* at 30, and that at least those correctional officers who are identified in the record understood those procedures. Specifically, both correctional officers Kenney and Winslow understood, at a minimum, that reasonable suspicion was required before misdemeanor detainees could be strip searched. The Plaintiff has not identified a single employee who, after the implementation of the

---

[19] Two points here are noteworthy. First, the court's conclusion that the county "failed to promulgate new written procedures", *Order* at 31, is incorrect. Defendants' Exhibits 49-51 are precisely such procedures. Second, if the court is correct that there was a widespread and pervasive practice of strip searching all misdemeanor detainees without reasonable suspicion, then a declaration that such searches were to stop would, without more, appear to be merely redundant of the existing policies which already contained that admonition. The efforts which the Defendants took were designed to be more comprehensive and aggressive, providing specific procedures which correctional officers could follow to ensure the implementation of the policy, as opposed to merely turning up the volume and yelling "no" louder than had been done in the past.

[20] The court also draws a curious conclusion regarding these procedures: that they applied only to misdemeanor detainees who had not been strip searched. *Order* at 29. The court appears to suggest, without citation to the record, that other misdemeanor detainees were strip searched. Although the decision does not analyze why those detainees were not strip searched, it at least recognizes that they were not. Given that the court recognizes that these detainees were not strip searched, it is difficult to understand why the court will not at least allow the inference, as it suggests elsewhere in its opinion, that implicit in the procedures and their discussion of non-searched misdemeanor detainees that misdemeanor detainees were not to be strip searched.

new procedures, understood that all misdemeanor detainees were to be strip searched.[21]  Thus, not only can it be inferred from the text of the new procedures that misdemeanor detainees should not be strip searched absent reasonable suspicion, but the Robbins memorandum on which the Court rests much of its decision, easily supports the inference that Officer Kenney understood after February 2001 that misdemeanants could not be routinely strip searched and that Officer Winslow  had, at some undetermined point, reached the same conclusion. *Order* at 15-16, see, also, Plaintiff's Exhibit 20, ¶3 and ¶4.

Third, in addition to promulgating the new procedures and providing them to correctional staffers, the Defendants also afforded specific training in the implementation of the procedures. *Order* at 32.  The title of the training session was "Procedures for Pre-Arraignment Class D and E Detainees".  The court criticizes the training roster because it only identifies the subject matter of the training, the identity of those officers who attentions and the scores of their quizzes following the training.  The court observes that the roster does not specifically discuss the training itself or how long the session lasted.  Nevertheless, the fact that the training was provided shows that *something* was being done to ensure adherence to the policies. *Cf., Bordanaro v. McLeod,* supra at 1156.  Guided by the summary judgment standard, the court should have drawn the inference that the training was on the implementation of the procedures which the training roster identified.

Fourth, in addition to promulgating the procedures, providing them to correctional staffers, and providing training in the procedures, the county also tested the officers to ensure their proficiency.  *Id.* at 32.

---

[21]  The Plaintiffs chose not to depose any corrections officers about the policy or practice in the Jail.  Therefore, they have not presented the court with *any* evidence in that regard.

Fifth, after having promulgated the procedures, provided them to correctional staffers, trained the staffers in the procedures, and tested the staffers on their knowledge of the procedures, the county followed up all of those initiatives by providing the staff with a memorandum entitled "Helpful Hints on D and E Detainee Procedures". Again, the court is critical because the "'hints' never explicitly state that misdemeanor detainees shall not be strip searched". *Id.* at 33. However, the document itself actually demonstrates that the county was imposing restrictions on the ability to strip search detainees that go beyond constitutional norms applied by the court. Specifically, the "helpful hints" document states that "[r]equest by other law enforcement agencies for us to do a strip search *because they feel they have probable cause is a simple NO." Order* at 33 (emphasis added).

This document is particularly revealing of the efforts taken at the Jail to conform to Constitutional requirements. For, in its effort to comply with those standards, the Jail was refusing, in advance, to conduct strip searches which, if probable cause existed, would be validated by any Court.[22] Probable cause is, of course, much higher than the "reasonable suspicion" standard articulated by the First Circuit in *Swain v. Spinney,* 117 F.3d 1, 5 (1st Cir. 1996). Thus, the County was taking the position that even though law enforcement officers believed that they had probable cause to believe than an inmate was concealing contraband, the County would not conduct such searches.

Sixth, in addition to promulgating procedures to implement its constitutional policy, providing those written procedures to staffers, providing training in the procedures, conducting

---

[22] It bears mention, again, that the United States Supreme Court has never articulated a standard governing strip searches under the Fourth Amendment. That is because, as is discussed below, the Supreme Court has never held that pretrial detainees or arrestees possess Fourth Amendment protections against such searches. Not having ruled on this issue, of course, the Supreme Court has never set forth a Fourth Amendment-based standard governing such searches. See, e.g., *Illinois v. Lafayette,* supra, *Bell v. Wolfish,* 441 U.S. 520 (1979).

tests on the procedures, and providing hints to implement the procedures, the County also provided outside training for its employees by attorneys. Such steps should meet the *Bordanaro* standard of doing "something" in response to knowledge of unconstitutional practices. Even so, the Court, in an apparent shifting of the summary judgment burden and abandonment of the *Bordanaro* standard, found the County's efforts ineffective because the training materials contained the observation that "the general trend .[ . ]. that courts are identifying [is] that it is unreasonable to conduct a strip search for a person arrested for a traffic offense or other minor offense unless authorities have a reasonable suspicion that the arrestee is concealing weapons or contraband . . .", *Order* at 34,  As the Court put it, because the training materials left "room to conclude that the practice of strip searching misdemeanor detainees may be lawful", it could not, as a matter of law, "be understood as guidance directed at putting an end to the long-standing unconstitutional practice by Knox County" .  *Id.*

In addition to imposing a standard of perfection on the County found nowhere in Supreme Court or First Circuit law, the Court's dismissal of this training advice is at odds with summary judgment standards because there is another equally tenable inference from that advice: correctional staffers were being trained that the general trend in decisional law was to find strip searches of misdemeanor detainees unconstitutional unless reasonable suspicion existed.

Seventh, beyond promulgating new procedures, providing them to correctional staffers, training them in the procedures, testing them on the procedures, providing them with hints for implementing the procedures, and providing outside training, the county also monitored its own compliance with those procedures. That monitoring is evident from the very documents which the court relies upon in finding the existence of an allegedly widespread unconstitutional practice. Plaintiff's Exhibit 20 are memoranda penned by Richard Robbins. The genesis of the

memoranda was Robbins' review of search records to determine that misdemeanor detainees were not being strip searched unless there was reasonable suspicion. Plainly, Robbins was investigating a notation in an intake log indicating that a misdemeanor detainee had been strip searched. *Order at 15.* Having questions about the search of that particular inmate, Robbins interviewed the correctional officer who conducted the search. *Id.* The officer explained her correct understanding of the current search policy, including that misdemeanor pretrial inmates were only to be searched based upon articulable suspicion. *Id.* When the correctional officer indicated that earlier training led her to believe that all inmates should be searched, and that she did not recall the Raymond Voyer policy prohibiting misdemeanor searches without reasonable suspicion, Robbins followed up with a sergeant and records officer. *Id.* He also interviewed another correctional officer who was identified as having received the same training as Correctional Officer Kenney. *Id. at 15-16.* Robbins then attempted to memorialize the information gained through his investigation. *Id.*

Finally, the jail garbed misdemeanor detainees in color coded uniforms so that, for security purposes, they could be identified as detainees who had not been strip searched. *Order at 29, n.20; Davey Affidavit, § 21A.*

The court concludes that no corrective action was taken because the county did not specifically state in one document what already existed in other documents. However, as the court correctly notes, implicit in its new procedures was an admonition that misdemeanor detainees should not be strip searched without reasonable suspicion. Beyond that, the county undertook at least eight different measures to ensure that its policy was being properly implemented. It (1) promulgated procedures for implementing the policy, (2) provided those procedures to staffers, (3) provided training in the procedures, (4) tested staffers on the

procedures, (5) provided follow up with "helpful hints" in implementing the procedures and the policies, (6) had outside training provided correctional staffers, (7) monitored its adherence to the new procedures and the previously existing policies and investigated when a potential breakdown was identified, and (8) provided misdemeanor detainees who were not to be strip searched with yellow-colored jail uniforms "to specifically distinguish them as non-searched inmates." *Decision* at 29, n. 20; quoting, *Davey Affidavit* at ¶21A. .

Though the court may be dissatisfied with the efficacy of the corrective measures undertaken by the Defendants, it cannot be said that, as a matter of undisputed fact, *nothing* was done to end the practice. At a minimum, there is a triable issue in this particular.

2. The Court's analysis of corrective action relies on evidence limited to discrete points in time but the decision applies to the entire class period which begins in 1996 and is open-ended.

The court's analysis relies almost exclusively on the actions taken by the county in response to the *Miller* lawsuit and the 2000 DOC jail inspection report. Nonetheless, the Order applies equally throughout the class period from 1996 to the present. Left out of the discussion is the jail's response to the 1994 report which resulted in substantial revisions to jail search policies which became effective in January 1995, review of those policies in January of 1996, and the absence of any evidence showing a need for either further revisions or corrective action until at least the time of the *Miller* litigation. Moreover, even though the decision appears to apply to 2003, 2004, 2005, and continuing, there is no evidence in the record as to any unconstitutional searches during those years. Indeed, the primary evidence which the court has based its decision on either contains no discussion of searches in that time frame, or, to the extent that there is such discussion, demonstrates that the searches conformed to the standards which the court has assumed apply.

Specifically, the *Ward* affidavit and the intake/release logs to which that affidavit refers contain no entries for 2003 forward. Moreover, as noted above, the Robbins memoranda relied on so heavily by the court to establish the existence of a widespread practice demonstrate that beginning in February of 2001 correctional staffers understood they should not strip search misdemeanor inmates without reasonable suspicion and that they continued to have that understanding as recently as 2003.

C. The court's finding that the policy regarding strip search felony detainees is unconstitutional is directly contradicted by District of Maine and First Circuit decisional law.

In its Order the court concludes that because applicable jail policies do not differentiate between violent felonies and other non-violent, non-weapon and non-drug related felonies, the policy is unconstitutional. The court observes that "the First Circuit has not directly addressed the appropriate test for the validity of a strip search during the booking process at a local jail and incident to a felony arrest . . .". *Order* at 24. Nevertheless, the court concluded that "with respect to detainees charged with a non-violent, non-weapon, non-drug felony, the particularized reasonable suspicion test is applicable . . .". *Id.* Importantly, the court neglected consideration of United States District Court and First Circuit decisional law which discusses the specific Knox County Jail policy which this court now declares unconstitutional. In *Miller v. Kennebec County*, 63 F. Supp.2d 75, 84 n.11 (D.Me. 1999) the court specifically found the policy constitutional.[23] *Id.* The First Circuit reached a like conclusion. *Miller v. Kennebec County*, 219 F.3d 8, 12 (1st Cir. 2000) (". . .the county's written policy[] conform to constitutional standards. . ."). This Court is therefore bound to find this portion of the policy constitutional.

---

[23] The *Miller* fact pattern took place in April 1996. Miller, 63 F. Supp.2d at 77-78. As this court has noted, the search policies in question were made effective in January of 1995. *Order at 11.* They were again reviewed in January of 1996 and no further changes were made. *Id.* at 11 n.5.

## II. SUMMARY JUDGMENT SHOULD NOT HAVE BEEN GRANTED AGAINST SHERIFF DAVEY INDIVIDUALLY WITH RESPECT TO STRIP SEARCHES OF DETAINEES CHARGED WITH MISDEMEANORS.

The court's determination that Sheriff Davey is individually liable for strip searches of misdemeanor detainees is initially premised on the court's conclusion that there was a widespread and pervasive practice of strip searching misdemeanor detainees without reasonable suspicion, that the practice was so widespread and pervasive that Sheriff Davey had actual or constructive knowledge of it and yet did nothing to prevent it. This issue has already been addressed.

In addition to the reasons that the governmental entity should not be liable, Sheriff Davey himself should not be liable because the record does not support a conclusion that, as a matter of law, his conduct amounts to either deliberate indifference or willful blindness to an unconstitutional practice of his subordinates. *Order at 4* (internal citation omitted).

The court's conclusion that Davey was recklessly indifferent and "allowed the practice to persist for years and caused the violation of the constitutional rights", *Order at 47*, is reached by the same analysis as the court employed in order to find municipal liability. Specifically, the court focuses on the time frame after the 2000 jail inspection report and identifies several discrete pieces of evidence which, according to the court, lead to the "unmistakable" and "undisputed" conclusion that Davey knew of the practice, acquiesced in it, failed to do anything to stop it, and was therefore deliberately indifferent. These now familiar pieces of evidence include (1) the promulgation of procedures designed to implement the county's search policies, (2) daily log entries reflecting strip searches of a small percentage of misdemeanor detainees ostensibly without reasonable suspicion, (3) the 2001 letter from Jail Administrator Robbins to police chiefs, (4) the two interdepartmental memoranda authored in 2003 by Jail Administrator

Robbins, and (5) Davey's failure to provide remedial training. *Order at 45-47*. For the same reasons that those items of evidence are insufficient to establish undisputed facts with respect to governmental entity liability, they fall far short of the mark required to establish the individual liability of Sheriff Davey.

First, as the court correctly notes, one inference that can be drawn from the new procedures promulgated in 2001 is that strip searches of misdemeanor detainees are prohibited. *Order at 34*. And, as discussed earlier, the express prohibition which the court desires already existed in at least two separate jail policies (Defendants' Exhibits 48 and 54).

Second, the intake/release logs relied on by the court demonstrate an approximately ninety percent or better compliance rate with the Defendants' established policies.

Third, the reliance on the 2001 letter from Jail Administrator Robbins to local police chiefs is misplaced. The court has concluded that "obviously, before the local departments received these memoranda, corrections officers conducted strip searches of misdemeanor detainees on the request of the arresting officer". Left out of this discussion is whether or not such strip searches were based upon reasonable suspicion. As discussed previously, *supra* at pp. 7-8, one reasonable inference that can be drawn from the letter is that these searches were conducted because the officer had reasonable suspicion to believe that the detainee was concealing contraband. Additionally, the searches were only conducted occasionally. *Order at 14*.

Fourth, the decision relies upon the 2003 interdepartmental memoranda to "support the conclusion that corrections officers believed that they should ignore the policy directing that misdemeanor detainees should not be strip searched without reasonable suspicion *and continued to strip search all detainees admitted to the jail*. *Order at 46-47* (emphasis added). These

memoranda describe the knowledge and belief of only two correctional officers. And, based upon these memoranda, it is apparent that as of approximately February 2001, these officers believed, at a minimum, that misdemeanor detainees could only be strip searched upon reasonable suspicion.[24] Statements attributed to two other correctional staffers contain a single reference to an assertion that admittedly constitutional policies should be ignored. The timing of this assertion is unknown, the number of persons to whom the statement was made is unknown, the identity of the person making the statement is unknown, and whether or for what period of time the policies were ignored is unknown. With these significant variables unaccounted for, the record does not lend itself to the definite and unyielding conclusion reached by the court.

The Court's treatment of the Robbins' memoranda overlooks the manifest inference that the unnamed individual who allegedly advised Officers Kenney and Winslow to disregard the Voyer policy *knew* that the advice was in derogation of official jail policy and that the officer felt that overruling the Voyer policy *sub silentio* was justified by the risks that failure to conduct such searches would create for Jail staff and inmates. *See Exhibit 20, ¶4,* statements of Sgt. Jay Costigan and R/O Cheryl Daniello. Under these circumstances, it is an entirely reasonable inference that that individual did not want his or her insubordination broadcast to the Jail Administrator or to Sheriff Davey. That Major Robbins was commissioned to do his investigation and documented this information (on which the Court relied) is objective evidence both that the training officer's unofficial policy had been successfully kept from the Jail Administrator and Sheriff Davey, and that the Jail Administrator was vigilant in uncovering and investigating the alleged transgression.

---

[24] Indeed, Winslow believed that misdemeanor detainees could not be strip searched at all. *Order at 16.*

Finally, the court characterizes Davey's conduct as "fail[ing] to take any corrective action directed at eradicating this pervasive practice . . .". *Order at 47*. To the contrary, as chronicled above, *supra* at pp. 17-23. Davey took numerous steps: he directed the promulgation and implementation of policy changes in 1994, 1995, and 1996, he directed the promulgation and implementation of additional procedures to enforce those policies in 2001, the new procedures were provided to correctional staffers, training in the procedures was provided to staff, staff were tested on their knowledge of the procedures, helpful hints were provided to assist staff in implementing the policies, outside training was provided to staff, and the jail administrator himself monitored compliance with the policy and investigated potential irregularities. All of this evidence creates, at a minimum, a genuine issue of fact as to whether Davey undertook corrective measures in order to ensure compliance with the county's search policies.

Finally, as discussed previously, the court's analysis focuses almost entirely on the 2001 time frame. There is little discussion of the practice or procedure before 2001 and, although the court has concluded that the practice which it contends exists continues unabated, there is no evidence of any strip searches of misdemeanor detainees in the absence of reasonable suspicion after 2002. Considering that, as of 1999, the First Circuit determined that Sheriff Davey could not be liable for any allegedly unconstitutional strip searches, it was erroneous for the court to determine that he can now be held both retroactively and prospectively liable.

Indeed, as a matter of law, Davey cannot be liable for any practice or custom that existed as of 1999, the date of the decision in the *Miller* case. And, focusing on the time frame from that point hence, the previous discussion demonstrates the proactive measures undertaken by jail officials at Davey's direction to enforce the policy which both this court and the First Circuit have declared constitutional.

### III. THE DECISION ERRONEOUSY ASSUMES THAT THE SUPREME COURT HAS HELD THAT PRETRIAL DETAINEES HAVE A FOURTH AMENDMENT RIGHT AGAINST STRIP SEARCHES AND, BECAUSE OF THAT ASSUMPTION, FAILED TO DETERMINE, AS A THRESHOLD ISSUE, WHETHER SUCH PERSONS POSSESS AN EXPECTATION OF PRIVACY AS REQUIRED BY SUPREME COURT AND FIRST CIRCUIT CASE LAW.

At two points in its decision, this Court referred to the precedential effect of *Bell v. Wolfish,* 441 U.S. 520 (1979). First, this Court stated that 25 years previous, "…the Supreme Court laid out a balancing test under the Fourth Amendment to determine the reasonableness of a strip search which requires the weighing of the 'need for the particular search against the invasion of personal rights that the search entails.'" *Order* at 21 (citing *Bell v. Wolfish,* 441 U.S. at 559). This Court then went on to state, "[s]pecifically, [the] *Bell v. Wolfish* balancing test requires courts to 'consider the scope of the particular intrusion, the manner in which it is conducted, the justification for initiating it, and the place in which it is conducted.'" *Order* at 21 (citing *Bell v. Wolfish,* 441 U.S. at 559).

At a later point, this Court considered the constitutionality of strip searches of persons charged with felonies that did not involve drugs, weapons or violence. The decision noted that neither the Supreme Court nor the First Circuit had ruled on the constitutionality of strip searches of persons so charged. *Order* at 42. In holding that strip searches of such persons must be supported by "reasonable particularized suspicion," this Court stated that, "Fourth Amendment jurisprudence concerning the standard for determining the reasonableness of a strip search has been rather consistent for many years." *Id.* In support of this assertion, the decision once again cited *Bell v. Wolfish. Id.* It also cited seven circuit court decisions.[25]

---

[25] Those decisions include: *Swain v. Spinney*, 117 F.3d 1, 7 (1st Cir. 2003); *Justice v. City of Peachtree*, 961 F.2d 188, 192 (11th Cir. 1992); *Masters v. Crouch*, 872 F.2d 1248, 1255 (6th Cir. 1989); *Weber v. Dell*, 804 F.2d 796, 802 (2d Cir. 1986); *Stewart v. Lubbock County*, 767 F.2d 153, 156 (5th Cir. 1985); *Giles v. Ackerman*, 746 F.2d 614, 615 (9th Cir. 1984); *Mary Beth G. v. City of Chicago*, 723 F.2d 1263, 1273 (7th Cir. 1983).

This Court's assertion that *Bell v. Wolfish* "required" the application of a reasonableness test to determine the constitutionality of a strip search mischaracterizes *Bell* and is inconsistent with First Circuit authority interpreting *Bell.*  Likewise, this Court's assertion that *Bell* set a "standard" for determining finally (rather than preliminarily) the constitutionality of a strip search is also inconsistent with both *Bell* and First Circuit authority interpreting *Bell.*[26]

Finally, in considering the novel question of whether persons detained for non-violent, non-drug, non-weapon felonies have a Fourth Amendment expectation of privacy against strip searches, this Court failed to apply the expectation of privacy test set forth in *Katz v. United States,* 389 U.S. 347,  361 (1967) (Harlan, J. concurring); instead, this Court assumed that such persons possessed a Fourth Amendment expectation of privacy and proceeded directly to a Fourth Amendment balancing test.  *Order* at 41-42. This aspect of the decision is inconsistent with *Bell*, post-*Bell* Supreme Court decisions, and First Circuit precedent.

The *Bell* Court considered two Fourth Amendment claims from pretrial detainees: a challenge to cell searches and a challenge to post-contact visit strip searches.  Both were decided by assuming "arguendo" that the pretrial detainees held such Fourth Amendment rights and then evaluating the detention facility practices and policies against a reasonableness standard.  *Bell v. Wolfish*, 441 U.S. at 556 and 558-559 (citing *Carroll v. United States,* 267 U.S. 132 (1925)).  In both cases, the detention facility practices survived Fourth Amendment scrutiny rendering unnecessary a decision on the Fourth Amendment claims on the merits.

---

[26]  Moreover, the Supreme Court has recognized the continuum of custody inherent in the arrest status from the time of arrest to ultimate incarceration.  *Illinois v. Lafayette*, 462 U.S. 640, 644 (1983).  There, the court expressly reserved circumstances in which a strip search of an arrestee would be appropriate. *Id.* at 646, n.2.  The arrestee in *Lafayette* was at a point in the continuum short of incarceration at the jail. That the court declined to address the question of whether and when a strip search of an arrestee would be permissible, four years after its decision in *Bell v. Wolfish*, underscores the fact that the issue remains undecided, and that the analysis is not necessarily within the confines of the Fourth Amendment.

To this day, *Bell* remains the only strip search case decided by the Supreme Court. That is not true of the Fourth Amendment cell search issue. The Supreme Court considered that question in *Hudson v. Palmer*, 468 U.S. 517 (1984). The *Hudson* Court expressly noted that *Bell* had *not* decided the Fourth Amendment cell-search issue. *Id.* at 524 n.6. Consequently, the Court announced that it would decide the Fourth Amendment cell search issue on the merits. *Id.* at 524-25. In doing so, the *Hudson* Court applied the expectation of privacy test as articulated in *Katz v. United States.* The Court refused to recognize a Fourth Amendment cell-based privacy interest and denied the Fourth Amendment claim. *Id.* at 525-30.

The First Circuit expressly recognized that *Bell v. Wolfish* did not reach the Fourth Amendment issue on the merits. *See United States v. Chamarro*, 687 F.2d 1, 3 (1st Cir.1982), *cert. denied*, 459 U.S. 1043 (1982); *Bonitz v. Fair*, 804 F.2d 164, 170 (1st Cir.1986) (quoting *Bell v. Wolfish*, 441 U.S. at 558-559); *Arruda v. Fair*, 710 F.2d 886, 886 (1st Cir. 1983).

The First Circuit's understanding of the limitations of *Bell v. Wolfish* is clearly demonstrated in *Blackburn v. Snow*, 771 F.2d/556 (1985). In *Blackburn,* the First Circuit recognized that no controlling authority had established that a visitor to a jail had a Fourth Amendment-protected expectation of privacy against a blanket strip search rule. Had *Bell* held that pretrial detainees had such an expectation of privacy, that logic would have been applied *a fortiori* to the visitors in *Blackburn,* who were unquestionably "free citizens." *Id.* at 563. In other words, *Bell* would have controlled and decided the issue.

Acknowledging that no there was no controlling law, the First Circuit in *Blackburn* followed *Hudson v. Palmer* and applied an "expectation of privacy" test in accordance with *Katz v. United States. Blackburn v. Snow,* 771 F.2d. at 562-64. Therefore, for all categories of

arrestees, this Court should employ the same sequence of analysis used by the Supreme Court in *Hudson v. Palmer* and by the First Circuit in *Blackburn v. Snow.*

In considering the novel question of whether *vel non* non-violent, non-drug, non-weapon arrestees possess a Fourth Amendment privacy right against strip searches, consideration should also be given to those Supreme Court cases dealing with the Fourth Amendment rights of arrestees from arrest to booking and incarceration. *See*, *e.g.*, *Illinois v. Lafayette,* 462 U.S. 640 (1983). Where a detainee is to be introduced into the general jail population, express consideration should be given to the nature of that population and the risks inherent in detention facilities. *See*, *e.g., Illinois v. Lafayette*, 462 U.S. at 646, *Bell v. Wolfish,* 441 U.S. at 546, n.28 and 559 ; *see also DiMarzo v. Cahill*, 575 F.2d 15, 18 (Campbell, J., concurring); *Feeley v. Sampson,* 570 F.2d 364, 367 (1st Cir. 1978); *United States v. Klein,* 522 F.2d 295, 300-301 (1st Cir. 1976); *cf., DeShaney v. Winnebago County Department of Social Services,* 489 U.S. 189, 198-99 (1989) (observing that jail environments can be dangerous and noting that governmental entity would have affirmative duties to protect persons in the custodial context). In reviewing jail policy on such procedures, this Court should also require the Plaintiff to produce "substantial evidence" that jail administrators have exaggerated their response to the security considerations on which the policy is premised. *Bell v. Wolfish,* 441 U.S. at 557, n. 38.

For the foregoing reasons, Defendants move that this Court vacate its decision recognizing Fourth Amendment-based limitations on strip searches of misdemeanor detainees and detainees held on non-drug, non-violent, and, non-weapon felonies and consider the threshold Fourth Amendment issues for each group consistent with *Hudson v. Palmer* and *Blackburn v. Snow* as indicated herein.

## CONCLUSION

This court should reconsider so much of its decision as granted Plaintiff's Partial Motion for Summary Judgment for the following reasons: (1) the Defendants were not afforded the benefit of the summary judgment standard because inferences which could have been drawn from facts of record in favor of the Defendants were ignored, (2) because the court reached conclusions and made findings not supported by the summary judgment record, (3) legal conclusions relative to strip searches of felony detainees are contrary to Maine District Court and First Circuit decisional law, and (4) this court misinterpreted and misapplied *Bell v. Wolfish* and First Circuit law interpreting and applying *Bell v. Wolfish*, resulting in an assumption that the Fourth Amendment privacy requirements applied to the categories of detainees listed in the class certification and failing to apply an expectation of privacy analysis.

The court's Order Granting in Part and Denying in Part Plaintiff's Motion for Partial Summary Judgment should be vacated and Plaintiff's Motion for Partial Summary Judgment should be denied in its entirety.

Dated: February 9, 2006

WHEELER & AREY, P.A.

By:_____/s/ Peter T. Marchesi _____
    Peter T. Marchesi, Esq.
    P.O. Box 376
    Waterville, Maine  04903-0376

MONAGHAN LEAHY, LLP

By:_____/s/ John J. Wall, III_____
    John J. Wall, III, Esq.
    95 Exchange Street, P.O. Box 7046
    Portland, ME 04112-7046

    Attorneys for Defendants

UNITED STATES DISTRICT COURT
District of Maine

|                                      |     |                          |
|--------------------------------------|-----|--------------------------|
| LAURIE TARDIFF                       | )   | Docket No.  02-251-PC   |
|                       Plaintiff      | )   |                          |
|                                      | )   |                          |
| v.                                   | )   |                          |
|                                      | )   |                          |
| KNOX COUNTY, DANIEL DAVEY,           | )   |                          |
| JANE DOE and JOHN DOE,               | )   |                          |
|                       Defendants     | )   |                          |
|                                      | )   |                          |

## CERTIFICATE OF SERVICE

I hereby certify that on February 9, 2006, I electronically filed with the Clerk of Court using the CM/ECF system Defendants' Motion for Leave to File Memorandum of Law in Support of Motion for Reconsideration in Excess of Page Limits and Defendants' Motion for Reconsideration of Order Granting in Part and Denying in Part Plaintiff's Motion for Partial Summary Judgment.  The Court will send notification of such filing(s) to the following:

SUMNER LIPMAN, ESQ.- slipman@lipmankatzmckee.com
DALE THISTLE, ESQ.- dthistle@verizon.net
ROBERT STOLT, ESQ.- rstolt@lipmankatzmckee.com
JOHN WALL, ESQ. - jwalol@monaghanleahy.com

Dated: February 9, 2006                              ___/s/ Peter T. Marchesi_____
                                                     Peter T. Marchesi, Esq.
                                                     Wheeler & Arey, P.A.
                                                     Attorney for Defendants
                                                     27 Temple Street, P.O. Box 376
                                                     Waterville, ME 04903-0376
cc: Malcolm Ulmer
    Timothy Woodcock, Esq.
    Daniel Davey
    Jane Desaulniers